# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| BOARD OF TRUSTEES, | ) | |
| SHEET METAL WORKERS' | ) | |
| LOCAL 9 PENSION TRUST, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:23-cv-03458-NYW-SBP |
| v. | ) | |
| | ) | |
| AMERICAN VETERAN HEATING & AIR, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF TRACI MOURITSEN IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

I, Traci Mouritsen, pursuant to 28 U.S.C. § 1746, declare:

1.      I am a Claims Administration Team Lead for Rehn & Associates ("Rehn"), which is the third-party administrator for the Sheet Metal Workers' Local 9 Pension Trust (the "Pension Fund"); Colorado Sheet Metal Workers' Local 9 Health Fund (the "Health Fund"); and the Colorado Sheet Metal Workers Training Fund (the "Training Fund" and, collectively with the Pension and Health Funds, the "ERISA Funds") and provides certain administrative services to the SMART Local 9 Vacation Plan (the "Vacation Plan"); the Colorado Sheet Metal Industry Fund (the "Industry Fund"); and the SMACNA Colorado Drug Testing Fund (the "Drug Testing Fund," and collectively with the ERISA Funds, Vacation Plan, and Industry Fund, the "Funds"). Rehn is responsible for collecting and remitting employer contributions to the Funds.

2.      I am over the age of 18, and I am competent to testify on the matters stated herein. I am familiar with the obligations of employers, including Defendant American Veteran Heating & Air ("Defendant"), to pay monthly contributions to the Funds. The facts stated below are based on my personal knowledge. I make this declaration in support of the Motion for Default Judgment being filed by the Plaintiffs to this action.

23053616v4

3.      Each of the ERISA Funds is a multiemployer jointly administered labor-management employee benefit plan created and maintained pursuant to Section 302(c)(5) of the LMRA, 29 U.S.C. § 186 (c)(5), and a "multiemployer plan" as defined in Section 3(37) of ERISA, 29 U.S.C. § 1002 (37). The ERISA Funds are employee benefit plans within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and employee welfare benefit plans or employee pension benefit plans within the meaning of Sections 3(1) or 3(2) of ERISA, 29 U.S.C. §§ 1002(1) or (2), maintained for the purpose of providing retirement, medical, accident, disability, or apprenticeship and related benefits to eligible participants and their beneficiaries.

4.      At all relevant times, International Association of Sheet Metal, Air, Rail, and Transportation Workers' Local 9 ("Local 9") has been the exclusive collective bargaining agent for a unit of Defendant's sheet metal employees.

5.      At all relevant times, Defendant has been a party to a CBA with Local 9 covering Defendant's sheet metal employees.  A true and correct copy of Defendant's CBA is attached hereto as **Exhibit A**.

6.      Defendant's CBA provides that it shall "remain in full force and effect until the 30th day of June 2019, and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date.  In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party." (*See* Ex. A at p. 43)

7.      Neither party to Defendant's CBA has terminated it pursuant to that provision in the CBA and so the CBA, including Defendant's obligations to contribute to the Funds, continues in full force and effect.

8.      The CBA obligates Defendant to pay contributions to the Funds.

2

9.      Article 8, Section 24(c) of the CBA provides that contributions to the Funds are due no later than the twentieth (20th) day of each month following the month in which the covered work is performed.   That section of the CBA further requires Defendant to transmit its contributions to the Funds "together with a remittance report containing such information, in such manner, and on such form as may be required by a fund's Board of Trustees."  (*See* Ex. A at p. 30).

10.      Article 8, Section 24(e) of the CBA provides that the Defendant is bound to the provisions of the Agreement and Declaration of Trust of each of the ERISA Funds (collectively, the "Trust Agreements"), which are incorporated by reference into the CBA, and to the actions of the Trustees. (*See* Ex. A at pp. 30-31)

11.      Article 8, Section 24(f) of the CBA provides that Defendant is bound to retain records and to permit auditors authorized by the Funds to inspect Defendant's payroll records to ensure compliance with its obligations to the Funds.  (*See* Ex. A at p. 31).

12.      Article 8, Section 24(h) of the CBA provides that, in the event the Defendant defaults or becomes delinquent in any of its obligations to the Funds, the Defendant shall be liable for such penalties and costs as may be provided for by the Trust Agreements, resolutions, and policies of the respective Trustees, including, but not limited to, interest, liquidated damages, and all costs of collection including reasonable attorney's fees and accounting fees.  (*See* Ex. A at p. 31).

13.      At all relevant times, the Collection Policy of each of the ERISA Funds, adopted by the Trustees pursuant to their authority under the ERISA Funds' respective Trust Agreements, to which Defendant is contractually bound, has provided that an employer's monthly contribution is delinquent if the completed remittance report and accompanying payment due the ERISA Funds

are not received by the Funds after the twentieth (20th) day of the month following the month in which the covered work is performed. A true and correct copy of the Collection Policy is attached hereto as **Exhibit B**.

14.     At all relevant times, the Collection Policy of each of the ERISA Funds has provided that an employer delinquent in its monthly contributions to the ERISA Funds is liable for: interest at the rate of ten percent (10%) per annum and liquidated damages at the rate of twenty percent (20%) of the delinquent contributions, and the ERISA Funds' attorneys' fees and costs. (*See* Ex. B).

15.     Article 8, Section 12(B) of the CBA further provides that delinquent payments to the Vacation Plan shall be "subject to . . . interest, liquidated damages, attorney's fees and other costs of audit and collection on the same terms and in the same amount as provided by the collection policy of the SMART Local 9 Benefit Fund, as may be amended from time to time, and which policy is hereby incorporated by reference by the parties to this Agreement." (*See* Ex. A at p. 22).

16.     The Funds must rely, in the first instance, upon the accuracy of the contributing employers, such as Defendant, in reporting hours worked and paid, and in properly calculating and reporting the contributions owed on behalf of their covered employees.

17.     Without accurate information, the Funds cannot determine the amount of the monthly contributions due to the Funds or the participants' eligibility for benefits.

18.     Defendant is currently delinquent in making its contractually-mandated contributions to the Funds for work performed for the months of July 2022 through November 2022, and January 2023 through March 2023 (the "Current Delinquencies"). Based upon the contribution reports that Defendant has submitted, Plaintiffs have determined that Defendant owes

4

a combined amount of $83,216.98 to Plaintiffs as a result of the Current Delinquencies, inclusive of interest through May 31, 2024 and liquidated damages but excluding attorneys' fees and costs, including the following amounts owed to each of the Funds:

    a.    $21,784.43 to the Pension Fund, including $16,076.23 in principal contributions, $3,215.25 in liquidated damages, and $2,492.95 in interest through May 31, 2024; and

    b.    $47,476.72 to the Health Fund, including $35,039.94 in principal contributions, $7,007.99 in liquidated damages, and $5,428.79 in interest through May 31, 2024; and

    c.    $6,052.77 to the Training Fund, including $4,468.02 in principal contributions, $893.60 in liquidated damages, and $691.15 in interest through May 31, 2024; and

    d.    $5,958.37 to the Vacation Plan, including $4,394.97 in principal contributions, $878.99 in liquidated damages, and $684.41 in interest through May 31, 2024; and

    e.    $1,785.20 in principal contributions to the Industry Fund; and

    f.    $159.49 in principal contributions to the Drug Testing Fund.

19. Additionally, Defendant has failed to pay contributions to the Fund for any months for November 2023 to present (the "Subsequent Delinquencies").

20. Of those months that comprise the Subsequent Delinquencies, the only one for which Defendant even submitted remittance reports identifying the amount of work performed by its covered employees, and the amount of contributions owed to the Funds, was for November

2023, which identified that Defendant owed a total of $4,462.02 in contributions to the Funds for the month of November 2023, including the following:

        a.     $1,075.12 to the Pension Fund; and

        b.     $2,645.11 to the Health Fund; and

        c.     $333.72 to the Training Fund; and

        d.     $261.25 to the Vacation Plan; and

        e.     $136.38 to the Industry Fund; and

        f.     $10.44 to the Drug Testing Fund

21.     However, despite the fact that Defendant submitted payment of $4,462.02 to the Funds for its November 2023 contributions, that payment was returned because Defendant lacked sufficient funds in its bank account to cover the payment that was made. Accordingly, Defendant's November 2023 contributions to the Funds remain delinquent.

22.     For each of the months of December 2023 through March 2024, Defendant has failed to submit either remittance reports or pay contributions to the Funds. Until such time as remittance reports are actually received for a given month, then the Funds' policy is to estimate that the contributions that are owed are the same as those that were reported for the most recent month for which reports were submitted. Accordingly, although the exact amount of contributions owed by Defendant for the Subsequent Delinquencies is currently unknown, the Funds estimate that Defendant owes $4,462.02/month in contributions to the Funds for each month between December 2023 and March 2024.

23.     As a result, the Funds currently estimate that Defendant owes a total of $27,178.60 to the Fund for the Subsequent Delinquencies, inclusive of interest through May 31, 2024 and

liquidated damages but excluding attorneys' fees and costs, including the following amounts owed

to each of the Funds:

     a.     $6,588.57 to the Pension Fund, including $5,375.60 in principal contributions, $1,075.12 in liquidated damages, and $137.85 in interest through May 31, 2024; and

     b.     $16,209.82 to the Health Fund, including $13,225.55 in principal contributions, $2,645.11 in liquidated damages, and $339.16 in interest through May 31, 2024; and

     c.     $2,045.11 to the Training Fund, including $1,668.60 in principal contributions, $333.72 in liquidated damages, and $42.79 in interest through May 31, 2024; and

     d.     $1,601.00 to the Vacation Plan, including $1,306.25 in principal contributions, $261.25 in liquidated damages, and $33.50 in interest through May 31, 2024; and

     e.     $681.90 in principal contributions to the Industry Fund; and

     f.     $52.20 in principal contributions to the Drug Testing Fund.

24.     Finally, the Funds also engaged Legacy Professionals LLP, Certified Public Accountants ("Legacy") to conduct an audit of Defendant's payroll records for the period January 1, 2020 through March 31, 2023 (the "Audit"). A copy of Legacy's audit report (the "Audit Report") is attached hereto as **Exhibit C**. The Audit Report identified that Defendant failed to pay all contributions that it owes to the Funds, such that it also owes additional amounts to the Funds as determined by the Audit (the "Audit Delinquencies").

25.    As identified by the table contained on Page 5 of the Audit Report (Ex. C, p. 5) (the "Table"), the Audit identified that Defendant owes the following amounts of principal Audit Delinquencies to each of the Funds:

    a.    $14,114.66 in principal contributions to the Pension Fund, which is inclusive of the amounts listed on the Table as "Local Pension" and "Loc. Pen. Non-Accrual"; and

    b.    $40,586.91 in principal contributions to the Health Fund, which is inclusive of the amounts listed on the Table as "H&W" and "PSL" (which refer, respectively, to Health and Welfare and Personal Sick Leave); and

    c.    $3,480.66 in principal contributions to the Training Fund, which is inclusive of the amounts listed on the Table as "Local Training"; and

    d.    $5,191.57 in principal contributions to the Vacation Plan, which is inclusive of the amounts listed on the Table as "Vacation"; and

    e.    $1,314.34 in principal contributions to the Industry Fund, which is inclusive of the amounts listed on the Table as "IFUS"; and

    f.    $217.46 in principal contributions to the Drug Testing Fund which is inclusive of the amounts listed on the Table as "Drug Test."

26.    The Table also reflects $10,095.94 owed as "Assessment." Those are amounts owed to Local 9; not the Funds.

27.    As a result, Defendant continues to owe a total of $91,095.13 to the Fund for the Audit Delinquencies, inclusive of interest through May 31, 2024 and liquidated damages but excluding attorneys' fees and costs, including the following amounts owed to each of the Funds:

8

a.   $19,720.36 to the Pension Fund, including $14,114.66 in principal contributions, $2,822.93 in liquidated damages, and $2,782.77 in interest through May 31, 2024; and

b.   $57,615.23 to the Health Fund, including $40,586.91 in principal contributions, $8,117.38 in liquidated damages, and $8,910.94 in interest through May 31, 2024; and

c.   $4,885.88 to the Training Fund, including $3,480.66 in principal contributions, $696.13 in liquidated damages, and $709.09 in interest through May 31, 2024; and

d.   $7,341.86 to the Vacation Plan, including $5,191.57 in principal contributions, $1,038.31 in liquidated damages, and $1,111.98 in interest through May 31, 2024; and

e.   $1,314.34 in principal contributions to the Industry Fund; and

f.   $217.46 in principal contributions to the Drug Testing Fund.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Traci Mouritsen

23053616v4

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 29, 2024, the foregoing was served by U.S. Mail and by email upon the following party at the mailing address it has registered with the Colorado Secretary of State.

American Veteran Heating & Air
150 Cascade Ct
Unit B
Colorado Springs, CO  80907
Email:  info@americanveteranheatingandair.com
*Defendant*

*/s/ Richard S. Siegel*
Richard S. Siegel

# EXHIBIT A

DWAYNE STEPHENS, Business Manager, State of Colorado

Jason Wardrip, Business Representative, Denver

Leonard Martinez Business Representative, Denver

Randy Mitchell, Business Representative, Southern & Western Colorado

**DENVER**
Meeting Dates
First Wednesday of every Month - 6:30 p.m.

**COLORADO SPRINGS/PUEBLO**
Meeting Dates
1st Tuesday following every Denver Meeting – 5:30 p.m.

**Grand Junction**
Meeting Dates
2nd Friday of every odd month 5:30 p.m.

**HOME OFFICE**
7510 West Mississippi Avenue, Suite 200, Lakewood, CO  80226
PHONE (303) 922-1213
FAX (303) 922-1398
STATE TOLL FREE 1 (888) 831-1213

**MAILING ADDRESS**
P. O. Box 27910, Denver, CO  80227-0910

**COLORADO SPRINGS OFFICE**
1420 Quail Lake Loop, Colorado Springs, CO  80906
PHONE (719) 632-1290
FAX (719) 632-6133
STATE TOLL FREE 1 (866) 304-4759

**JOINT APPRENTICESHIP AND TRAINING COMMITTEE**
1515 West 47th Avenue, Denver, Colorado 80211
PHONE (720) 855-0305
FAX (720) 855-0307
John Fleck, Statewide Training Director
Andy Gilliland, Southern Area Coordinator
Brian Summers/Western Area Coordinator

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| 1 | Scope of the Agreement | 1 |
| 2 | Subcontracting | 2 |
|  | Struck Goods Clause | 2 |
| 3 | Maintenance of Jurisdiction | 2 |
|  | Insurance | 3 |
|  | Safety | 3 |
|  | Sheet Metal Industry Alcohol and Substance Abuse Policy | 3 |
| 4 | Furnishing of Men | 9 |
|  | Referral | 9 |
|  | Stewards | 10 |
|  | Shop Visitation | 10 |
| 5 | Union Shop | 11 |
|  | Union Check Off | 11 |
|  | Management Rights | 11 |
| 6 | Regular and Overtime Hours | 12 |
|  | Overtime Equalization | 14 |
|  | Notification of Overtime | 14 |
|  | Break | 14 |
|  | Job-Site Shelter | 14 |
|  | Hourly Employees | 14 |
|  | Employment Processing | 15 |
|  | Banking/Trading of Hours | 15 |
|  | Working Meetings | 15 |
|  | Holidays | 15 |
|  | Make Up Day | 15 |
|  | Show Up Pay | 15 |
|  | Shift Work | 15 |
|  | Haz-Mat Work | 16 |
|  | Occupied Buildings | 16 |
|  | Light Manufacturing Facilities | 16 |
|  | Multiple Company Contractor | 17 |
|  | Jury Duty | 17 |
| 7 | Travel Rate and Subsistence | 17 |
|  | Hiring Centers | 18 |
|  | Paid Parking | 18 |
| 8 | Foreman Ratio | 19 |
|  | Home Shop Fabrication | 19 |
|  | Manufactured Items | 19 |
|  | Job Site Wage Scale | 20 |
|  | Two Man Rule | 20 |
|  | Withheld Pay | 21 |

|  | Termination Pay | 21 |
|  | Owner/Member | 21 |
|  | Eligible Employers | 22 |
|  | Vacation Pay | 22 |
|  | National Pension Plan and national 401 (k) Plan | 23 |
|  | Local Pension Plan | 24 |
|  | Family Health Plan | 24 |
|  | Industry Fund | 25 |
|  | International Training Institute | 27 |
|  | Local Training Fund | 27 |
|  | Scholarship Loan Agreement | 27 |
|  | Sheet Metal Occupational Health Institute Test (SMOHIT) | 28 |
|  | National Stabilization Agreement of Sheet Metal Industry (SASMI) | 28 |
|  | SMWIA Scholarship Fund | 28 |
|  | National Energy Management Institute (NEMI) | 28 |
|  | Employer Responsibility and Payment of Fringe Benefits and Contributions | 29 |
|  | Integrity Clause | 31 |
| 9 | Membership Education Program | 32 |
|  | Employee Responsibility | 32 |
|  | Preferential Clause | 34 |
|  | Savings Clause | 35 |
|  | Successor and Assigns | 35 |
| 10 | Addendum Ratification and Implementation | 35 |
| 11 | Grievance Procedure | 35 |
| 12 | PAL Political Fund | 38 |
| 13 | Apprentices | 39 |
| 14 | Apprentice Applicants | 41 |
| 15 | Classified Worker | 42 |
| 16 | No Strike – No Lock Out | 43 |
|  | Signature of Agreement | 43 |

STANDARD FORM OF UNION AGREEMENT (CO A-07-16)
AS AMENDED, MODIFIED & REVISED FOR THE SHEET METAL, ROOFING,
VENTILATING AND AIR CONDITIONING CONTRACTING DIVISIONS OF THE
CONSTRUCTION INDUSTRY OF COLORADO

Agreement entered into this 1st day of July 2016, by and between American Veteran Heating and Air, hereinafter referred to as the Employer, and the International Association of Sheet Metal, Air, Rail, transportation Workers' Local 9, hereinafter referred to as the Union for the State of Colorado.

**Definition of Employee:** Any person employed by the signatory Employer to perform any of the work covered under Standard Form of Union Agreement, Article 1 is defined and hereinafter called "Employee".

**Definition of Employer:** Signatories to this Agreement must be properly licensed, must have an established and operating place of business other than a residence, and must be equipped with the tools required for the performance of the work in such business. "Shop" shall mean a permanent place of business, not a temporary job site shop.

Employer voluntarily recognizes the Union as sole and exclusive bargaining representative, based upon a majority status, for negotiating agreements. The Union hereby recognizes SMACNA Colorado as the sole and exclusive bargaining representative for all contractors who have authorized the association to represent them in the bargaining. The Union hereby agrees to recognize the independent contractor as its own bargaining agent. During the term of this Agreement the Employer agrees that it will not rely upon any defense based upon majority status in any enforcement proceeding respecting this Agreement and the Employer agrees that it will not disavow this Agreement because of a lack of majority status.

# ARTICLE 1

## SCOPE OF AGREEMENT

**1-1.** This Agreement covers the rates of pay and conditions of employment of all employees of the Association Employers and Non Association Employers who are engaged in, but not limited to, the (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or non-ferrous metal work and all other materials used in lieu thereof and of all HVAC systems, airveyor systems, exhaust systems, and air handling systems regardless of material used, including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (c) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches whether manually drawn or computer assisted used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; including as-built drawings as required in the plan, specification, or bid documents by the owner or engineer; (e) metal roofing; and (f) all other

work included in the jurisdictional claims of the International Association of Sheet Metal, Air, Rail, Transportation Workers'.

    **1-2.**  The Employer agrees to work with the Union to obtain all of the work that comes within the jurisdiction of the International Association of Sheet Metal, Air, Rail, Transportation Workers'.

    **1-3.**  The Employer agrees that none but journeymen, apprentices, apprentice applicants and classified sheet metal workers shall be employed on any work described in Article 1.

# ARTICLE 2

## SUBCONTRACTING

    **2-1.**  No Employer shall subcontract or assign any of the work described herein which is to be performed at a job site to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to Union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project.

    **2-2.**  Subject to other applicable provisions of this Agreement, the Employer agrees that when subcontracting for prefabrication of materials covered herein; such prefabrication shall be subcontracted to fabricators who pay their Employees engaged in such fabrication not less than the prevailing wage for comparable sheet metal fabrication, as established under provisions of the Agreement.

## STRUCK GOODS CLAUSE

    **2-3.**  The Employer agrees that it will not render non-customary assistance to any Employer who is involved in a strike or lockout, against any employees represented by SMART Local #9.  Such a strike or lockout shall be the result of an active organizing effort being conducted by SMART Local #9.  Accordingly, no employees covered by this Agreement will be required to manufacture or install finished products or otherwise do work which normally would have been done by employees of the Employer involved in a labor dispute as described above.

# ARTICLE 3

## MAINTENANCE OF JURISDICTION

    **3-1.**  The Employer agrees to provide the Union with written evidence of Assignment on the Employer's stationary, describing specific items of work performed by Sheet Metal Workers in the shop or on a job-site as requested by the union.  This provision shall be honored by the

Employer regardless of whether the request is made prior to commencing, during the performance of, or after the completion of such work.

## INSURANCE

**3-2.** The Employer, regardless of the number of workers employed, agrees to carry and pay Workmen's Compensation with a reliable insurance company or the State of Colorado Compensation Department on all employees covered by this Agreement, and shall furnish to the Union, the insurance carrier and policy number before being furnished men by the Union.

**3-3.** The Employer further agrees, regardless of number of workers employed, to pay the Colorado Unemployment Security Tax on all employees covered by this Agreement, and to furnish to the Union the account number of said tax, before being furnished men by the Union. The Employer shall remain subject to both of the above provisions during the terms of this Agreement.

## SAFETY

**3-4.** Each party agrees to be governed by the State and Federal Governments Safety regulations, such as the Construction Safety and Health Standards Public Law 91-54 put out by the U.S. Department of Labor.

**(A).** For the safety and well being of our industry, the Union agrees that all foremen, journeymen, apprentices and classified workers shall be trained on an as needed basis in the following areas but not limited to:  Ladder Safety, Scaffold Safety, and OSHA 10-Hour Course. This training will be conducted through the JATC.  The JATC Trustees and the LMCC will advise the Union and SMACNA Colorado how to implement the training.

## SHEET METAL INDUSTRY ALCOHOL AND SUBSTANCE ABUSE POLICY

**3-5.** This Policy applies to all construction company employees covered under this agreement within the SMART Local #9 jurisdiction as well as applicants for any such position.

**Preface:**  Alcohol/substance abuse is recognized as a treatable illness. The desired result is rehabilitation. The preferred rehabilitation procedure is through referral to the Family Health Plan approved Members Assistance Program (MAP) or a state approved and certified resource, hereinafter referred to as the (MAP). Costs associated with the MAP will be borne by the individual if not covered by the employee's health insurance benefits.  The use of alcohol or illegal drugs during working hours, or on a job site or on employer premises is absolutely forbidden. Any Employee or prospective employee who violates this policy shall be required to undergo rehabilitation and may be subject to discipline including termination. Company management personnel and immediate supervisors may make exceptions for the use of alcoholic beverages for company sponsored social events when proper safeguards are utilized.

**(A)**  The term use shall be defined as consuming, processing, selling, concealing, distributing or arranging to buy or sell, being under the influence or reporting for duty under the influence of alcohol or illegal drugs.

**(B)**  Employers' premises shall be defined as company vehicles, parking lots, and storage areas, as well as the job site and shop.

**(C)**  The term alcohol or illegal drugs shall be defined as any form of alcohol and/or other intoxicating substances, narcotic plants or similar narcotic substances, including legal drugs obtained illegally.

**(D)**  The term working hours shall be defined as all time in which an Employee is engaged in work duties including travel time or other times subject to the Employers control.

**(E)**  The term under the influence of alcohol shall be defined as a body alcohol content of 0.05 percent or greater.

**(F)**  The term under the influence of an illegal drug shall be defined as urine content determined to equal or exceed the levels established by the Alcohol, Drug Abuse, and Mental Health Administration of the United States Department of Health & Human Services.

**(G)**  A member who suspects he/she has developed an addiction to, dependency on, or otherwise has a problem with alcohol or drugs, is expected to seek assistance from the MAP. Any person who voluntarily enrolls in the MAP and seeks assistance or rehabilitation for alcohol and/or drug related problems prior to being screened or tested shall be granted amnesty and discipline is waived for drug/alcohol related issues so long as the person continues to participate satisfactorily in the rehabilitation or counseling program.

**3-6 (A). Types of Allowable Testing:**  The SMART Local #9 and SMACNA Colorado Labor/Management Drug and Alcohol Testing Fund ("the Fund") regards urine testing as problematic and does not advocate reliance on such procedures to identify individuals with an alcohol/chemical dependency.  However, to show our commitment to a safe work environment, all current employees covered under this agreement who have not been tested on a pre-employment basis will be required to participate in an initial urine drug-screening test. Certain circumstances support substance testing as a warranted vehicle for determining possible impairment and/or a propensity for substance abuse.  These include: (a) Random Screening, (b) Probable Cause Testing, (c) Work Opportunities Mandated Testing, and (d) Post Accident or Injury Testing.

**3-6 (B).** Random Testing:

1.  Employees shall be subject to unannounced random drug testing.  Random selections will be made 12 times a year at an annualized rate of twenty five (25) percent.  Random selections will be made by the use of a computer generated numerical program designed to

ensure that no employee can be singled out.  Upon notification of workers selected for random testing, compliance officers shall have ten (10) calendar days to complete the random testing requirement.  Workers must report for random testing at the time of notification by their compliance officer of their random selection, which must be done within twenty-four (24) hours of notification.  However, no employee will be randomly selected more than one (1) time in a calendar year unless the individual is subject to required random testing under MAP or Job Mandated random testing.

    2. SMART Local Union #9 shall maintain a database of employees indicating their current eligibility status in the program.  A worker's status shall indicate the individual's compliance or non-compliance with the Program's terms and conditions as follows:

    a.  Active Status: Employees who have been subject to and have complied with the Programs terms and who therefore are eligible for immediate placement without having to take another drug test.

    b.  Inactive Status: Employees who have missed a random test through no fault of their own (not willful), or who have not been selected for a test in the previous four (4) years.

    c.  Pending Status: Employees who have provided a specimen but the final results have not been received from the laboratory and/or Medical Review Officer.

    d.  Random Status: Employees who have been selected for a random drug test and have not yet provided a specimen.

    e.  Reinstated Status:  Employees who have been suspended for violation of the Policy and must complete the reinstatement requirements prior to being returned to Active Status.

    f.  Periodic Testing: Substance testing will be required of individuals who have not been tested within a forty-eight-month period.

    3. Pre-employment Testing: employees are subject to drug screening to ascertain whether an employee is capable of safely performing the duties and meeting the prerequisites of employment offered.  However, if the employee has an Active Status under this policy and has been out of work for less than 31 days, the applicant is eligible to immediately go to work without testing.  A negative pre-employment test shall move an employee's status to Active and count as a random.

    4. a. Employees (except pre hires) will be compensated by the employer for all substance testing; either at the applicable rate during working hours up to one (1) hour or at one (1) hour of show-up pay during off work hours.
      b. For each successful test, the Employee (except pre hires) shall be compensated $50.00 from the Drug Testing Fund.

c. All mileage associated with being tested shall be paid to the Employee, by the employer, using the current IRS rates.

5. If an employee's random test is "sent to the lab" the employee will continue working until the results are conclusive.

6. Confirmed Positive: An individual with a confirmed positive test result is not eligible for referral or return to work until satisfaction of one of the following conditions:

    a. An opportunity to seek assistance in overcoming a drug or alcohol problem through an evaluation and rehabilitation program through the MAP or other recognized and approved rehabilitation or counseling program. Costs of the MAP program will be borne by the individual, unless covered by the health insurance benefits.

    b. Immediate termination from employment with no opportunity to retest for (30) days if assistance is declined or the rehabilitation/counseling program is not successfully completed. After (30) days, the individual must provide, at their own cost from a certified testing facility, a negative drug and alcohol test result before returning to work.

**3-6 (C). Probable Cause Testing:** Substance testing can be implemented when there is "probable cause." Probable cause shall be defined as those circumstances, based on objective evidence about the employee's conduct in the workplace, that would cause a reasonable person to believe that the Employee is demonstrating signs of impairment due to alcohol or drugs. Examples of objective evidence include signs of impairment such as difficulty in maintaining balance, slurred speech, erratic or atypical behavior, or an apparent inability to perform his/her job in a safe manner. The examples noted, or others, must be observed and documented by the employee's jobsite supervisor and at least one other supervisory or managerial employee, or jobsite steward. An Employee's private property may be inspected only for probable cause.

**3-6 (D). Work Opportunities Mandated Testing:** In all situations where an Employer is required to participate in a testing program in order to qualify as a bidder on the project, testing may occur but only if performed in accordance with these minimum standards and applied uniformly to all personnel having access to the project. There shall be no discrimination against any employee who refuses a job assignment to a project that has mandatory drug testing.

**3-6 (E). Post Accident or Injury Testing:** Testing may also be required after any work-related, OSHA reportable, accident or injury; or when damage to company property or other physical damage occurs on company premises, at a job site, or under other work related circumstances where human error may have been a factor.

**3-6 (F). Payment of Screening or Testing**

**1. Random Screening:** All costs (excluding wages and mileage) associated with the random screening of employees will be paid through the Drug Testing Fund.

**2. Probable Cause, Work Opportunities Mandated, or Post Accident or Injury Testing:** All costs associated with probable cause, work opportunities mandated, or post accident or injury testing as defined above shall be paid by the Employer and performed at the employers approved facility.

### 3-6 (G). Testing Procedures:

**1.** The initial test shall be an Enzyme Immunoassay (EMIT) Conformation test-Gas Chromatography/Mass Spectrometry (GC/MS) Certified test. All positive test results will be sent to a N.I.D.A. certified laboratory for confirmation. Drug testing and the chain of custody shall be conducted in accordance with the procedures of the U. S. Department of Health and Human Services Mandatory Guidelines for Federal Workplace Drug Testing Programs. Urine samples will be separated into two containers at the time of donations of the sample--one portion of the original urine sample shall be kept secure and chemically stable and made available for verification of laboratory testing results.

**2.** A "positive" drug test result shall mean test levels, on both the screening test and confirmatory test, which are recognized as positive by the U. S. Department of Health and Human Services in its Mandatory Guidelines for Federal Workplace Drug Testing Programs.

**3.** Any Employee or prospective employee testing positive shall, within ten (10) days, have the right to have the secured portion of his/her urine sample independently examined by a laboratory of his/her choice at his/her expense. The laboratory selected shall meet the same certification as required under this policy.

**4.** The Employee or prospective employee shall also have the option of having a blood test to confirm their positive test within twenty-four (24) hours of notification of a positive test.

### 3-6 (H). Test Results and Reporting Procedures:

**1.** The results of any positive test will not be released to any other party or agency not referenced herein unless required by law or with the written permission of the Employee or Prospective Employee. If the Employee or prospective Employee chooses to be evaluated by the MAP, results may be released to the MAP.

**2. Random Screening:** Test results will be released to the Union Representative and Employee on a confidential need to know basis.

**3. Probable Cause, Work Opportunities Mandated, or Post Accident or Injury Testing:** Test results will be released to the Employer Representative, the Union Representative, and the Employee on a confidential basis. Only the Employer's representative or the Union's designated representative will communicate a positive test result to the Employee. The Employer will select at least one, and no more than two, Designated Representatives to handle all

confidential matters regarding this policy. Only the Employer's representative(s) and the employee's immediate supervisor will be informed if the Employee tests positive. Notification will be given privately and shall not be communicated to any other person who does not have a bona fide need to know.

    **4.** Nothing in this policy is intended, nor shall it be construed, to authorize any action that is unlawful under federal or state law.

    **3-6 (I). Disciplinary Actions:**

    **1.** Workplace problems arising out of an employee's relationship with substance abuse may warrant a variety of management responses, including referral for treatment, testing, disciplinary action or termination of employment. Discipline of bargaining unit members shall be in accordance with the collective bargaining agreement and/or the rules of the Joint Apprenticeship & Training Committee when Apprentice Applicants or Apprentices are involved. Upon release from the MAP, all Employees or prospective Employees shall be bound to all of the provisions contained herein.

    **2. Pre-Employment Screening:** Any person who does not successfully pass a pre-employment screen shall have his or her name removed from the out of work list, not be eligible to have their name added to the out of work list, and not be eligible for employment with any employer signatory to this agreement until they can verify that they have successfully enrolled in and completed a program through the MAP.

    **3. Probable Cause, Work Opportunities Mandated, or Post Accident or Injury Testing:** Any Employee who has tested positive for alcohol and/or drugs will be required to enroll in and complete a program through the MAP for counseling or rehabilitation. The Employee will be suspended from work without pay. Upon submission of a work release from the MAP, the Employee may return to work if a job is available, or be referred from the out-of-work list. The failure of an Employee to promptly participate in testing or a search under probable cause at management's request, or should an employee's test results be positive and the employee refuses to seek rehabilitation or fails to complete a rehabilitation program, that Employee shall be terminated.

    **4. Drug Related Activities:** An Employee who is convicted for violations of laws involving illegal drugs while on work status will be considered to be in violation of this policy and subject to any of the Disciplinary Actions contained herein. Failure of an Employee to notify his or her immediate supervisor within five (5) days after such conviction is cause for immediate termination.

# ARTICLE 4

## FURNISHING OF MEN

**4-1.** The Union agrees to furnish upon request by the Employer, duly qualified journeymen, in sufficient number as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement.

**4-1 (A).** Beginning July 1, 2016, any SMART Local #9 Member who enters the workforce, without having completed the Local #9 Apprenticeship Training program or another Office of Apprenticeship approved program, will be considered a journeyman applicant, at the equivalent of a 90% Classified Worker wage and fringe package, and must complete 40 hours of CTE within the first six months of initial hire in order to transition to full journeyman status. If the appropriate amount of training is not available within the first six months following implementation of this Article 4-1(A), the time for completion of the training requirement will be temporarily extended. Effective 7/1/17, the six-month time frame will be fully implemented.

**4-2.** It is understood and agreed that there shall be no discrimination concerning compensation, working conditions, employment, hiring, termination or any other term or provision of this contract because of race, color, age, sex, religion or national origin of the Employee or prospective Employee, and the Union shall take immediate action to seek compliance with Title VII of the Equal Employment Opportunity Commission.

## REFERRAL

**4-3.** The JATC shall select and refer qualified applicants for employment in the order in which said applicant has been registered with the JATC without discrimination against such applicants by reason of or in any way affected by Union membership, by-laws, rules and regulations, constitutional provisions, or any other aspect or obligation of Union membership policies or requirements.

**(A)** Should the Union or JATC be unable to furnish qualified men within 48 hours, the Employer has the right to obtain Employees from any source available, subject to the requirements of this Agreement.

**(B)** Both the Union, JATC and the Employer agree to post a copy of the referral procedure in places where notices to Employees and applicants for employment are customarily posted.

**(C)** The Employer agrees to notify the Employee and Union by written notice within 48 (forty-eight) hours of reason for discharge of any worker covered by the jurisdiction of this Agreement. If the Employee and the Union are not notified within the 48-hour period the Employer and the Union shall agree the termination is a reduction in force. Discharge form shall

be in triplicate and mutually acceptable to Union and Management. The Employer also agrees to notify the Union of employment or recall of any worker covered by this Agreement within five (5) working days.

**(D)(1)** Local contractors signatory to this Agreement may utilize current employees on all work acquired.

**(D)(2)** All new hires employed for work covered under a Local Project Agreement or an International Project Agreement will be referred by the local Union.

**(E)** All Journeyman and Classified Workers hired by an Employer working under this agreement, whose permanent established shop is located outside of the jurisdiction of Local 9, shall be employed on a ratio of a one (1) Union referral and then one (1) self solicitation basis.

## STEWARDS

**4-4.** The Union shall have the right to appoint a working steward in each shop and on any job. The duties of a steward shall be to observe conditions of employment and conduct of members to the end that the duties and obligations of members and the provisions existing in Union Agreements shall be complied with.

**(A)** The steward may assist in adjusting differences or misunderstandings, which may arise out of the existing Union Agreements in connection with the employment of members in shops or jobs. The steward shall be retained as long as three (3) or more men are working on any operation on such job or shop so long as he is qualified to perform such available work.

**(B)** When the Employer of a steward has eight (8) or more journeymen sheet metal workers working overtime on a job site or shop, excluding draftsmen or foremen, the steward shall be one of the journeymen working overtime.

**(C)** Whenever possible, Employees appointed as stewards, shall have been with the Employer over one year. Employees, who have been with the Employer for less than one year, shall be appointed as Stewards by mutual agreement of both the Employer and Local # 9

**(D)** The Union agrees to notify the Employer of such appointment of a steward within twenty-four (24) hours by phone and confirmed within one week by mail.

**(E)** Local # 9 Members, who have been appointed as Stewards by Local #9, shall not have the ability to change jobsites unless written permission is given to the Employer by the Union.

## SHOP VISITATION

**4-5.** It is hereby understood and agreed that the authorized Representative of the Union shall, with notification to the Employer or his job representative, have access to the shops or job sites and the opportunity to discuss with Employees, parties of this Agreement, matters of

common interest in the performance of their duties, said privilege to be so exercised that no unnecessary time be lost to the Company.

# ARTICLE 5

## UNION SHOP

**5-1.**  The Employer agrees to require membership in the Union, as a condition of continued employment of all Employees performing any of the work specified in Article 1 of this Agreement, within eight (8) days following the beginning of such employment or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable grounds for believing that membership is available to such Employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the Employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership.

**5-2.** If during the term of this Agreement, the Labor Management Relations Act of 1947 shall be amended by Congress, in such manner as to reduce the time within which an Employee may be required to acquire Union Membership, such reduced time shall become immediately effective instead of and without regard to the time limit specified in 5-1 of this Article.

**5-3.**  The provision of this Article shall be deemed to be of no force and effect in any state, to the extent to which the making or enforcement of such provision is contrary to law.  In any state where the making and enforcement of such provision is lawful only after compliance within certain conditions precedent, this article shall be deemed to take effect as to involved Employees immediately upon compliance with such conditions.

## UNION CHECK OFF

**5-4.**  Upon receipt of a signed individual authorization form from any Employee covered under this Agreement, irrespective of whether they are Union members, the Employer shall withhold from such employee's earnings payment for Union dues assessments, or service fees (excluding fines and initiation fees) or other obligations under the terms and conditions specified in the individual's authorization.  Deductions shall be made from the first pay of each month of said Employee and remitted to the Financial Secretary of the Local Union on the 20th day of the month, together with a list of the names of the employees to whom said monies are to be credited.  Check off forms are available from Local #9.

## MANAGEMENT RIGHTS

**5-5 (A).**  It is agreed that the Employer reserves the rights of Management at all times, except as abridged, delegated, granted or modified by this Agreement.  The Employer retains the sole right to manage its business and direct the workforce and to supervise the employees, covered by this Agreement.  When required by building owners, governmental agencies, general

contractors or customers as a condition of performing work on a project, background checks will be permitted as per the terms and conditions of the contract documents.

**5-5 (B).** By way of example, the term "Management Rights" includes: the right to manage covered employees; the right to schedule working hours; the right to establish or change work schedules or standards and direct work forces, including the right to determine the size of the work forces; the right to hire, promote, transfer, suspend, discipline or discharge any employee for just cause; the determination of safety, health and property protection measures for covered employees; the establishment, modification and enforcement of rules and regulations which are not in conflict with this Agreement.

**5-5 (C).** The Employer reserves the Right of Management at all times, and the right to select, in cases of reduction or replacement of forces, those employees who are, in its estimation, the best qualified. The Employer may designate work that employees shall do, without regard to seniority, but otherwise in accordance with the terms and conditions of this Agreement.

**5-5 (D).** The foregoing enumeration of Management Rights shall not be deemed to exclude other functions not specifically set forth. The Employer retains all legal rights not specifically limited by this Agreement. The maintenance of discipline and efficiency of the employees is, subject to the provisions of this Agreement, within the sole, complete and exclusive rights and responsibilities of the Employer.

# **ARTICLE 6**

## **REGULAR AND OVERTIME HOURS**

### **6-1. (A)  Regular Week**

**1.** Five (5) days per week, Monday thru Friday

**2.** Eight (8) hours per day 6:00 A.M. thru 6:00 P.M.

**3.** Employees shall be at the work area at the scheduled starting time each day and shall remain at their work area until quitting time.

**4.** All full or part time labor performed during such scheduled hours shall be recognized as regular working hours and paid for at the applicable hourly wage rate.

### **6-1. (B)  Regular and Overtime Working Hours**

**1.** First eight (8) hours per day Monday thru Friday = Regular Rate.

**2.** First three (3) hours in excess of eight (8) hours Monday thru Friday = 1-1/2 x Regular Rate.

**3.** All work performed in excess of eleven (11) hours Monday thru Friday = 2 x Regular Rate.

**4.** First ten (10) hours on Saturday = 1-1/2x Regular Rate.  All work performed in excess of 10 hours on Saturday = 2 x Regular Rate.

**5.** All work performed on Sundays or Holidays = 2x Regular Rate.

**6-1. (C)  4/10 EXCEPTIONS:**  On a job by job basis, with the approval of the union and management, there can be established a work week consisting of four (4) consecutive ten (10) hour days, Monday thru Thursday or Tuesday thru Friday respectively.  Regular and Overtime working hours under this exception shall be described below and will be paid at the applicable hourly wage rate.

**1.** First ten (10) hours Monday thru Thursday or Tuesday thru Friday respectively = Regular Rate.

**2.** First two (2) hours in excess of ten (10) hours, Monday thru Thursday or Tuesday thru Friday respectively = 1-1/2 x Regular Rate.

**3.** All work performed in excess of twelve (12) hours Monday thru Thursday or Tuesday thru Friday respectively = 2 x Regular Rate

**6-1. (C)(1) Work** performed outside a Monday thru Thursday workweek:

**a.** First ten (10) hours of work performed on Fridays and/or Saturday = 1-1/2 x Regular Rate.

**b.** All work performed in excess of ten (10) hours on Fridays and/or Saturdays = 2x Regular Rate.

**6-1. (C)(2)** Work performed outside a Tuesday thru Friday workweek:

**a.** First ten (10) hours of work performed on Mondays and/or Saturday = 1-1/2 x Regular Rate.

**b.** All work performed in excess of ten (10) hours on Monday and/or Saturday = 2 x Regular Rate.

**c.** All work performed Sunday or Holiday = 2 x Regular Rate.

## OVERTIME EQUALIZATION

**6-l.(D)** Preference to overtime work shall be given to employees on the job on a rotation basis, so as to equalize such work as nearly as possible. Overtime work will be on a voluntary basis. Any employee with unexcused absences during the regularly scheduled work hours may not be given the opportunity to work overtime during that payroll period.

## NOTIFICATION OF OVERTIME

**6-l.(E)** Employers signatory to this Agreement shall notify the Union of all overtime hours to be worked. This notification can be made by telephone and should be made in advance whenever possible. It is agreed that either the Employer or the Employee may notify the Union.

## BREAK

**6-l.(F)** There will be an unorganized break for each Employee granted at midmorning; for shifts that exceed 8 (eight) consecutive hours whether overtime or not, there shall be an afternoon break. Breaks shall not exceed ten (10) minutes and Employee must take his/her break in their immediate work area unless the area constitutes a health hazard. The Employer shall establish break times. There shall also be a midday thirty (30) minute uninterrupted lunch period.

## JOB-SITE SHELTER

**6-l. (G)** The employing contractor shall make provisions for a shelter during times of inclement weather for Sheet Metal Workers to change their clothes, take their breaks, and eat their lunch on all projects of twenty-five (25) working days or longer and when three (3) or more men are on such a job.

**1.** The job-site shelter shall be safely constructed of materials (or be located in an area within a building), which will be dry, out of the wind, safely lit, and heated to a temperature that is reasonable to the ambient air temperature.

**2.** If a suitable shelter is already available to Sheet Metal Workers, the Sheet Metal employer will not be required to provide another facility.

**3.** The Employer shall provide adequate secured gang boxes on all jobs of at least ten (10) days duration.

## HOURLY EMPLOYEES

**6-1. (H)** It is agreed that all members of the bargaining unit, including Foreman and General Foremen, will be paid pursuant to the minimum hourly rates provided for in this Agreement.

## EMPLOYMENT PROCESSING

**6-1. (I)**  The Employer agrees to pay all persons employed for all time spent in employment processing at the applicable wage rate.

## BANKING/TRADING OF HOURS

**6-1. (J)** There shall be no banking or trading of work hours.

## WORKING MEETINGS

**6-1. (K)** Work related meetings, which are mandated by the Employer and scheduled outside the regular shift, shall be compensated for at the overtime rate provided for in the Agreement.

## HOLIDAYS

**6-2.**  New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and Sundays shall be recognized as holidays.  Should any of the foregoing holidays occur on a Saturday, the previous Friday shall be recognized as the Holiday.  Should any of the foregoing holidays occur on a Sunday, the following Monday shall be recognized as the Holiday.  All work performed on holidays shall be paid at two (2) times the wage rate.

## MAKE UP DAY

**6-3.**  When a crew loses a day's work, within the scheduled work week, due to weather, acts of God, or circumstances beyond the Employer's control, the local Union may allow a make-up day by permit only, with pay at straight time hourly rate on Monday thru Saturday, as the case may be.  Make-up days shall be on a voluntarily basis for the Employees or Employer.

## SHOW UP PAY

**6-4.**  Employees who report for work by the direction of the Employer and are not placed at work at regular starting time shall be entitled to two (2) hours pay at the established rate of pay.  This provision, however shall not apply under conditions over which the Employer has no control, or if the Employee was not at work on the preceding workday.  In addition, this provision shall not apply in situations when the employee fails to report to the assigned jobsite as directed by the employer or fails an alcohol or drug test.

## SHIFT WORK

**6-5.**  Shift work shall be construed as work performed immediately following the end of the regular working hours and for the stated number of hours as defined herein. Shift work privilege shall be permitted for two or more consecutive days.

**(A)  Daylight Shift** - Eight hours pay for eight hours work.

**(B) Shift Work** - The Employer may choose to implement either an eight (8) hours paid for eight (8) hours worked with a 6% wage differential premium, or an eight (8) hours paid for seven and one-half (7 ½) hours worked at straight time schedule for the project.  Said schedule shall be determined and communicated to the Employees prior to the start of the project.

**(C) Graveyard Shift** – The Employer may choose to implement either an eight (8) hours paid for eight (8) hours worked with a 13% wage differential premium, or an eight (8) hours paid for seven (7) hours worked at straight time schedule for the project.  Said schedule shall be determined and communicated to the Employees prior to the start of the project.

**(D)  Special Shift** - Upon request of the Employer, a special daylight shift may be established at job or shop.  Employees must have an eight (8) hour rest period when changing from swing to regular shift.

**(E)** – Eight (8) hours' notice must be given to call off a scheduled shift.  If eight (8) hours' notice is not given by the Employer, the Employer will be required to pay two (2) hours show up pay.  Shift works, including special or unusual shifts are to be authorized by the Business Agents or Executive Board of the Local Union.

**(F)**  There shall be no more than eight (8) hours work between 6:00 A.M. and 6:00 P.M. at the regular rate of pay, and not more than one hour shall be taken out for lunch period.  Such shift shall not be established for less than two (2) consecutive days.

## HAZ-MAT WORK

**6-6.**  Employees covered under this Agreement who, as a condition of employment, are required to wear Company issued clothing and full face respirators or full body suits and/or supplied air situations while working in facilities that manufacture, store and/or use radioactive substances, nerve gas and/or defoliants, or on jobsites that warrant Confined Space conditions as determined by current OSHA regulations will receive the wage and fringe benefit as provided in Appendix A.  **Note:** No Haz-Mat compensation will be required if the work being performed requires that the owner's product or atmosphere be protected from the employee.

## OCCUPIED BUILDINGS

**6-7.**  Upon request of the Employer, a special night shift may be established in occupied buildings without shift pay differential. Occupied buildings means an area where people are working or the work to be done cannot be performed during regular working hours.

## LIGHT MANUFACTURING FACILITIES

**6-8.** Where specified in bid documents (excluding industrial and new commercial), overtime shall be paid at one and one half (1 1/2) times the specified base rate.

## MULTIPLE COMPANY CONTRACTOR

**6-9.** Contractors who own or operate multiple companies and employ members of SMART LU #9 covered under this Agreement, shall not allow these employees to work in excess of forty (40) hours per week in combination with these companies without first notifying the Union that the Employee will be working overtime. Any Employee who exceeds the regular work day or work week while in the employ of a multiple company contractor shall be paid overtime at the rates provided for in the Agreement.

## JURY DUTY

**6-10.** The Employer shall pay an employee serving on a jury, $50 (fifty dollars) per day for the first three (3) days of jury duty as required under state law.

# ARTICLE 7

## TRAVEL RATE AND SUBSISTANCE

**7-1.** There shall be a seventy (70) road mile free zone established from each hiring center, as referenced below; mileage shall be measured using the shortest distance on paved highways as determined by Mapquest. All jobsites requiring travel outside of the free zone shall be paid at the current IRS mileage rates, with the exception that Employees traveling in a company vehicle will not be paid travel pay. Any worker employed forty (40) miles or more outside of the free zone shall also have suitable lodging provided by the Employer and receive thirty-five ($35.00) per day for meals. Employees may choose alternative types of housing (i.e. camping) in lieu of the Employer provided hotel accommodations and will still receive the per diem for meals. Any Employee choosing, of their own volition, to drive home at the end of the workday, instead of staying in the general area of the jobsite, will not receive travel or subsistence. However, apprentices who are driving back and forth from the jobsite to apprenticeship school will receive their per diem for meals.

**7-2.** When employed in a shop or job-site within the limits of the "Free Zone", or beyond the limits of the "Free Zone" as described in paragraph 7-1 above, employees shall be governed by the working hours specified herein and shall provide necessary transportation from home to shop or job-site at starting time and from shop or job-site to home at quitting time. All Employees are required to be at their work stations at the assigned starting times and remain until quitting time.

**7-3.** When an Employee is directed by the Employer to transport himself in his own vehicle to more than one job-site per day within the "Free Zone" during working hours, he shall

receive the current IRS rates per mile for the use of his personal vehicle in addition to the applicable hourly wage rate.

**7-4.** An Employee directed by the Employer to transport himself in his personal vehicle beyond the "Free Zone" limits, during working hours, shall be paid the current IRS rates per mile in addition to the applicable hourly wage rate.

**7-5.** All subsistence expenses owed to employees shall be paid weekly and at the same time as the regular paycheck is issued.

**7-6.** When an employee, by his or her own choice, does not report for work on a subsistence job, he or she will not be paid subsistence for days not worked. However, this will not apply in case of severe weather, illness or other justifiable personal emergency.

**7-7.** When suitable room and board is not available within seventy (70) road miles of a subsistence job, the Employer shall pay employees the current IRS rates per mile (round trip) for each mile traveled outside the "Free Zone" to the location where suitable room and board is available.

## HIRING CENTERS

**7-8.** There shall be established hiring centers at mile markers 101 (Pueblo), 141 (Colorado Springs), 214 (Denver), and 269 (Fort Collins) on interstate highway I-25.

**(A)** The Employer's permanent established shop shall determine his designated hiring center upon execution of this Agreement. However, Employers have the option to utilize alternate hiring centers on a project and will notify Local 9 of their intention to utilize an alternate hiring center, prior to manning the project.

**(B)** Shops established on or near job sites after job bidding or job awards shall not be considered as permanently established shops.

**(C)** Any Employer not having an established hiring center within the State of Colorado prior to bidding on a job can utilize the hiring center closest in proximity to the jobsite.

**(D)** Employees may be allowed to change their hiring centers, but may not be required to do so as a condition of employment.

## PAID PARKING

7-9. When an employee is required to park in a pay parking lot because of the location of the job, the employer agrees to reimburse an amount, agreed to prior to the job start, on a weekly basis upon submission of receipt or other proof of payment.

# ARTICLE 8

## FOREMAN RATIO

8-1 (A). Denver Ratio (within these 27 counties - Adams, Arapahoe, Boulder, Clear Creek, Denver, Douglas, Eagle, Elbert, Garfield, Gilpin, Grant, Jackson, Jefferson, Lake, Larimer, Logan, Moffat, Morgan, Park, Phillips, Rio Blanco, Routt, Sedgwick, Summit, Washington, Weld and Yuma Counties, Colorado).

1. All supervision shall be designated by the company. On a job site where six men are employed, the Employer must designate one of the six as a foreman. Two foremen, when sixteen men are on the job site.

2. In the shop the Employer shall designate one (1) foreman when eight (8) men are in the shop. Also, a general foreman shall be required on a job site or in the shop when there are 35 people employed in the shop or at that job site. A foreman can only supervise other foremen on one job site. He shall not be allowed to supervise foremen at other job sites.

8-1 (B).  Colorado Springs and Pueblo Foremen Ratio

1. All counties not included in "Denver Ratio" are governed by this section. Each Employer shall have a designated foreman when four men are on the job site, two foremen when twelve men; when twenty (20) men on job site, two foremen and one general foreman, and when 28 men on job site, three foremen and one general foreman. This ratio is to be in effect as the number of men increases; also, one (1) shop foreman where four (4) men are regularly employed as shop men weekly.

## HOME SHOP FABRICATION

8-2. On all work specified in Article I of this Agreement, fabricated and/or assembled by journeymen, apprentices, preapprentices and/or classified sheet metal workers within the jurisdiction of this Union, or elsewhere, for erection and/or installation within the jurisdiction of any other collective bargaining areas or local union affiliated with the International Association of Sheet Metal, Air, Rail and Transportation Workers', whose established wage scale is higher than the wage scale specified in this Agreement, the higher wage scale of the jobsite Union shall be paid to the employees employed on such work in the home shop or sent to the jobsite.

## MANUFACTURED ITEMS

**8-3.** The provisions of paragraph 8-2 of this Article, paragraph 2-2 of Article 2 and paragraph 3-1 of Article 3 shall not be applicable to the manufacture for sale to the trade or purchase of the following items:

    1. Ventilators

    2. Louvers

    3. Automatic and fire dampers

    4. Radiator and air conditioning unit enclosures

    5. Fabricated pipe and fittings for residential installations and light commercial work as defined in the locality

    6. Mixing (attenuation) boxes

    7. Plastic skylights

    8. Air diffusers, grilles, and registers

    9. Sound attenuators

    10. Chutes

    11. Double wall panel plenums

    12. Angle rings

**8-4.** The provisions of Section 8-2 of this Article shall not be applicable to the manufacture for sale to the trade or purchase of air pollution control systems, fabricated for the purpose of removing air pollutants excluding air conditioning, heating and ventilating systems. In addition, the provisions of Section 8-2 of this Article will not be applicable to the manufacture of spiral pipe and fittings for high pressure systems.

### JOB SITE WAGE SCALE

**8-5.** Except as provided in paragraphs 8-2 and 8-4 of this Article, the Employer agrees that journeyman sheet metal workers hired outside of the territorial jurisdiction of this Agreement, shall receive the wage scale and working conditions of the Local Agreement covering the territory in which such work is performed or supervised.

### TWO MAN RULE

**8-6.** When the Employer has any work specified in Article I of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by another Agreement with another Union affiliated with the International Association of Sheet Metal, Air, Rail, Transportation Workers', and qualified Sheet Metal Workers are available in such areas, he/she may send no more than two (2) Sheet Metal Workers per job into such area to perform any work which the Employer deems necessary, both of whom shall be from the Employer's home jurisdiction.

**(A)** All additional Sheet Metal Workers shall come from the area in which the work is to be performed. Journeyman Sheet Metal Workers who are sent outside of the area covered by this Agreement shall be paid at least the established minimum wage specified in Section 1 of this Article but in no case less than the established wage scale of the Local Agreement covering the territory in which such work is performed or supervised, plus

all the necessary transportation travel rate, board and expenses while employed in that area, and the Employer shall be otherwise governed by the established working conditions in that Local Agreement. If employees are sent into an area where there is no Local Agreement of the International Association of Sheet Metal, Air, Rail, Transportation Workers', covering the area, then the minimum conditions of the home Local Union shall apply.

**8-7.** In applying the provisions of paragraphs 8-2, 8-5 and 8-6 of this Article, the term "wage scale" shall include the value of all applicable hourly contractual benefits in addition to the hourly wage rate provided in said sections.

## WITHHELD PAY

**8-8.** Wages at the established rate specified herein shall be paid by cash or check in the shop or on the job at or before quitting time on the designated payday of each week, or by electronic transfer to the employee's designated bank and no more than five (5) days pay will be withheld. This will not apply for circumstances beyond Management's control. In situations where the Employer is utilizing electronic transfer, and the Employee opts out of this method of payment, the Employer will mail the paycheck to the Employee, using standard U.S. Mail, with a postmark of no later than five (5) days following the pay period. If an Employee fails to receive their check within seven (7) days, the Employer will reissue the check and either hand deliver or overnight the new check within three (3) days of notification. Employees, when discharged, shall be paid in full. When designated payday falls on a holiday, the Employers will pay Employees the day prior to holiday. Employees paid by electronic transfer shall receive a check stub reflecting the amount deposited on the date which he/she would normally receive a paycheck. Participation in electronic transfers or direct deposit shall be voluntary and therefore not be a condition of employment.

## TERMINATION PAY

**8-9.** When Employees are laid off, or discharged, they shall be paid in full for all hours up to the time he receives his pay. If required to wait after regular quitting time, he shall receive the overtime rate. If an Employee is required to pick up his pay at another destination during regular work time, he shall get paid travel time to and from designated destination back to job-site at regular rate of pay, plus mileage. Should it be after regular working hours, he shall receive overtime rate, plus mileage for traveling.

**(A)** When Sheet Metal Workers quit of their own accord, they may be required to wait until the regular payday for the wages due them.

**(B)** When an Employee is discharged, he shall be given one-half (1/2) hour to gather his tools and belongings and return Employer owned property.

## OWNER/MEMBER

**8-10.** Each Employer covered by this Agreement shall employ at least one journeyman sheet metal worker who is not an owner or stockholder of the Employer, on all work specified in Article I of this Agreement. However, it will be permissible for an owner-member to be the journeyman sheet metal worker. Bargaining unit employees hereunder shall include Owner/Members, *i.e.*, employees of incorporated Employers who: (a) are officers, directors, or majority stockholders of an incorporated Employer; (b) perform work covered by the terms of this Agreement; and (c) are listed on the Registration Statement filed with the Sheet Metal Workers' National Pension Fund and National Cola Fund. Contributions on behalf of Owner/Members shall be made to all employee benefit plans set out in sections 8-13 through 8-23 for all hours for which the Owner/Member is paid or entitled to payment, at the rate set out in the Appendix; provided, however that contributions to the Family Health Plan under Section 8-15 shall be the greater of (a) all hours for which the Owner/Member is paid or entitled to payment or (b) 1,450 hours per year.

## ELIGIBLE EMPLOYERS

**8-11.** The Union will furnish men only to contractors regularly engaged in the performance of work covered under Article 1-1 with equipment and personnel adequate to perform such work.

**(A)** When the Union signs a contract with any Employer that differs from the contract negotiated with the Association, a verified copy of said contract shall be filed with the Association within fourteen (14) days.

## VACATION PLAN

**8-12.** **(A)** In order to provide Journeymen and Apprentices working under this Agreement with paid vacation, it is hereby mutually agreed that the amount set forth in Appendix A shall be deducted from the Employees' weekly pay. The Employer shall make all legal payroll deductions for income tax, social security, state tax, etc. from the total wages and shall then withhold the full amount of the vacation deduction. On overtime hours worked, the vacation deduction will be at the rate that the overtime is paid.

**(B)** The Employer shall make vacation payments to a financial institution designated jointly by the Union and SMACNA Colorado for deposit into individual accounts established for Employees. Payment shall be made monthly for each hour worked by each Employee as set forth in this Agreement and paid no later than the 20th of the month following the month in which the hours were worked ("Due Date"). Remittance forms will accompany vacation payments and copies sent to SMART Local Union #9. An Employer who fails to make its vacation payments by the Due Date shall be considered delinquent and subject to late fees, interest, liquidated damages, attorney's fees and other costs of audit and collection, on the same terms and in the same amount as provided by the collection policy of the SMART Local 9 Benefit Funds, as may be amended from time to time, and which policy is hereby incorporated by reference by the parties to this Agreement.

**(C)**     It is the intention of the parties that individual vacations should, as far as possible, be granted to each Employee in accordance with recognized vacation practices. It is recognized that this may not always be practical on account of such circumstances as exigencies of particular jobs, sickness of individual employees and other sufficient reasons, and it shall be necessary in such cases to make vacation arrangements to fit the needs of each particular job or shop.

**(D)**     Vacation funds in the Employee's account at the designated financial institution may be accumulated from year to year or may be withdrawn at any time, in whole or in part, by the individual Employee at their election.

**(E)**     Not more than twenty percent (20%) of the employees in any shop or on any job shall be granted their vacation at the same time unless agreed to by the Employer.

**(F)**     Any Employee who is unable to take his vacation at the time agreed upon as provided for above, either because of accident or sickness, or because they are required by their Employer to work during that period, shall be granted his vacation by the Employer as soon thereafter as is reasonably convenient. When the Employee is so required by his Employer to work during the vacation period as previously decided upon, he shall be paid for his work during that period at the regular rates of pay.

**(G)**     The parties agree that the rights and responsibilities under this Section 8-12, including the collection of delinquent Employer payments, may be enforced by the Union, at its discretion, either through the grievance-arbitration procedure of this Agreement or by filing a lawsuit in an appropriate state or federal court. The Employer expressly waives any defense based on the exhaustion of the grievance-arbitration procedure in any lawsuit brought by the Union to enforce the terms of this Section.

## NATIONAL PENSION PLAN AND NATIONAL 401(k) PLAN

**8-13.     (a)**     The Employer will contribute to the Sheet Metal Workers' National Pension Fund (NPF) amounts as set forth in this Agreement per hour for each hour worked for each Employee of the Employer subject to Section 8-24 below. Payment shall be made on or before the 20th day of the succeeding month and shall be remitted to the office of the National Pension Fund as designated by the Trustees of the Fund. The parties agree to be bound by the Agreement and Declaration of Trust establishing said Fund and Amendments thereto as may be made from time to time and hereby designate as their representatives on the Board of Trustees such Trustees as named, together with any successors who may be appointed pursuant to said Trust Agreement. SMART Local 9 and SMACNA Colorado agree to adopt the terms and conditions of the National Pension Fund 2008 Default Schedule that NPF distributes in conjunction with the Notice of Critical Status. The 2008 Default Schedule is deemed incorporated into this Agreement and becomes part of this Agreement.

      **(b)**    The Employer will contribute to the Sheet Metal Workers' National Supplemental Savings Plan ("401(k) Plan" or "NSSP") amounts as set forth in this Agreement per hour for each hour worked for each Employee of the Employer subject to Section 8-24 below. Payment shall be made at such time and in such manner as directed by the Trustees of the NSSP and shall be remitted to the office of the NSSP as designated by the Trustees of the NSSP. The parties agree to be bound by the Agreement and Declaration of Trust establishing said Plan and Amendments thereto as may be made from time to time and hereby designate as their representatives on the Board of Trustees such Trustees as named, together with any successors who may be appointed pursuant to said Trust Agreement.

    When sheet metal workers are temporarily employed outside the jurisdiction of their home local union, the parties' signatory to this agreement shall arrange to transmit any 401(k) contributions required to be made to a 40(k)

    plan where the work is performed to a 401(k) plan established for the employee's home local union, and/or to the National Supplemental Savings Fund.

    This obligation is conditioned upon a suitable reciprocity arrangement being agreed to by the Trustees of such plans.

## SHEET METAL WORKERS' LOCAL # 9 PENSION PLAN

**8-14.**   **(a)**    The Employer agrees to become and remain a participating employer in the SMART Local No. 9 Pension Trust ("Trust" or "Pension Trust") or any successor Plan throughout the term of this Collective Bargaining Agreement, including any extensions thereof, subject to the provisions of Section 8-24 below.

      **(b)**    The Employer agrees to make contributions to the Pension Trust each month on behalf of all Employees engaged in sheet metal work within the meaning of Section 1-1 of this Agreement to the Trust at the hourly rate(s) set out in the Appendix to the Agreement. Contributions shall be made for each hour worked by each Employee.

## SHEET METAL WORKERS' LOCAL # 9 FAMILY HEALTH PLAN

**8-15.** **(a)**    The Employer agrees to become and remain a participating employer in the Colorado Sheet Metal Workers Local No. 9 Family Health Plan ("Health Plan"), or any successor Plan, throughout the term of this Collective Bargaining Agreement, including any extensions thereof, subject to the provisions of Section 8-24 below.

When sheet metal workers are employed temporarily outside the jurisdiction of their home local union, the parties' signatory to this Agreement agree to arrange through the Health and Welfare Trust Fund to transmit health and welfare contributions made on behalf of the employee to the Health and Welfare Trust Fund in the employee's home local union.

The parties to this Agreement agree to establish a system for continuing health and welfare coverage for employees working temporarily outside the jurisdiction of the local collective bargaining agreement when health and welfare contributions are transmitted on their behalf by trust funds from other areas

This obligation is conditioned upon a suitable reciprocity arrangement being agreed to by the Trustees of such plans.

     **(b)**    The Employer agrees to make contributions to the Health Plan each month on behalf of all Employees engaged in sheet metal work within the meaning of Section 1-1 of this Agreement to the Health Plan at the hourly rate(s) set out in the Appendix to the Agreement. Contributions shall be made for each hour worked by each Employee.

## COLORADO SHEET METAL INDUSTRY FUND

**8-16.** Contributions provided for in Section 8-16a of this Article will be used to promote programs of industry education, training, negotiation and administration of collective bargaining agreements, research and promotion, such programs serving to expand the market for the services of the sheet metal industry, improve the technical and business skills of Employers, stabilize and improve Employer-Union relations, and promote, support and improve the employment opportunities for members of the International Association of Sheet Metal, Air, Rail, Transportation Workers'. No part of any such payments, however, shall be used for political activities or to oppose officially stated policy, or officially endorsed programs or to interfere in any way in the internal affairs of the International Association of Sheet Metal, Air, Rail and Transportation Workers', or of any affiliated local union.

**(A)** The Employer shall pay the Sheet Metal and Air Conditioning Contractors National Industry Fund of the United States (IFUS) as set forth in this Agreement for each hour worked on and after the effective date of this Agreement by each Employee of the Employer covered by this Agreement. Payment shall be made on or before the 20th day of the succeeding month and shall be remitted to IFUS, 4201 Lafayette Center Drive Chantilly, VA 20151 or for the purpose of transmittal, through Colorado Sheet Metal Industry Fund.

**(B)** The IFUS shall submit to the International Association of Sheet Metal, Air, Rail, Transportation Workers', not less often than semi-annually written reports describing accurately and in reasonable detail, the nature of activities in which it is engaged or which it supports directly or indirectly with any of its funds. One time per year, the IFUS shall include in such written report a financial statement attested by a certified public accountant, containing its balance sheet and detailed statement of annual receipts and disbursements. Further specific

detailed information in regard to IFUS activities or its receipts and/or expenditures shall be furnished to the International Association of Sheet Metal, Air, Rail, Transportation Workers' upon written request.

**(C)**   Grievances concerning use of IFUS funds for purposes prohibited under 8-16 or for violations of other subsections of this Section may be processed by the International Association of Sheet Metal, Air, Rail, Transportation Workers' directly to the National Joint Adjustment Board under the provisions of Article 10 of this Agreement. In the event such proceedings results in a deadlock, either party may, upon ten (10) days notice to the other party, submit the issue to final and binding arbitration. The Arbitrator shall be selected by the Co-Chairmen of the National Joint Adjustment Board. The Arbitrator shall be authorized to impose any remedial order he deems appropriate for violation of this Section, including termination of the employer's obligation to contribute to the IFUS.  The authority of the Arbitrator is expressly limited to a determination of a deadlocked issue under this Section.

**(D)**   Contributions provided for in Section 8-16(E) of this Article will be used to promote programs of industry education, training, negotiation and administration of collective bargaining agreements, research and promotion, such programs serving to expand the market for the services of the Sheet Metal Industry, improve the technical and business skills of Employer-Union relations and promote, support and improve the employment opportunities for Employees.  No part of any such payments, however, shall be used for political activities or to oppose officially stated policy or officially endorsed programs, or to interfere in any way in the internal affairs of the International Association of Sheet Metal, Air, Rail, Transportation Workers' or of any affiliated local union.

**(E)**   The Employer shall pay to the Colorado Sheet Metal Industry Fund (hereinafter referred to as the local Industry Fund) as set forth in this Agreement for each hour worked by all Employees of the Employer covered by this Agreement. Payment shall be made monthly on or before the 20th day of the succeeding month.

**(F)**   The Fund shall furnish to the Business Manager of the Union not less often than semi-annually, written reports describing in reasonable detail the nature of activities in which it is engaged or which it supports directly or indirectly with any of its funds.  At least one time per year, the Fund shall include in such written report, a statement attested by a certified public accountant and containing its balance sheet and detailed statement of receipts and disbursements. Further specific detailed information in regard to Fund activities or its receipt and/or disbursements shall be furnished to the Business Manager of the Union upon his written request.

**(G)**   Grievances concerning use of local industry fund monies to which an employer shall contribute for purposes prohibited under Section 8-16(E) or for violations of other subsections of this Section shall be handled under the provisions of Article 10 of this Agreement.  The National Joint Adjustment Board shall be authorized to impose any remedial order for violation of this Section, including termination of the employer's obligation to contribute to the local industry fund.

## INTERNATIONAL TRAINING INSTITUTE

**8-17.** The Employers will contribute to the INTERNATIONAL TRAINING INSTITUTE for the Sheet Metal and Air Conditioning Industry as set forth in this Agreement for each hour worked, for each Employee of the Employer. Payment shall be made on or before the 20th day of the succeeding month and shall be remitted to the office of the INTERNATIONAL TRAINING INSTITUTE as designated by the Trustees of the Fund or for purposes of collection and transmittal, through Sheet Metal Workers Training Fund. The parties agree to be bound by the Agreement and Declaration of Trust establishing said Fund and amendments thereto as may be made from time to time and hereby designate as their representatives on the Board of Trustees, such trustees as named, together with any successors who may be appointed pursuant to said Agreement.

**(A)** The parties agree to be bound by the separate Agreements and Declarations of Trust establishing the INTERNATIONAL TRAINING INSTITUTE for the Sheet Metal and Air Conditioning Industry, the National Energy Management Institute Committee, the Sheet Metal Occupational Health Institute Trust, SMWIA Scholarship Fund, and the Industry Fund of the United States and the separate agreements and declarations of trusts of all other local or national programs to which it has been agreed that contributions will be made. In addition, the parties agree to be bound by any amendments to said trust agreements as may be made from time to time and hereby designate as their representatives on the Board of Trustees such trustees as are named together with any successors who may be appointed pursuant to said agreements.

**(B)** The parties authorize the trustees of all national funds to cooperatively establish uniform collection procedures to provide for efficient and effective operation of the various national trusts. For purposes of collection and transmittal of all National Funds to Sheet Metal Workers National Benefit Funds, P.O. Box 14176, Ben Franklin Postal Station, Washington, D.C. 20006.

## SHEET METAL WORKERS' LOCAL # 9 TRAINING FUND

**8-18.** The Colorado Sheet Metal Workers Training Fund is created to help meet the definite obligation on the part of the Sheet Metal Industry to help in the cost of training of Apprentices and Journeymen.

The payment by Employers shall be made to the "Colorado Sheet Metal Workers Training Fund" monthly for each hour worked by each Employee as set forth in this Agreement, subject to Section 8-24.

## SCHOLARSHIP LOAN AGREEMENT

**8-19.** It is the understanding of the parties to this Agreement that the funds contributed by signatory Employers to the Fund and any local Joint Apprenticeship and Training Fund ("Local JATC") will not be used to train apprentices or journeymen who will be employed by Employers

in the Sheet Metal Industry not signatory to a Collective Bargaining Agreement providing for contributions to the Fund and a local JATC. Therefore, the Trustees of the Fund and local JATC shall adopt and implement a Scholarship Loan Agreement Program which will require apprentices and journeymen employed by signatory Employers to repay the cost of training either by service following training within the union sector of the industry or by actual repayment of the cost of training if the individual goes to work for a non-signatory employer in the Sheet Metal Industry. The cost of training shall include the reasonable value of all Fund and local JATC materials, facilities and personnel utilized in training. If a local JATC does not implement the Scholarship Loan Agreement, the local JATC shall be prohibited from utilizing Fund materials and programs.

## SHEET METAL OCCUPATIONAL HEALTH INSTITUTE TRUST (SMOHIT)

**8-20.** Effective as of the date of this Agreement the Employers will contribute to the Sheet Metal Occupational Health Institute Trust as set forth in this Agreement for each hour worked by each Employee of the Employer covered by this Agreement until the Institute Trustees determine that the Trust is financially self sufficient. Payment shall be made on or before the 20th day of the succeeding month and shall be remitted as designated by the Trustees of the Trust.

## NATIONAL STABILIZATION AGREEMENT OF SHEET METAL INDUSTRY (SASMI)

**8-21.** The Employer shall make monthly payments of an amount equal to three percent (3%) of the gross earnings of each Employee subject to this Agreement of Sheet Metal Industry (SASMI) Trust Fund. Gross Earnings, for purposes of this Agreement, shall mean (a) total wages paid to an Employee by the Employer which are reportable by the Employee for Federal Income Tax purposes, and (b) any and all contributions paid by such Employer on behalf of the Employee to a pension and/or health and welfare fund.

**(A)** The Employer agrees to adopt the National SASMI Trust as presently constituted and as the same may be amended from time to time, to be bound by all Rules and Regulations of the Plan as adopted by the Trustees, as presently existing and as the same may be amended from time to time.

## SMWIA SCHOLARSHIP FUND

**8-22.** The SMWIA Scholarship Fund is a National Trust Fund administered by a board of trustees. It provides scholarships for the members of the International Association of Sheet Metal, Air, Rail, Transportation Workers' at the various colleges and institutes in the United States and Canada. The Employer shall pay the above named fund the applicable amount according to the current collective bargaining agreement.

## NATIONAL ENERGY MANAGEMENT INSTITUTE (NEMI)

8-23. Effective as of the date of this Agreement the Employers will contribute to NEMI the amounts as set forth in this Agreement for each hour worked by each Employee of the Employer covered by this Agreement. Payment shall be made on or before the 20th day of the succeeding month and shall be remitted as designated by the Trustees of the Trust.

## EMPLOYER RESPONSIBILITY AND PAYMENT OF FRINGE BENEFITS AND CONTRIBUTIONS

The provisions of this Section 8-24 apply to all employee benefit funds in Sections 8-13 to and including 8-23 unless specifically provided otherwise.

8-24.   (a)   Requirement to Maintain Bond. All Employers signatory to the Agreement shall carry with a reliable bonding company, at its own expense, a bond in accordance with the following schedule of Employees to ensure payment of all employee benefit contributions.

| | |
|---|---|
| One to five *employees, excluding Owner members* | $ 25,000.00 |
| Six to fifteen | 50,000.00 |
| Sixteen to twenty-five | 80,000.00 |
| Twenty-six and over | 150,000.00 |

The bond shall be conditional upon payment by the Employer of all fringe benefits and contributions under this Agreement. The Employer shall provide the Union with evidence that the bond is in force and the name of the bonding or insurance company issuing same.

The Employer may choose to deposit a certified or cashiers check payable to SMART Local #9 Benefit Trust Funds in the amount equal to the schedule listed above. If an Employer fails to purchase a new Bond, if required, he shall then be required to furnish a Cashiers Check equal to the schedule listed above, within five (5) business days.

The certified or cashiers check shall be a joint signature check to be cashed by the Trust Funds in the event of the Employer's failure to remain current on all fringe benefit payments.

SMART #9 will not refer members to any Employer who does not comply with the items noted above.

Any Employer having established a record of twelve (12) consecutive months wherein all fringe benefits and contribution payments have been made, may discontinue maintaining a bond. Thereafter, a delinquency to any employee benefit plan to which contributions are required under this Agreement of thirty (30) days or more will require immediate reinstatement, or reacquisition, of a bond. If an Employer that is required to reinstate a bond subsequently establishes a record of twelve (12) consecutive months wherein all fringe benefits and contribution payments have been timely made, such Employer may discontinue maintaining a bond as long as contributions required under this Agreement are current.

**(b)** Contributions.

**(i)** The vacation pay deduction required by section 8-12 shall be paid for regular hours worked times the vacation rate, plus overtime hours at the rate overtime is paid. See Article 6 and Appendix A.

**(ii)** The Family Health Plan, Pension Trust, Industry Fund, Training Fund, National Pension Fund, NSSP 401(k) Plan and other national fund contributions shall be paid for the total hours worked.

**(iii)** The SASMI contribution shall be 3% of gross earnings as provided in Section 8-21.

**(iv)** Employers not bound to payments into the Industry Fund will pay, in lieu of the Industry Fund, the established amount to the Colorado Sheet Metal Workers' Local Training Fund.

**(v)** SMART Local 9 working assessment, service fee deduction or dues check-off shall be submitted to a financial institution designated by Local 9.

**(vi)** The Employer agrees to make contributions to the employee benefit funds as required by this Agreement as long as the Agreement is in effect or, upon the expiration of this Agreement, until it is no longer under a duty to make such contributions under the National Labor Relations Act, if later.

**(c)** Due Date. Contributions for work in a month shall be paid on or before the twentieth (20th) day of the month immediately following the month in which the hours were worked (or on or before such other date as the Board of Trustees of a fund may have determined or hereafter determine). Contributions shall be transmitted together with a remittance report containing such information, in such manner, and on such form as may be required by a fund's Board of Trustees.

**(d)** Work Stoppage. If on the last day of the month following the month for which contributions to the benefit funds are due, the Employer has failed to pay contributions and deductions, then on the next working day, *a hiring freeze shall be in effect or* he may suffer a work stoppage on jobs and/or in the shops at the discretion of the Delinquency Committee. This work stoppage will continue until all contributions have been paid and there shall be no loss of pay to his Employees during this work stoppage, not to exceed a total of sixteen (16) hours per Employee.

**(e)** Employer Bound by Trust Agreements. The Employer agrees to be bound by the provisions of the Agreements and Declaration of Trust establishing each benefit fund hereunder as they may from time to time be amended, and by all resolutions and rules adopted by

their respective Board of Trustees pursuant to the powers delegated to them by the applicable Trust Agreement, including collection policies, receipt of which is hereby acknowledged and the terms of which are incorporated herein by reference. The Employer hereby designates the Employer members of each benefit fund's Boards of Trustees, or their duly selected successor(s), as its representatives on the respective fund's Boards of Trustees.

**(f)** Payroll Review. The Employer agrees to retain records and to permit auditors authorized by the Boards of Trustee(s) of the benefit fund(s), individually or jointly, to inspect and review any of its records necessary to ensure compliance with this Agreement and to forward such records or true copies thereof to the fund's auditors upon request, and as may be provided in the applicable Trust Agreement. The Employer further agrees to make available to the Union all payroll records the Union may require to administer the working assessment, service fee deduction or due's check off provided under this Agreement, and to maintain all payroll records, including time cards, for a period of three (3) years for such purposes.

**(g)** Cooperation with Funds. The Employer and Union agree to cooperate with the Trustees of the Family Health Plan, Pension Trust and other benefit funds in distributing plan booklets, literature, and other documents supplied by the Board of Trustees or Administrators of such funds, and in obtaining and providing such census data as may be required by the funds' Administrators or Trustees.

**(h)** Delinquencies. The Employer agrees that, should it default or become delinquent in any of its obligations to any employee benefit fund, as set forth in this Agreement, it shall be liable for such penalties and costs as may be provided for by the Trust Agreement(s), resolution(s) and policies of the Board(s) of Trustees of the respective fund(s), including, but not limited to, a late payment fee, interest, liquidated damages, and all costs of collection including reasonable attorney's and accounting fees.

**(i)** Termination of Participation. The parties acknowledge that the participation of the Employers in the benefit funds hereunder are subject to approval by the Board of the Trustees of the respective benefit funds and that the respective Trustees reserve the right to terminate, at their sole and unreviewable discretion, the participation of the employees covered by this Agreement. Such termination may be directed by the Trustees for reasons including, but not limited to, failure of the Employer to timely pay contributions, and expiration of a Collective Bargaining Agreement. If the Trustees should deny an Employer's participation for any reason, the contributions provided by this Agreement shall be added to the employees' wages.

## INTEGRITY CLAUSE

**8-25.(A)** A "bad-faith employer" for purposes of this Agreement is an Employer that itself, or through a person or persons subject to an owner's control, has ownership interests (other than a non-controlling interest in a corporation whose stock is publicly traded) in any business entity that engages in work within the scope of SFUA Article I hereinabove using employees whose wage package, hours and working conditions are inferior to those prescribed in this

Agreement or, if such business entity is located or operating in another area, inferior to those prescribed in the Agreement of the sister local union affiliated with the International Association of Sheet Metal, Air, Rail, Transportation Workers', AFL-CIO in that area.

**(B)** An Employer is also a "bad-faith employer" when it is owned by another business entity as its direct subsidiary or as a subsidiary of any other subsidiary within the corporate structure thereof through a parent-subsidiary and/or holding-company relationship, and any other business entity within such corporate structure is engaging in work within the scope of SFUA Article I hereinabove using employees whose wage package, hours and working conditions are inferior to those prescribed in this Agreement or, if such other business entity is located or operating in another area, inferior to those prescribed in the Agreement of the sister local union affiliated with the International Association of Sheet Metal, Air, Rail, Transportation Workers', AFL-CIO in that area.

**(C)** Any Employer that signs this Agreement or is covered thereby by virtue of being a member of a multi-employer bargaining unit expressly represents to the Union that it is not a "bad-faith employer" as such term is defined in Section 1 hereinabove and, further, agrees to advise the union promptly if at any time during the life of this Agreement said Employer changes its mode of operation and becomes a "bad-faith employer". Failure to give timely notice of being or becoming a "bad-faith employer" shall be viewed as fraudulent conduct on the part of such Employer.

**(D)** In the event any Employer signatory to or bound by this Agreement shall be guilty of fraudulent conduct as defined above, such Employer shall be liable to the Union for liquidated damages at the rate of $500 per calendar day from the date of failure to notify the Union until the date on which the Employer gives notice to the Union. The claim for liquidated damages shall be processed as a grievance in accordance with, and within the time limits prescribed by, the provisions of SFUA Article X.

## MEMBERSHIP EDUCATION PROGRAM

**8-26. (A)** There is hereby established a "Membership Education Program" between SMART Local Union #9 and each Employer or his Representative Association.

**8-26. (B)** It is agreed that all Apprentices shall participate in the program. The activities of the program that involve organizing and other traditional union activities shall be funded by the Union through a check-off in compliance with the provisions of Section 302 (c) of the L.M.R.A.

# ARTICLE 9

## EMPLOYEE RESPONSIBILITY

**9-1.** Journeyman and Apprentice Sheet Metal Workers covered by this Agreement shall provide for themselves hand tools, including the following:

| | |
|---|---|
| 1 - Pair Snips - Left Cut | 2 – 12" Pair Channel Locks (Water Pumps) |
| 1 - Pair Snips - Right Cut | 1 – Scratch Gauge |
| 1 - Pair Bulldog Snips | 1 - Welding Hood/For Welders Only |
| 1 - Pair Combination Snips | 2- Tapered Drift Pins 1/4" to 3/8" |
| 1 – Speed Wrench | 2 - Scratch Awls |
| 1 - Sheet Metal Hammer | 1 - Pipe Crimper |
| | 1 Pair Square Nose Pliers |
| 1 - Pair Tongs | 1 – Pair Lineman Pliers (wire cutters) |
| 1 - Small Dolly | 1 - Cold Chisel |
| 1 - Hacksaw | 1 - Bit Box |
| 4- Pair Vice Grips | 1 - 1/8" Pop Riveter |
| 2 – Pair of C Grips | 1 – Duct Puller |
| 1 -3/8 ratchet with commonly used sockets | 1 – Large Nipper (Duct Pullers) |
| 1 - 50' Steel Tape | 1 – Nail Bar |
| 2 - Crescent Wrenches - 10" and 6" | 1 – 12" Tri Square |
| 1 - 25' Steel Tape | Tool Pouches |
| 1 - Plumb Bob and Chalk Box | |
| 1 - Small Level not to exceed 18" | |
| 1 - Set Allen Wrenches | |
| 2 - 8" Screwdriver | |
| 1 - Stubby Screwdriver | |
| 1 - 8" Phillips Screwdriver | |
| 1 - Pair Dividers 8" | |
| 1 – V Notcher, or button punch, or Whitney Punch, at Employees discretion | |

The Employee will be provided with two pair of safety glasses in a six-month period and will be provided training and materials needed to clean and maintain the safety eyewear in good condition. Employees are required to maintain safety eyewear in good condition.

In the event that safety eyewear becomes damaged through appropriate use, they will be replaced on an as needed basis. This policy requires the employee to present the damaged glasses to the employer. Safety eyewear replaced due to damage resulting from proper use will not count towards the two pair per 6-month period.

In the event the employee does not arrive at work with safety approved safety glasses as provided by the Company or purchased individually, the following will be applicable:
  The Employee can elect to receive a written reprimand.
  Following a second reprimand, the employee will be sent home without show up pay.
  In the event of a third reprimand, the employee may be terminated.

**9-1. (A)**   Apprentice Applicant tool list, contractors will allow a credit for these tools to the Apprentice Applicant for a period of sixty (60) days, the following tools:

1 - Pair Snips - Left cut
1 - Pair Snips - Right cut
1 - Sheet Metal Hammer
1 - 8" Screwdriver
1 - Tape
1 - Scratch Awl

**9-2.**   Journeymen, Apprentices, apprentice applicants or classified sheet metal workers covered by this Agreement shall not be permitted or required as a condition of employment to furnish the use of automobile or other conveyance to transport men, tools, equipment or materials from shop to job, from job to job, or from job to shop; facilities for such transportation to be provided by the Employer.  This provision shall not restrict the use of an automobile or other conveyance to transport its owner and personal tools from home to shop or job at starting time, or from job to home at quitting time.

**(A)**   Journeymen, Apprentices, Apprentice Applicants and any other classification of employee covered by this Agreement shall not be restricted from using their automobile or other conveyance to transport its owner and personal tools and certain small tools (provided they are furnished by the Employer) such as electric drills up to 3/8", drop cords not to exceed 100 feet, small power saws, pop rivet guns, pop rivets, bits, bench rules, or other small hand tools which can be carried in the worker's tool box, from home to shop or job at starting time or from job or shop to home at quitting time.

**(B)**   Journeymen, Apprentices, Apprentice Applicants and any other classification of employee covered by this Agreement shall not be required or permitted to lease, rent, or in any way loan his automobile, truck, welding machines, or any other material or equipment, to his Employer, or any other Employer signatory to this Agreement.

**(C)**   Employer furnished hand tools that are worn or faulty are to be replaced by the Employer promptly for better productivity and Employees are financially responsible for Employer furnished tools if negligence is proven.

## PREFERENTIAL CLAUSE

**9-3.**   The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Sheet Metal, Roofing, Ventilating and Air Conditioning Industry, for covered work in the State of Colorado, any better Agreement than this Agreement, such better Agreement

shall be made available to the Employer for all jobs in Colorado and the Union shall immediately notify the Employer Association of any such concessions.

**(A)**  Upon notification of ratification of any addendum to the Standard Form of Union Agreement, the Employer must give the Union fifteen (15) days notice of intent to utilize and sign. For any new non-HVAC Agreement or Addendum, the Employer will have 90 (ninety) days to sign and implement said Agreement or Addendum.

**(B)**  Under this favored nations clause, it is expressly understood that this issue is not to be raised concerning the application of Resolution Number 78 on any targeted job, so long as all signatory contractors who wish to do so, have an opportunity to compete under the same conditions on that particular targeted job.

**(C)**  Preferential clause will not be applicable to organizing campaigns conducted by SMART Local #9.  Labor and Management will meet quarterly to review the organizing activities of SMART Local #9.

## SAVINGS CLAUSE

**9-4.**  Inasmuch as this Agreement is subject to any and all governmental laws, rules and regulations, any provisions of this Agreement adjudged to be unlawful by a court of competent jurisdiction, shall be treated for all purposes as null and void, but all other provisions of this Agreement shall continue in full force and effect as provided herein.

## SUCCESSOR AND ASSIGNS

**9-5.**  Prior to selling, liquidating or transferring ownership of the business a signatory contractor must insure that all trust funds are paid, up to the date of sale.

## ADDENDUM RATIFICATION & IMPLEMENTATION

**9-6.**  Any Addendum must be ratified by Local #9's membership before becoming effective.  Any addendum shall be subject to Article 9-3 and 9-3(A) if the particular addendum has not been negotiated by the Association and shall be subject to 9-3(A) if Association has negotiated the particular addendum.

# ARTICLE 10

## GRIEVANCE PROCEDURE

The Union and the Employer, whether party to this Agreement independently or as a member of a multi-employer bargaining unit, agree to utilize and be bound by this Article.

**10-1.** Grievances of the Employer or the Union, arising out of interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible. Both parties may participate in conferences through representatives of their choice.

**(A)** To be valid, grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within thirty (30) calendar days of first knowledge of the facts giving rise to the grievance.

**10-2.** Grievances not settled as provided in Section 1 of this Article may be appealed by either party to the Local Joint Adjustment Board where the work was performed or in the jurisdiction of the Employer's home local and such Board shall meet promptly on a date mutually agreeable to the members of the Board, but in no case more than fourteen (14) calendar days following the request for its services, unless the time is extended by mutual agreement of the parties, or Local Joint Adjustment Board. The Board shall consist of representatives of the Union and of the Local Employers Association and both sides shall cast an equal number of votes at each meeting. The local Employers Association, on its own initiative, may submit grievances for determination by the Board as provided in this Section. Except in the case of a deadlock, a decision of a Local Joint Adjustment Board shall be final and binding.

**(A)** Notice of appeal to the Local Joint Adjustment Board shall be given within thirty (30) days after termination of the procedures prescribed in 10-1 of this Article, unless the time is extended by a mutual agreement of the parties.

**10-3.** Grievances not disposed of under the procedure prescribed in Section 2 of this Article, because of deadlock, or failure of such Board to act, may be appealed jointly or by either party to a panel consisting of one (1) representative appointed by the Labor Co-Chairman of the National Joint Adjustment Board and one (1) representative appointed by the Management Co-Chairman of the National Joint Adjustment Board. Appeals shall be mailed to the National Joint Adjustment Board. Notice of appeal to the panel shall be given within thirty (30) days after termination of the procedures prescribed in Section 2 of this Article. Such Panel shall meet promptly, but in no event more than fourteen (14) calendar days following receipt of such appeal, unless such time is extended by mutual agreement of the panel members. Except in case of deadlock, the decision of the panel shall be final and binding.

**(A)** Notwithstanding the provisions of Paragraph 1 of this Section an Employer who was not a party to the labor agreement of the area in which the work in dispute is performed may appeal the decision of the Local Joint Adjustment Board from that area, including a unanimous decision and request a panel hearing as set forth in Section 3 of this Article, providing such appeal is approved by the Co-Chairmen of the National Adjustment Board.

**10-4.** Grievances not settled as provided in Section 3 of this Article may be appealed jointly or by either party to the National Joint Adjustment Board. Submission shall be made and decisions rendered under such procedures as may be prescribed by such Board. Appeals to the

National Joint Adjustment Board shall be submitted within thirty (30) days after termination of the procedures prescribed in Section 3 of this Article. The Procedural Rules of the National Joint Adjustment Board are incorporated in this Agreement as though set out in their entirety. (Copies of the procedures may be obtained from the National Joint Adjustment Board.)

**10-5.** Local Joint Adjustment Board, Panel and the National Joint Adjustment Board are empowered to render such decisions and grant such relief to either party as they deem necessary and proper, including awards of damages or other compensation.

**10-6.** In the event of non-compliance within thirty (30) calendar days following the mailing of a decision of a Local Joint Adjustment Board, Panel or the National Joint Adjustment Board, a local party may enforce the award by any means including proceedings in a court of competent jurisdiction in accord with applicable state and federal law. If the party seeking to enforce the award prevails in litigation, such party shall be entitled to its costs and attorney's fees in addition to such other relief as is directed by the courts.

**10-7.** Failure to exercise the right of appeal at any step thereof within the time limit provided therefore shall void any right of appeal applicable to the facts and remedies of the grievance involved. There shall be no cessation of work by strike or lockout during the pendency of the procedures provided for in this Article. Except in case of deadlock, the decision of the National Joint Adjustment Board shall be final and binding.

**10-8.** In addition to the settlement of grievances arising out of interpretation or enforcement of this Agreement as set forth in the preceding sections of this Article, any controversy or dispute arising out of the failure of the parties to negotiate a renewal of this Agreement shall be settled as hereinafter provided:

**(A)** Should the negotiations for a renewal of this Agreement or negotiations regarding a wage/fringe reopener become deadlocked in the opinion of the Union representative(s) or the Employer(s) representative, or both, notice to that effect shall be given to the National Joint Adjustment Board.

**(B)** If the Co-Chairmen of the National Joint Adjustment Board believe the dispute might be adjusted without going too final hearing before the National Joint Adjustment Board, each will then designate a panel representative who shall proceed to the locale where the dispute exists as soon as convenient, attempt to conciliate the differences between the parties and bring about a mutually acceptable agreement. If such panel representatives or either of them conclude that they cannot resolve the dispute, the parties thereto and the Co-Chairmen of the National Joint Adjustment Board shall be promptly so notified without recommendation from the panel representatives. Should the Co-Chairmen of the National Joint Adjustment Board fail or decline to appoint a panel member or should notice of failure of the panel representatives to resolve the dispute be given, the parties shall promptly be notified so that either party may submit the dispute to the National Joint Adjustment Board.

**(C)** In addition to the mediation procedure set forth above or as an alternate thereto, the Co-Chairmen of the Board may each designate a member to serve as a subcommittee and hear the dispute in the local area. Such committees shall function as arbitrators and are authorized to resolve all or part of the issues. They are not, however, authorized to deadlock and the matter shall be heard by the National Joint Adjustment Board in the event a subcommittee is unable to direct an entire resolution of the dispute.

**(D)** The dispute shall be submitted to the National Joint Adjustment Board pursuant to the rules as established and modified from time to time by the National Joint Adjustment Board. The unanimous decision of said Board shall be final and binding upon the parties, reduced to writing, signed and mailed to the parties as soon as possible after the decision has been reached. There shall be no cessation of work by strike or lockout unless and until said Board fails to reach a unanimous decision and the parties have received written notification of its failure.

**(E)** Any application to the National Joint Adjustment Board shall be upon forms prepared for that purpose subject to any changes which may be decided by the Board from time to time. The representatives of the parties who appear at the hearing will be given the opportunity to present oral argument and to answer any questions raised by members of the Board. Any briefs filed by either party including copies of pertinent exhibits shall also be exchanged between the parties and filed with the National Joint Adjustment Board at least twenty-four (24) hours in advance of the hearing.

**(F)** The National Joint Adjustment Board shall have the right to establish time limits which must be met with respect to each and every step or procedure contained in this section. In addition, the Co-Chairmen of the National Joint Adjustment Board shall have the right to designate time limits which will be applicable to any particular case and any step therein which may be communicated to the parties by mail, telegram, or telephone notification.

**(G)** Unless a different date is agreed upon mutually between the parties or is directed by the unanimous decision of the National Joint Adjustment Board, all effective dates in the new agreement shall be retroactive to the date immediately following the expiration date of the expiring Agreement.

**10-9.** I understand, with the execution of this Agreement I have signed Local 9's new Standard Form of Union Agreement. I recognize that this Agreement contains Article 10, Section 8 dealing with interest arbitration. I further recognize that since interest arbitration is a permissive subject of bargaining and is not mandatory that I may not invoke the equal treatment clause in the contract to adopt a different form of Union Agreement that does not contain interest arbitration.

# ARTICLE 11

## PAL POLITICAL FUND

**11-1.** The Employer agrees to recognize political contribution deduction authorizations for its Employees who are Union members in the following form:

"I hereby authorize the Financial Institution designated to hold my vacation account to deduct from my vacation fund the sum of two cents ($.02) for each hour worked and to forward that amount to PAL Political Fund and/or AFL-CIO COPE. This authorization is signed voluntarily and with the understanding that PAL Political Fund and/or AFL-CIO COPE will use this money to make political contributions and expenditures in connection with federal, state and local elections. I am aware of my right to refuse to sign this authorization without reprisal. This authorization may be revoked by mailing notices of revocation by United States Registered or Certified Mail, Return Receipt Requested, to the Treasurer, PAL Political Committee and/or AFL-CIO, 1750 New York Avenue N.W., Washington, D.C. 20006, and to SMW #9 Office, P.O. Box 27910, Denver, CO 80227-0910.

**(A)** The political contribution deduction from the vacation fund shall be made on the first pay period of each month during which an Employee who has performed compensated service has in effect a voluntarily executed political contribution deduction authorization filed with the Vacation Board of Trustees. The money shall be remitted within ten (10) days thereafter to PAL Political Fund, and/or AFL-CIO COPE, 1750 New York Avenue, N.W., Washington, D.C. 20006, accompanied by a form stating the name and hours worked for each Employee for whom a deduction has been made. All collections and administration shall be treated as a vacation delinquency by the Vacation Board of Trustees. The Employer shall have no responsibility for collection, administration or distribution of these political funds.

# ARTICLE 12

## APPRENTICES

**12-1.** There shall be one (1) Joint Apprenticeship and Training Committee hereinafter referred to as the JATC. It is agreed that the JATC will establish Training Centers in sufficient numbers to meet the training needs of all employer's signatory to this Agreement.

**(A)** All duly qualified apprentices and apprentice applicants shall be under the supervision and control of a Joint Apprenticeship and Training Committee as determined in the Apprentice Trust documents.

**12-2.** It is hereby mutually agreed by both parties hereto that they will individually and collectively cooperate to the extent that duly qualified apprentices be given every opportunity to secure proper technical and practical education experience in the trade, under the supervision of the JATC.

**12-3.** It is hereby agreed that the Employer shall be entitled to apply to the Joint Apprenticeship and Training Committee on the basis as listed below in the following table. It is hereby agreed that the Employer shall be entitled to apply to the JATC for apprentices and

STANDARD FORM OF UNION AGREEMENT **(CO A-07-16)**                                      39

apprentice applicants according to the JATC policy. The total ratio per shop and job site shall be as follows:

| Number of Journeymen Employed | Eligible for Number of Apprentices | Eligible for Number of Apprentice Applicants | Eligible for Number of Classified Workers |
|---|---|---|---|
| 1 | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |
| 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 |
| 10 | 10 | 10 | 10 |
| 12 | 12 | 12 | 12 |
| 13 | 13 | 13 | 13 |
| 14 | 14 | 14 | 14 |
| 16 | 16 | 16 | 16 |
| 17 | 17 | 17 | 17 |
| 18 | 18 | 18 | 18 |
| 20 | 20 | 20 | 20 |
| 21 | 21 | 21 | 21 |

**(A)** When the established ratios are not able to be met, the Employer may substitute within all classifications to establish these ratios.

**(B)** Apprentices utilized under these circumstances will retain their regular rate of pay and fringe benefits.

**(C)** Apprentice applicants being utilized under these circumstances will be paid no less than the minimum rates provided for an apprentice at the sixty percent (60%) level including all applicable fringe benefits. The Union will be entitled to all assessments normally paid by the sixty percent (60%) apprentice as well. Note: Apprentice applicants are not applicable to some jobs and projects.

**12-4.**     Paragraph 12-3 notwithstanding, any Contractor engaged exclusively in the residential market (residential market is herein defined as single family housing) shall be entitled to apply to the JATC on the basis of one (1) apprentice to two (2) journeymen.

**12-5.**     All applicants for apprenticeship in Colorado shall be a minimum of 17 years of age. All applicants for apprenticeship shall meet the requirements of the Local J.A.T.C. Apprentices shall not be put in charge of work on any job and shall work under the supervision of a journeyman until apprenticeship terms have been completed and they have qualified as a journeyman.

**12-6.**     A graduated wage scale for apprentices shall be as provided for in appendix A.

**12-7.**     No apprentice shall work without proper or adequate supervision of the journey worker.

For the purpose of these apprenticeship standards, adequate or proper supervision of the apprentice means the apprentice is under the supervision of a fully qualified journeyworker or supervisor at all times who is responsible for making work assignments, on the job learning and safety at the work site.

To adequately or properly supervise an apprentice does not mean the apprentice must be within eyesight or reach of the supervisor, but that the supervisor knows what the apprentice is working on; is readily available and making sure the apprentice has the necessary instruction and guidance to perform their level of performance safely, correctly and efficiently.

# ARTICLE 13

## APPRENTICE APPLICANTS

**13-1.** It is hereby agreed that the Employer may apply to the Joint Apprenticeship Committee and the Joint Apprenticeship Committee shall grant apprentice applicants, based on their availability.  Any apprentice of the Employer on layoff at the effective date of this agreement must be rehired before said Employer is entitled to any apprentice applicant.

**(A)** Apprentice applicants shall be enrolled by the JATC as applicants for future openings in the apprenticeship program. The Joint Apprenticeship Committee shall evaluate the qualifications of apprentice applicants for such openings during the thirty (30) days of employment.  No apprentice applicant shall be retained beyond thirty (30) days unless they are qualified for the apprenticeship program.

**(B)** As a condition of employment and prior to being placed at work, apprentice applicants must be referred by the JATC.  Upon termination or lay off, apprentice applicants must notify the JATC and obtain new referral from the JATC before going back to work.

**(C)** The minimum wages and fringes for apprentice applicants shall be provided for in Appendix-A.

# ARTICLE 14

## CLASSIFIED WORKER

**14-1.** Classified workers may be employed in the following ratio:

**(A)** One (1) classified worker for any Employer who employs an apprentice;

**(B)** Both the Union and the Employer agree not to circumvent the Apprentice Program by encouraging or allowing any indentured apprentice or former apprentice to change his classification to either a classified worker or a journeyman until his class graduates.

**(C)** Classified workers may perform any work covered by Article 1 of which they are capable and will work under the general direction of a journeyman. The wage rate for classified workers will not be less than forty-five percent (45%) of the journeyman wage rate. They shall be covered by the local Family Health Plan. Local Pension, National Pension, and 401 (k) contributions shall be at the same percentage as their wage rate.

**(D)** In the event the Employer is entitled to employ a classified worker and the union fails to comply with the Employer's written request to furnish a classified worker within forty-eight (48) hours, the Employer may directly hire such employees and refer them to the Union.

**(E)** In the event that apprentices or classified workers are not available to meet the established ratios, the Employer may substitute apprentice applicants and/or classified workers to achieve either ratio.

**(F)** Apprentice applicants being utilized under these circumstances will be paid no less than the minimum rates provided for a sixty percent (60%) apprentice including all applicable fringe benefits. The Union will be entitled to all assessments normally paid by the sixty percent (60%) apprentice as well.

**(G)** Classified Workers shall be evaluated using a method jointly developed by Labor and Management to determine the wages, qualifications, and capabilities to enter the workforce. Following the evaluation, the Classified Worker will then be given the opportunity to make application to the Apprenticeship Program. Through the interview process by the Local JATC, the Classified Worker may be offered placement into the appropriate year of the Apprenticeship Program based on their past experience. The wages and fringes will be specified per the stated wage and fringe matrix.

# ARTICLE 15

## NO STRIKE - NO LOCK OUT

**15-1.** Neither the Union nor any of the employees covered by this Agreement will collectively, concertedly or individually induce, engage or participate directly or indirectly, in any strike, sympathy strike, picketing, slowdown, stoppage or other curtailment of interference with the Employer's operations, or interference with the flow of materials or persons in or out of places where the Employer is doing business. The Union agrees to exert every effort through its local officers and representatives to end any unauthorized interruption of work. The Employer will not lock out any of the Employees covered by this Agreement.

**(A)** The elimination of any strike or lockout caused by an impasse of negotiations at the time a current Collective Bargaining Contract has expired is not included above. An individual's rights shall not be in jeopardy by any language in this Article.

# ARTICLE 16

## SIGNATURE OF AGREEMENT

**16-1.** This Agreement shall become effective on the 1st day of July 2016, and remain in full force and effect until the 30th day of June 2019, and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date. In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party.

**16-2.** Notwithstanding any other provision of this Article, or any other Article of this Agreement, whenever an amendment to the Standard Form of Union Agreement shall be adopted by the sponsoring national associations, any party to this Agreement, upon the service of notice to all other parties hereto, shall have this Agreement reopened thirty (30) days thereafter, for the sole and only purpose of attempting to negotiate such amendment or amendments into this Agreement for the duration of the term hereof. There shall be no strike or lockout over this issue.

**16-3.** Each Employer hereby waives any right it may have to repudiate this Agreement during the term of this Agreement, or during the term of any extension, modification or amendment of this Agreement. This shall be effective during the entire term of any collective bargaining agreement that has been entered into under Section 8(f) of the National Labor Relations Act, and upon conversion of the bargaining relationship to one under Section 9(a) of the National Labor Relations Act, either by an election conducted by the National Labor Relations Board, or through the procedures set forth in this Agreement.

**16-4.** By execution of the Agreement, the Employer authorizes SMACNA Colorado to act as its collective bargaining representative for all matters relating to this Agreement. The

parties agree that the Employer will hereafter be a member of the multi-employer bargaining unit represented by said Association unless this authorization is withdrawn by written notice to the Association and the Union at least 150 days prior to the then current expiration date of the Agreement.

In witness whereof, the parties hereto affix their signatures and seal this 28th day of February 2019.

American Veteran Heating and Air

By: _____
Signature of Officer or Representative

By: _____
Signature of Officer or Representative

International Association of Sheet Metal, Air, Rail, Transportation Workers 'Local No. 9

By: _____
Signature of Officer or Representative

By: _____
Signature of Officer or Representative

**International Association of Sheet Metal, Air, Rail, Transportation Workers' Local #9
AND
SMACNA COLORADO**

**LETTER OF UNDERSTANDING**

All items contained in this letter of understanding will be in effect from July 1, 2016 through June 30, 2019. On June 30, 2019 the negotiated Appendix A and Appendix B in effect at that time shall govern and be considered a part of the SFUA for negotiating purposes. All other items contained herein shall become null and void on June 30, 2019.

**APPENDIX A**

The negotiated Appendix A beginning July 1, 2016 and ending on June 30, 2019 shall supersede any prior Appendices. Appendix A provides for a three (3) year collective bargaining agreement.

STANDARD FORM OF UNION AGREEMENT (CO A-07-16)                                          44

Year one of the agreement (7/1/16 – 6/30/17) provides for an increase of $1.75/hour. Year two of the agreement (7/1/17 – 6/30/18) provides for an increase of $1.40/hour. Year three of the agreement (7/1/18 – 6/30/19) provides for an increase of $1.45/hour. The year two increase of $1.40/hour is conditioned on the Local #9 Family Health Plan (FHP) receiving contributions based upon a minimum of 1,261,250 man hours for the time period 1/1/16 thru 12/31/16. The year three increase of $1.45/hour is conditioned on the Local #9 FHP receiving contributions based upon a minimum of 1,274,367 man hours for the time period 1/1/17 thru 12/31/17.

Should the FHP reach the required minimum number of man hours in the prescribed time frame, years two and three of the Agreement will be implemented as defined above. Should the FHP fail to reach the required minimum number of man hours in the prescribed time frame, SMACNA Colorado retains the option to: A) proceed with the scheduled increases for years two and three; or B) decline the option and meet with Local #9 to open contract negotiations, for wages only, which may include a wage freeze, but will not include a wage reduction, however, any decision shall be based upon the economic conditions that exist at that time. For purposes of calculating the FHP man hour contributions, any contractors showing a delinquency for any of the months of 2016 and/or 2017 shall have their last reported monthly man hours duplicated for the missing months, provided that Local #9 members have been employed by the delinquent contractor for that time period, in order to complete the calculation for the year.

## APPENDIX B

Appendix B shall be applicable to all counties in the State of Colorado, with the exception of the City and County of Denver, Arapahoe County, Boulder County, Jefferson County, Adams County, Douglas County, Larimer County and the City and County of Broomfield. Appendix B shall only be applicable on jobs with a Sheet Metal value of $500,000 (five hundred thousand dollars) or less. In instances where a journeyman is not available for hire under this Appendix B, a Classified Worker may be substituted. The terms and conditions of Appendix A, relative to implementation and expiration, shall also apply to Appendix B.

(For purposes of this CBA negotiation, any increases to the Local Pension Fund contribution, under Appendix B, will come from the negotiated wage increase).

## MATERIAL HANDLER

A classification of Material Handler shall be created. The Pre-Apprentice classification shall be eliminated. A Material Handler will be allowed to do any work contained in Article 1. Following a thirty (30) day probationary period, a Material Handler will be allowed to be a member of Local 9 for a maximum of one (1) year (including the 30-day probationary period). Thereafter, he/she will be indentured into the Apprentice program, be changed to a Classified Worker, or terminated. Both the Union and the Employer agree not to circumvent the Apprenticeship Program by encouraging or allowing any indentured apprentice or former apprentice to change

his classification to a Classified Worker, Material Handler or a Journeyman, until his class graduates.

In witness whereof, the parties hereto affix their signatures and seal this 28th day of February 2019.

American Veteran Heating and Air

By: _____
    Signature of Officer or Representative

By: _____
    Signature of Officer or Representative

Local Union No. 9 of the International Association of Sheet Metal, Air, Rail and Transportation Workers'

By: _____
    Signature of Officer or Representative

By: _____
    Signature of Officer or Representative

STANDARD FORM OF UNION AGREEMENT (CO A-07-16)                    46

# EXHIBIT B

**SHEET METAL WORKERS LOCAL 9 PENSION TRUST**
**COLORADO SHEET METAL WORKERS LOCAL 9 HEALTH FUND**
**COLORADO STATE SHEET METAL WORKERS TRAINING FUND**

**POLICY FOR**
**COLLECTION OF DELINQUENT CONTRIBUTIONS**

**Revised April 2018**

**SECTION 1.**

**GENERAL POLICY**

It is the policy of the Sheet Metal Workers Local 9 Pension Trust, the Colorado Sheet Metal Workers Local 9 Health Fund, and the Colorado State Sheet Metal Workers Training Fund (collectively, "Fund" or "Funds"), to collect all employer contributions as they are due and to make such diligent and systematic efforts as are appropriate under the circumstances to do so.

If an employer ceases to have an obligation to contribute to the Fund under the Trust Agreement, a collective bargaining agreement ("CBA"), or applicable law, the employer shall remain subject to this Policy with regard to the time period during which the employer was obligated to contribute to the Fund.

The Trustees of the Fund have the legal right to exercise all remedies allowable under the Trust Agreement, the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and other applicable law, including, but not limited to:

1.      The right to establish a date on which contributions are due;

2.      The right to audit the financial records of the employers, including but not limited to payroll ledgers, federal and state tax returns, IRS Form 941s and such other books and records of the employers that are necessary for the auditors to ascertain that the proper contributions have been made;

3.      The right to establish a random audit program;

4.      The right to require that a delinquent employer pay the cost of an audit, interest, attorneys' fees, and any other expenses incurred by the Fund in determining the amount of a delinquency and in collecting a delinquency;

5.      The right to recover liquidated damages;

6.      The right to require a bond, a letter of credit, or a cash deposit in escrow as security for prompt future payments due from an employer that has been delinquent in its contributions to the Fund;

7.     The right to take any other steps and to perform all other acts that are necessary in order to collect contributions due to the Fund in a timely and expeditious manner, including filing liens; and

8.     The right to terminate a delinquent employer's participation in the Fund in appropriate circumstances, as determined by the Trustees in their sole discretion.

The procedures set forth herein shall be followed unless the Board of Trustees determines that they should be waived in a particular instance.

For the purposes of this Policy, "Funds Office" may refer to a third party provider of services to the Fund.

All questions or disputes relating to the interpretation, meaning and/or application of this policy shall be finally and exclusively resolved by the Board of Trustees in the exercise of its discretion and in the performance of its fiduciary obligations to the Fund's participants and beneficiaries, in the protection of the financial integrity and soundness of the Fund and the efficient and effective administration of the Fund.

## SECTION 2.

## COLLECTION PROCEDURE AND OTHER PROCEDURES IN CASES OF DELINQUENCY

In accordance with the Trust Agreement, ERISA, and the above declaration of policy, the following administrative steps shall be taken to effectuate the collection of delinquent contributions.

1.     Contributions and the supporting remittance report (collectively referred to herein as "Contributions") are due on the date the employer's CBA requires payment. If the CBA does not state a due date, then Contributions are due on the twentieth (20th) day of  the month following the month in which work for which contributions are due is performed (either date to be referred to as the "Due Date"). Contributions shall become delinquent on the fifth (5th) day of the month following the Due Date.

2.     In the event the Contributions are not received by the Due Date, and to the extent practicable, in addition to the procedures described below, the Funds Office may contact the employer by telephone, to attempt to obtain payment of Contributions.

3.     If the delinquent Contributions are not received by the fifth (5th) day of the month following the Due Date, the Funds Office shall send a written Notice to the employer advising the employer that the Contributions must be received immediately.

4.     If the delinquent Contributions are not received by the Funds Office by the fifteenth (15th) day of the month in which the first Notice referred to in paragraph 3 is mailed, the Funds Office shall send a second Notice to the employer and interest shall accrue on the delinquent Contributions from the Due Date at the rate of 10% per annum. The second Notice shall advise the employer that interest will accrue from the Due Date and that its account will be

referred to Legal Counsel if payment is not promptly received, as well as notify the employer of further consequences of non-payment, including late fees and potential termination from participation in the Funds. The employer shall be obliged to secure either a bond, letter of credit, or escrow deposit, in the amount specified in the employer's CBA with Sheet Metal Workers' Local 9 (or, if none, in the agreement between Local 9 and SMACNA), and on terms acceptable to the Trustees, and provide evidence of such bond, letter of credit, or escrow deposit to the Funds. The applicable bond, letter of credit, or escrow deposit must remain in place until the employer has made timely contributions to the Funds for 12 consecutive months.

5.      If the delinquent Contributions are not received by the fifth (5th) day of the second month following the Due Date, late fees will be assessed in the amount of 5% of the contributions due. The Funds Office shall also refer the matter to Legal Counsel as set forth in Section 3. The Funds Office will also notify the employer that its participation in the Funds will be terminated and will notify all affected employees advising them of the potential loss of their benefits, if delinquent contributions and interest are not received within 30 days. Those notices will advise the employer that termination of its participation will not relieve it of its obligation to pay contributions pursuant to the terms of the relevant CBA. If the Funds do not receive the contributions and interest in the 30-day period, the Funds Office will notify the employer and employees that the employer has been terminated. The Funds Office will provide notification to the Funds' Boards of Trustees and to Local 9 at least two (2) days prior to sending any letters described in this paragraph.

6.      If an employer pays the principal amount of the delinquency but does not pay accrued interest and/or any other amounts owed, acceptance of the principal amount shall not constitute a waiver of the Fund's claim for accrued and unpaid interest and/or any other amounts. The Trustees may suspend collection of interest and/or any other amounts due, and in the event the employer subsequently become delinquent, may demand prior interest and/or other amounts owed and collect such amounts in any legal action to collect delinquent contributions.

7.      If an employer's contributions decline significantly (by 10% or more) from its preceding contributions, the Funds Office shall report the situation to the Board of Trustees. The Board of Trustees may direct the Funds Office to contact the employer and the Local Union for an explanation of the decline, or take other action as necessary.

8.      Any payment received by the Funds (including Contributions, interest and/or late fees) from an employer owing delinquent Contributions, interest, and/or late fees of more than $500 in the aggregate, regardless of how the payment is characterized (*e.g.*, for a current month Contribution) may be applied first to the delinquent Contributions with the oldest Due Date, including any applicable unpaid interest and/or late fees, and the remainder of the payment, if any, will be applied to any delinquency due for the following month(s) until the payment is exhausted. The Funds Office will notify the employer how the payment has been allocated and the extent of the remaining delinquency, if any.

9.      Any delinquency policy, practice or remedy set forth in the applicable CBA or other written agreement between an employer and Sheet Metal Workers' Local 9 requiring Contributions to the Funds is hereby incorporated by reference to the extent not inconsistent with this Policy, and in addition to the remedies herein (for example, a requirement that a delinquent employer post bond or secure a letter of credit or escrow deposit).

10. If an employer does not pay the full amount of Contributions required under the applicable CBA or other written agreement between the employer and Sheet Metal Workers' Local 9 requiring Contributions to the Sheet Metal Workers' Local 9 benefit funds and programs on whose behalf the Funds Office collects employer Contributions, the Contributions will be distributed to such benefit funds and programs as follows. The Contributions will first be distributed to the benefit funds and/or programs funded by employee wage deductions, such as the Sheet Metal Workers' Local 9 Vacation Fund. Any remaining Contributions will then be distributed to the remaining benefit funds and programs based on the proportion each of their rates of Contribution bears to the total rate of Contributions for such benefit funds and programs under the applicable CBA or other written agreement, regardless of how the payment is characterized by the employer (*e.g.*, for Health Fund and Training Fund only), subject to the Trustees' right to determine an alternative method of distribution, in their sole discretion, on a reasonable and consistent basis.

## SECTION 3.

## LEGAL ACTION AND SETTLEMENT

1. If an employer's delinquent Contributions are not received by the fifth (5th) day of the second month following the Due Date, and the delinquent Contributions, interest and late fees exceed $1,000 (aggregated for all Funds), the delinquent amount shall be referred to Legal Counsel for collection.

2. Legal Counsel will send a Final Notice to the employer demanding payment of the delinquent Contributions and notifying the employer that it is liable for interest and late fees as set out above. Legal Counsel shall further notify the employer that if the full amount is not paid within twenty (20) days of the Final Notice, suit will be filed and the employer will be liable for the contributions, interest, liquidated damages, attorneys' fees and costs. Liquidated damages shall accrue if suit is filed as set forth in Section 6.

3. In the event an employer fails to pay the delinquent Contributions within twenty (20) days after Legal Counsel's Final Notice, Legal Counsel shall initiate legal proceedings, unless Legal Counsel recommends a different course of action based upon pertinent factors which include, but are not limited to, the following:

      a.    the amount of the delinquency;

      b.    the length of time the delinquent amount has been owed;

      c.    the financial condition of the employer;

      d.    the employer's past performance as a contributing employer;

      e.    the likelihood of collecting on a judgment once it is obtained;

      f.    any other factor that, in the discretion of Legal Counsel, may have a material bearing on the collection of the delinquent Contributions.

4

A lawsuit shall not be commenced if the Board of Trustees determines there is a likelihood that the costs of the suit will exceed the recovery. Unless the Trustees direct otherwise, a lawsuit will not be commenced if aggregate contributions and interest do not exceed $1,000. A lawsuit shall not be commenced under such circumstances pending action of the Trustees on recommendation by Legal Counsel.

4.     Legal Counsel is authorized to enter into settlement negotiations, either orally or in writing, with delinquent employers. Without further approval of the Board of Trustees, Legal Counsel may agree to the immediate payment of the full amount owed; but, any settlement that waives or compromises the amount owed, including interest, liquidated damages, attorneys' fees or costs, must be approved by the Board of Trustees or its designated subcommittee.

5.     Legal Counsel may, without Board consultation, accept any proposal for settlement that contemplates payment of all amounts (including interest and late fees or liquidated damages) due over a reasonable period of time, not to exceed six (6) months.

6.     Unless the Trustees specifically agree to the contrary, no settlement may permanently waive the collection of interest, liquidated damages or attorneys' fees, although any settlement may suspend the collection of interest, liquidated damages, or attorneys' fees until a subsequent delinquency if the current collection of those amounts would involve unwarranted expense.

7.     The Board of Trustees reserves the right to accept or reject an employer's proposal regarding any delinquent Contributions, interest, liquidated damages, and attorneys' fees over a period of time and to compromise any claim or delinquent account, either before or after suit is filed; provided, however, that any such decision to extend the time for payment, or to compromise the amount owing, complies with the Department of Labor Prohibited Transaction Exemption 76-1.

8.     Settlements calling for payments over time or compromising the amount, including interest, liquidated damages, attorneys' fees or costs, must be in writing and signed on behalf of the Funds and the employer unless it would be inappropriate under the circumstances to do so.

9.     If a settlement results in payment of less than the full amount owed (including interest, late fees or liquidated damages), such settlement will be distributed to the applicable Funds pro rata, based on the proportion each Fund's rate of contribution bears to the total rate of contributions for the Funds subject to this Policy, subject to the Trustees' right to determine an alternative method of distribution of the settlement amount, in their sole discretion, on a reasonable and consistent basis.

10.     Notwithstanding the procedures set out in this policy, the Board of Trustees may refer any delinquent account to Legal Counsel at an earlier or later date than provided for herein when circumstances warrant that collection action be expedited or delayed.

11.     The Trustees may, from time to time, appoint a Committee of at least one Employer and one Union Trustee to act on behalf of the Board of Trustees, as provided for under this policy.

## SECTION 4.

## PAYROLL AUDIT POLICY

1.     (a)  The Board of Trustees shall have complete discretion to determine which employers will be audited in each year.  Each employer participating in the Fund shall generally be audited at least once during a three (3) year period.  All employers shall be audited at least once during a five (5) year period, such period to commence from the date of the last audit of the employer, or in cases where an employer has not previously been audited, from the date the employer first became a participating employer in the Fund.  Each new employer shall be audited within the first year of its participation and each employer that terminates its participation in the Fund or files a petition in bankruptcy shall be audited as soon as practicable following such termination or petition.

(b)  The period audited shall generally be three (3) years, unless circumstances dictate otherwise.  In instances where the Trustees decide not to audit a particular employer at least once during a three (3) year period, the period audited shall be determined by the Trustees based on the particular facts and circumstances.

(c)  Notwithstanding the guidelines set out in this Section, the Trustees may, in the exercise of their discretion, determine that the audit schedule set forth above should not be followed in a particular instance.  For example, the Trustees may, in the exercise of their discretion, decide not to conduct an audit if an employer has consistently reported accurately or, if facts and circumstances indicate that a particular employer may be reporting inaccurately or inconsistently, the Trustees may direct that the Fund's auditors conduct an audit.  If an audit uncovers inaccurate or inconsistent reporting by an employer, the Trustees will then make a determination as to whether the auditor should schedule a subsequent audit within the appropriate statute of limitations.

2.     If an employer ceases to have an obligation to contribute to the Fund under the Trust Agreement, CBA, or applicable law, the employer shall remain subject to these audit procedures for the purpose of verifying that the employer made the proper contributions during the time period in which the employer was obligated to contribute to the Fund.

3.     Prior to conducting each audit, the Fund auditor shall notify the Funds Office and review the employer's CBA and any pending issues.  The Funds Office will forward a letter to the employer advising it of the impending audit, citing the Trustees' authority to conduct the audit and describing the records required.

4.     If during a payroll audit the Fund auditor encounters an issue of interpretation of the CBA or an employer takes a position inconsistent with the auditor's understanding of such CBA, the Auditor shall seek the opinion of the Union.  If the Union agrees with the employer's interpretation or position, that shall resolve the matter, unless such interpretation or position is, in the view of the auditor, clearly inconsistent with the language of the governing documents.  In

such an event, or if the Union and employer disagree, the Fund auditor shall present the issue in writing to the Board of Trustees for a decision before completing the payroll audit.

5.      After an audit of an employer is conducted, the Fund auditor shall review with the employer the auditor's findings.  After providing the employer with a reasonable time within which to respond to the auditor's findings, the auditor shall issue a final report to the Fund with its payroll audit findings.

6.      After receipt of the Fund auditor's report, the Funds Office shall send a letter to the employer demanding payment of any amounts found to be due by the auditor.  The letter shall state that interest on the delinquent Contributions shall be calculated as set forth in Section 2.  If amounts due as the result of a routine audit are found to be the result of a good faith error by the employer, and the employer makes payment within sixty (60) days of a demand by the Fund, late fees will be waived, provided that the Trustees determine that there are no unusual circumstances, such as repeated prior delinquencies or prior audit discrepancies.

7.      In the event an employer refuses to permit an audit upon request by the Trustees, or if the employer refuses the Fund auditor access to pertinent records, the Fund auditor shall refer the matter to Legal Counsel.  Legal Counsel shall thereafter demand in writing that the employer make available such books and records as are necessary for the Fund Auditor to conduct an audit.  If the records are still not made available, upon approval of the Board of Trustees, counsel shall institute legal action to enforce the Trustees' right to conduct a payroll audit and the employer shall be obligated to pay to the Fund all costs and attorneys' fees incurred as a result of the employer's refusal to permit an audit or refusal to make available all pertinent records.

8.      If a payroll audit identifies an overpayment by the employer: (a) to be considered for a refund, the employer must submit a request to the Board of Trustees in writing within six (6) months of being advised by the auditor or the Fund of the overpayment, stating the reason for the overpayment; (b) the Board of Trustees will decide in its sole discretion whether a refund will be granted; (c) if the refund is granted by the Board of Trustees, it shall be net of the cost of the payroll audit; (d) any such net refund may be recovered by the employer through a credit against future contributions only as determined by the Trustees and communicated to the employer in writing; and (e) any attempt by the employer to recoup any overpayment through a procedure other then the one described in this paragraph (for instance, by the employer unilaterally taking a credit) shall result in the automatic forfeiture of the refund and the treatment of any credit taken by an employer as a delinquent contribution.

## SECTION 5.

## MISTAKEN CONTRIBUTIONS

1.      An employer may, without prior approval of the Trustees, credit an overpayment against the contributions due to the Funds for the month immediately following the month in which the overpayment occurred.  The employer may not credit any other overpayment against subsequent contributions due, and any request for a refund of subsequent overpayments may only be made pursuant to these procedures.

2.      If an employer does not credit any overpayment on the report submitted to the Funds for the month immediately following the month in which the overpayment occurred, with the exception of overpayments determined in a payroll audit under Section 4, no refund of excess contributions shall be granted by the Fund without a written request for such refund having been received within two (2) years after the date that such excess contributions were received by the Fund.

3.      If the Fund incurred a direct or indirect cost, expense or liability as a result of an excess contribution, any refund of such contribution shall be reduced by the full value of such cost, expense or liability.   The amount returned may not include any interest or earnings attributable to the overpayments and must also be reduced by any investment loss attributable to the overpayments.

4.      The obligation to discover and delineate the amount of excess contributions within the time limits provided within the policy is the sole and exclusive responsibility of the employer.

5.      The request of the employer must contain copies of all documentation upon which the employer relies to substantiate its request or which may be required by the Fund to verify the exact amount of the excess contributions.

6.      An employer request for a refund of excess contributions must be received by the Fund no later than six (6) months after the Trustees determine the contributions were made by mistake.  Any request by an employer for a refund under paragraph 2 of this section prior to the Board's determination will be deemed to comply with this provision.

7.      The failure and/or refusal of the employer promptly and fully to comply with any or all of the provisions of this policy shall result in the denial of the request for the refund of excess contributions.

8.      As used in this policy, the term "refund" shall include the offset of previously-submitted excess contributions against currently due contributions ("credits").   As such, upon approval of the Trustees, an employer may be permitted to credit excess contributions, less the Fund's set-offs described in this policy, against current contributions only to the same extent and under the same terms and conditions as such employer may be entitled to a refund under this policy.  Any employer attempt to recoup any excess contribution through a procedure other than the one described in this paragraph (for instance by the employer unilaterally taking a credit) shall result in the automatic forfeiture of the refund and the treatment of any credit taken by the employer as a delinquent contribution.

## SECTION 6.

### LIQUIDATED DAMAGES, ATTORNEYS' FEES AND COSTS

1.      Liquidated damages shall be calculated from the Due Date, and shall become due and owing (in lieu of late fees described in Section 2, paragraph 6), if suit is commenced.  The amount of the liquidated damages shall be the greater of:

8

a.  Interest on the delinquent Contributions determined in accordance with Section 2, paragraph 4, or Section 4, paragraph 6; or

b.  20% of the delinquent Contributions.

2.  Attorneys' fees shall be due to the Funds from a delinquent employer at the hourly rate charged to the Funds for such services, for all time spent by counsel in collection efforts pursuant to Section 3 hereof or in enforcing the Board of Trustees' right to payroll audits pursuant to Section 4 hereof, whether or not suit is commenced.

3.  Notwithstanding Section 4, Subsections 7 and 8, all costs, (including, but not limited to, attorneys' fees) incurred (a) to determine, discover and collect delinquent Contributions, (b) to obtain the information necessary or to properly allocate, credit and record such Contributions as necessary to administer the Fund, and (c) to enforce the Trustees' right to audit the employer's payroll records, shall be due to the Funds from the delinquent employer. These shall include, but not be limited to, fees incurred in determining, discovering and collecting Contributions from the employer, arbitration fees, filing fees, arbitrator's fees, fees for service of process, travel, copying charges, postage, expert fees, and such other costs as would otherwise be charged to the Board(s) of Trustees to determine, discover and collect any of the amounts described herein.

## SECTION 7.

## REPORTS

1.  The Administrator shall prepare a delinquency report to be presented at each Board of Trustees meeting.  The report shall identify all delinquent employers, the amount owed, the Due Date of the delinquent Contributions and the steps that have been taken to collect delinquent Contributions.  The determination of the Board with respect to action on such Contributions, and the specific basis therefore, shall be recorded in the minutes.

2.  The Administrator shall maintain a file of currently effective CBA's and other agreements detailing the basis upon which employers are obligated to make Contributions.

3.  All written settlements of delinquencies shall be on file in the Administrator's office.

By: _____
Chairman

By: _____
Secretary

Dated: _4/19/2018_____

Dated: _4/19/18_____

## EXHIBIT A

## FIRST DELINQUENCY NOTICE

**[To be sent by the Administrator on Fund letterhead on the 5th of the month following the Due Date to delinquent employers]**

DATE:

[Employer name and address]

Re:    DELINQUENT CONTRIBUTIONS

[President or Owner of Employer]:

Your Pension, Health Fund and Training Fund contributions and remittance reports for the month of _____ have not been received.  Please send your contributions and reports immediately.

If the Funds do not receive payment and the required remittance reports by the fifteenth (15th) day of this month, your company will be liable for the delinquent contributions, plus interest at the annual rate of 10% from the due date (the 20th of the month following the month in which the hours were worked) and until the contributions are received in this office.  Once the Funds receive the contributions, you will be billed for the interest.

If your contributions and reports have been mailed, please disregard this notice.  If you employed no bargaining unit employees during the above period, please write "None" across the report and return the report to the Funds Office.

Thank you for your cooperation.

Sincerely,

For the Boards of Trustees

10

## EXHIBIT B

### SECOND DELINQUENCY NOTICE

**[To be sent by the Administrator on Fund letterhead on the 15th of the month following the Due Date to delinquent employers]**

DATE:

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

[Employer name and address]

Re:    DELINQUENT CONTRIBUTIONS – **SECOND NOTICE**

[President or Owner of Employer]:

We have already notified you that you are delinquent in making your required contributions to the Sheet Metal Worker's Local 9 Pension, Health Fund and Training Funds for the month of _____.  Your company also has not submitted the required remittance reports.

**Due to your failure to make timely contributions to the Funds, you must secure either a bond, letter of credit, or escrow deposit in the amount specified by the collective bargaining agreement with Local 9 (or, if none, the amount in the collective bargaining agreement between Local 9 and SMACNA), and on terms acceptable to the Trustees, and provide evidence of the bond, letter of credit, or escrow deposit to this office.  You must maintain the applicable bond, letter of credit, or escrow deposit until you have made timely contributions to the Funds for 12 consecutive months.**

Further, because the Funds did not receive payment and the required remittance reports by the fifteenth (15th) day of this month, your company is now liable for the delinquent contributions, plus interest at the annual rate of 10% from the due date (the 20th of the month following the month in which the hours were worked) and until the contributions are received in this office.  Once the Funds receive the contributions, you will be billed for the interest.

Finally, if we do not receive your contributions and reports by the fifth (5th) day of next month, you will also be assessed late fees in the amount of 5% of the delinquent contributions in addition to the interest due.  This matter will also be referred to the Funds' attorney for collection, and, in that event, you may also be liable for liquidated damages equal to 20% of the delinquent contributions, interest, and attorney's fees and costs.  *Moreover, your participation in the Funds will be terminated.*  This means that your employees will cease to accrue benefits in the Pension Fund and will lose their health coverage in the Health Fund when their hour banks run out. You may also be liable for withdrawal liability to the Pension Fund.  Your employees will also no longer be eligible for apprenticeship or other training by the Training Fund. Unless we receive the delinquent contributions due, we will be required to notify your employees of the pending loss of their benefits as well. Termination of participation will not relieve your company of its obligation to pay contributions pursuant to the terms of the relevant collective bargaining agreement.

We trust that you will forward your contributions and reports immediately. Prompt action on your part can minimize your liability, as well as ensure that your employees continue to receive the benefits of participation in the Sheet Metal Workers' Local 9 Employee Benefit Funds.

Sincerely,

For the Board of Trustees

12

## EXHIBIT C

### TERMINATION NOTICE TO EMPLOYER
**[To be sent by the Administrator on Fund letterhead by the 5th of the month following the second notice]**

Date:

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

[Employer]
[address]

Re: Sheet Metal Workers' Local 9 Benefit Funds – TERMINATION NOTICE

[President or Owner of Employer]:

This is to advise you that due to your Company's failure to pay the outstanding delinquencies owed to the Sheet Metal Workers' Local 9 Benefit Funds, the Company will be terminated from participation in the Sheet Metal Workers' Local 9 Pension Trust, the Colorado Sheet Metal Workers' Local 9 Health Fund and the Colorado State Sheet Metal Workers' Training Fund 30 days from the date of this letter.

Termination means that your covered employees will cease to accrue pension benefits for retirement in the Pension Trust. Also, because your covered employees have not been credited with hours for the months for which you have not made contributions to the Health Fund on their behalf, their health coverage under the Health Fund will terminate when they no longer have sufficient hours under the hour bank to maintain coverage. Your employees will also no longer be eligible for apprenticeship or other training from the Training Fund.

However, if the Benefit Funds receive the full amount of contributions due, plus interest, the Boards of Trustees may, in their discretion, reinstate the Company's participation in the Benefit Funds retroactively to the date of termination. Termination of participation, should that occur, will not relieve your Company of its obligation to pay contributions pursuant to the terms of the relevant collective bargaining agreement. In addition, your Company may be liable for any applicable withdrawal liability due to the Pension Trust as a result of your Company's termination of participation in the Pension Trust.

We sincerely hope that your Company will take the responsible path and promptly bring its accounts with the Funds current.

Sincerely,

For the Boards of Trustees

13

## EXHIBIT D

**TERMINATION NOTICE TO EMPLOYEES**
**[To be sent by the Administrator on Fund letterhead**
**by the 5th of the month following the second notice]**

Date :

[Employee]
[address]

Re:     [Employer] – TERMINATION NOTICE

Dear Participant:

The Board of Trustees of the Colorado Sheet Metal Workers' Local 9 Health Fund regrets to inform you that, because your employer is delinquent in its contributions to the Health Fund, your employer will be terminated unless the Health Fund receives the full amount of contributions owed, plus interest, within 30 days. You have not been credited with hours for which your employer did not make a contribution to the Health Fund. This means that your hour bank is, or may soon be, exhausted, and your coverage will terminate. Unfortunately, the Health Fund cannot continue to cover you and your dependents unless it receives contributions from the Company that it owes on your behalf.

The Board of Trustees of the Sheet Metal Workers' Local 9 Pension Trust has taken similar action. The Trustees have notified the Company that its participation in the Pension Trust will be terminated in thirty (30) days for failure to make its contractually required contribution to the Pension Trust. After that date, you will not accrue any further pension benefits. You will not, however, lose any pension benefits that have already vested. You will also no longer be eligible to receive apprenticeship or other training from the Colorado State Sheet Metal Workers' Training Fund.

The Boards of Trustees regret having to take this action, but cannot continue to provide benefits that have not been paid for. To do so would undermine the financial well-being of the Funds and harm other participants whose employers are meeting their contractual obligations. Accordingly, the Trustees are compelled to end your employer's participation in the Funds.

If you have any questions either about your hour bank and eligibility in the Health Fund or your benefits in the Pension Trust or Training Fund, please contact the Funds Office.

Sincerely,

For the Boards of Trustees

14

## EXHIBIT E

### FINAL TERMINATION NOTICE TO EMPLOYER
**[To be sent by the Administrator on Fund letterhead
30 days after the Termination Notice]**

Date:

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

[Employer]
[address]

**Re: Sheet Metal Workers' Local 9 Benefit Funds – FINAL TERMINATION NOTICE**

[President or Owner of Employer]:

This is to advise you that due to your Company's failure to pay the outstanding delinquencies owed to the Sheet Metal Workers' Local 9 Benefit Funds, the Company has been terminated from participation in the Sheet Metal Workers' Local 9 Pension Trust, the Colorado Sheet Metal Workers' Local 9 Health Fund and the Colorado State Sheet Metal Workers' Training Fund effective _____.

Your employees will also be notified of the termination. This means that your covered employees will not accrue pension benefits for retirement in the Pension Trust after the date of termination. Also, because your covered employees have not been credited with hours for the months for which you have not made contributions to the Health Fund on their behalf, their health coverage under the Health Fund will terminate when they no longer have sufficient hours under the hour bank to maintain coverage. Your employees also are no longer eligible for apprenticeship or other training from the Training Fund.

You may restore your employees' benefits in the Funds, retroactive to the date of termination, if you pay the full amount of contributions owed, plus interest, to the Funds, and the Trustees, in their sole discretion, accept your request to participate again in the Funds. Please note that your Company's termination in the Funds does not affect any legal proceedings that have been, or may be, instituted to collect delinquent contributions. The Trustees expressly reserve their right to pursue legal action to collect such contributions, plus interest, liquidated damages, attorneys' fees, and costs. In any event, the termination of participation does not relieve your Company of its obligation to pay contributions pursuant to the terms of the relevant collective bargaining agreement. In addition, your Company may be liable for any applicable withdrawal liability due to the Pension Trust as a result of your Company's termination of participation in the Pension Trust.

Sincerely,
For the Boards of Trustees

15

**EXHIBIT F**

**FINAL TERMINATION NOTICE TO EMPLOYEES**
**[To be sent by the Administrator on Fund letterhead**
**30 days after the Termination Notice]**

Date :

[Employee]
[address]

**Re:  [Employer] – FINAL TERMINATION NOTICE**

Dear Participant:

We regret to inform you that, because your employer is delinquent in its contributions to the Sheet Metal Workers' Local 9 Benefit Funds, your employer has been terminated from the Sheet Metal Workers' Local 9 Pension Trust, the Colorado Sheet Metal Workers' Local 9 Health Fund and the Colorado State Sheet Metal Workers' Training Fund, effective _____.

This means that you will not accrue pension benefits for retirement in the Pension Trust after the date of termination. You will not, however, lose any pension benefits that have already vested. Also, because you have not been credited with hours for the months for which your employer did not make contributions to the Health Fund on your behalf, your health coverage under the Health Fund will terminate when you no longer have sufficient hours under the hour bank to maintain coverage. You also are no longer eligible for apprenticeship or other training from the Training Fund.

The Boards of Trustees regret having to take this action, but cannot continue to provide benefits that have not been paid for. To do so would undermine the financial well-being of the Funds and harm other participants whose employers are meeting their contractual obligations. Accordingly, the Trustees were compelled to end your employer's participation in the Funds.

Your benefits in the Funds may be fully restored, retroactive to the date of termination, if your employer pays the full amount of delinquent contributions, plus interest, to the Funds and the Trustees, in their discretion, accept the employer's request to participate again in the Funds.

If you have any questions, either about your hour bank and eligibility in the Health Fund or your benefits in the Pension Trust or Training Fund, please contact the Funds Office.

Sincerely,

For the Boards of Trustees

## EXHIBIT G

## DELINQUENCY NOTICE FOLLOWING PAYROLL AUDIT

**[To be sent by the Administrator on Fund letterhead after approval by the Board of Trustees]**

DATE:

Certified Mail, Return Receipt Requested

[President or Owner of Employer]

     Re:    Delinquent Contributions Discovered During Payroll Audit

Gentlemen:

As you know, the Sheet Metal Workers' Local 9 Benefit Funds recently conducted a payroll review to verify the accuracy of your company's contributions to the Funds. As a result of this review, certain discrepancies in hours reported were found. You have reviewed the results and agreed that contributions are due and owing to the Funds. Enclosed is a schedule of the contributions due.

According to the Funds' Collection Policy, an employer that is delinquent in its contributions to the Funds is liable for interest at the rate of 10% per annum, and late fees (liquidated damages) at the rate of 5% of contributions due. However, in view of the fact that your company generally remits contributions to the Funds on a timely basis, and does not dispute the principal amount due, the Boards of Trustees of the Funds have agreed to waive the late fees in the amount of $_____, provided payment of the principal and interest in the total amount of $_____ is received by the Funds within 60 days of this letter. Please make your check for $_____ payable to the Sheet Metal Workers' Local 9 Benefit Funds and send it to my attention at the address above.

Thank you for your cooperation. If you have any questions, please contact me at the address above.

Sincerely,

_____
For the Board of Trustees

Enclosure
cc:    Trustees
        Fund Counsel

**EXHIBIT H**

SHEET METAL WORKERS LOCAL 9 BENEFIT FUNDS

Summary of Delinquency Policy

| Due Dates | Actions | Example |
|---|---|---|
| 20th of the month following period for which contributions owed | Contributions and Reports due ("Due Date"). | May hours and contributions due June 20 |
| 5th of the next month | 1st Delinquency Notice sent by Funds Office. (Exhibit A) | July 5 |
| 15th of the same month (10 days after 1st Notice) | 2nd Delinquency Notice sent by Funds Office. Employer must secure bond, letter of credit, or escrow deposit (for at least 12 months). Interest now assessed at 10% (starting on Due Date). (Exhibit B) | July 15 |
| 5th of second month after Due Date (10 days after 2nd Notice) | Late fees now assessed at 5% of the contributions due.<br><br>Referred to counsel (if contributions, interest and late fees combined for all Funds are more than $1,000).<br><br>Letter sent to participants advising of potential loss of benefits. Letter sent to employer advising of termination within 30 days. (Exhibits C & D) | Aug. 5 |
| By the 20th of the second month after the Due Date | Attorney demand letter sent. | Aug. 20 |
| 5th of third month after the Due Date (30 days after Termination Notice) | Employer terminated. Final Termination Notice to employer and employees. (Exhibits E & F) | Sept. 5 |
| 10th of third month after the Due Date (20 days after attorney's Final Notice) | Suit filed for contributions, interest, liquidated damages (equal to interest or 20% of contributions, in lieu of late fees), attorney's fees and court costs. | Sept. 10 |

299077v1

20598563v1

**SHEET METAL WORKERS LOCAL 9 PENSION TRUST**
**COLORADO SHEET METAL WORKERS' LOCAL 9 HEALTH FUND**
**COLORADO STATE SHEET METAL WORKERS TRAINING FUND**

**Amendment 1 to**
**POLICY FOR**
**COLLECTION OF DELINQUENT CONTRIBUTIONS**

WHEREAS, the Sheet Metal Workers' Local 9 Pension Trust ("Pension Fund"), the Colorado Sheet Metal Workers' Local 9 Health Fund ("Health Fund"), and the Colorado State Sheet Metal Workers Training Fund ("Training Fund") adopted a Policy for Collection of Delinquent Contributions ("Policy"), revised effective April 2018; and

WHEREAS, due to the state of emergency declared by the governor of Colorado and the economic impact of the COVID-19 pandemic, the Pension Fund, Health Fund, and Training Fund desire to amend the Policy to temporarily extend the due date for remittance of employer contributions;

NOW THEREFORE, effective March 20, 2020, the Policy is amended as follows:

1.     The Due Date for Contributions due for work performed in February 2020 is extended by one month (from March 20, 2020 to April 20, 2020), provided the Funds receive the employer's remittance report reflecting hours worked in February 2020 by no later than April 5, 2020.

2.     If the Funds receive an employer's Contributions for work performed in February 2020 by no later than April 5, 2020, the Due Date for Contributions due for work performed in March 2020 is extended by one month (from April 20, 2020 to May 20, 2020), provided the Funds receive the employer's remittance report reflecting hours worked in March 2020 by no later than May 5, 2020.

IN WITNESS WHEREOF, the undersigned have set their hands and seals as of the dates written below.

**Sheet Metal Workers' Local 9 Pension Trust**

_____          _____3/20/2020_____
Signature                                                      Date

_____          _____3/20/2020_____
Signature                                                      Date

**Colorado Sheet Metal Workers' Local 9 Health Fund**

| | |
|---|---|
| _(signature)_ | 3/20/2020 |
| Signature | Date |
| _(signature)_ | 03/20/2020 |
| Signature | Date |

**Colorado State Sheet Metal Workers Training Fund**

| | |
|---|---|
| _(signature)_ | 3/20/2020 |
| Signature | Date |
| _(signature)_ | 03/20/2020 |
| Signature | Date |

20820554v1

- 2 -

**SHEET METAL WORKERS LOCAL 9 PENSION TRUST**
**COLORADO SHEET METAL WORKERS' LOCAL 9 HEALTH FUND**
**COLORADO STATE SHEET METAL WORKERS TRAINING FUND**

**Amendment 2 to**
**POLICY FOR**
**COLLECTION OF DELINQUENT CONTRIBUTIONS**

**WHEREAS**, the Sheet Metal Workers' Local 9 Pension Trust ("Pension Fund"), the Colorado Sheet Metal Workers' Local 9 Health Fund ("Health Fund"), and the Colorado State Sheet Metal Workers Training Fund ("Training Fund") adopted a Policy for Collection of Delinquent Contributions ("Policy"), revised effective April 2018; and

**NOW THEREFORE**, effective April 1, 2024, the Policy is amended as follows:

1.      Section 2, Subsection 4 of the Policy is amended as follows:

4.      If the delinquent Contributions are not received by the Funds Office by the fifteenth (15th) day of the month in which the first Notice referred to in paragraph 3 is mailed, the Funds Office shall send a second Notice to the employer and interest shall accrue on the delinquent Contributions from the Due Date at the rate of 10% per annum. The second Notice shall advise the employer that interest will accrue from the Due Date and that its account will be referred to Legal Counsel if payment is not promptly received, as well as notify the employer of further consequences of non-payment, including late fees and potential termination from participation in the Funds. The employer shall be obliged to secure either a bond, letter of credit, or escrow deposit, in the amount specified in the employer's CBA with Sheet Metal Workers' Local 9 (or, if none, in the agreement between Local 9 and SMACNA-CO), and on terms acceptable to the Trustees, and provide evidence of such bond, letter of credit, or escrow deposit to the Funds. The applicable bond, letter of credit, or escrow deposit must remain in place until the employer has made timely contributions to the Funds for 12 consecutive months. At the time that the employer becomes subject to the bond, letter of credit, or escrow deposit requirements described in this paragraph, the Funds Office shall provide notice to Local 9 and SMACNA-CO that the employer is subject to such requirements.

- 2 -

**IN WITNESS WHEREOF**, the undersigned have set their hands and seals as of the dates written below.

**Sheet Metal Workers' Local 9 Pension Trust**

_____          5 – 14 – 2024
Signature                                 Date

_____          5/14/2024
Signature                                 Date

**Colorado Sheet Metal Workers' Local 9 Health Fund**

_____          5 – 14 – 2024
Signature                                 Date

_____          5/14/2024
Signature                                 Date

**Colorado State Sheet Metal Workers Training Fund**

_____          5 – 14 – 2024
Signature                                 Date

_____          5/14/2024
Signature                                 Date

# EXHIBIT C

*Professional services rendered in connection with the audit of:*

American Veteran Heating & Air
6847 Red Cardinal Loop
Colorado Springs, CO 80908

Employer Number: 10295

January 1, 2020 through March 31, 2023



Board of Trustees
SMART Local 9
Benefit Funds
PO Box 11040
Denver, CO  80211-0040

Re:  American Veteran Heating & Air
        Reporting Period: January 1, 2020 through March 31, 2023

 We were engaged by the Board(s) of Trustees of the SMART Local 9 Benefit Funds to assist you in determining whether contributions to the Funds were made in accordance with the Collective Bargaining and Trust Agreements during the above referenced reporting period.

The management of American Veteran Heating & Air is responsible for making contributions in accordance with the requirements of the Collective Bargaining and Trust Agreements.

This engagement was performed in accordance with Statements on Standards for Consulting Services issued by the American Institute of Certified Public Accountants. We were not engaged to, and did not, conduct an audit, the objective of which would be the expression of an opinion. Accordingly, we do not express such an opinion.  Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

Our findings are included in the attached schedules.

This report is intended solely for the information and use of the Trustees and Administrator of the SMART Local 9 Benefit Funds and is not intended to be and should not be used by anyone other than these specified parties.

*Legacy Professionals LLP*

Westchester, Illinois

February 16, 2024

SMART Local 9
Compliance Audit Information Sheet

Employer's Name: American Veteran Heating & Air

Employer Number: 10295

FEIN #: ███████

Business Address: 6847 Red Cardinal Loop

City/State/ Zip Code: Colorado Springs, CO 80908

Business Phone Number: 719-208-5721

Business Fax Number: Not provided

E-Mail Address: info@americanveteranheatingandair.com

Contact's Name: Brandy Conway                Title: Not provided

Person Fund is to contact: Brandy Conway      Title: Not provided

Organization Type: _____ Sole Proprietor  _____ Corporation  _____ Partnership

_____ LLC  _____ LLP  __XX__ Not Provided

Main Business Activity: Not provided

Ownership - Principals (Officers, Owners and/or Partners):

| Name | Title | % of Ownership | Address |
|---|---|---|---|
| Not provided | | | |
| | | | |
| | | | |
| | | | |

Are any of the above owners reported to SMART Local 9?
Yes Not provided
No

Workman's Compensation Policy # Not provided

Insurance Company Not provided

Insurance Agent Not provided

Fringe Benefit Bond Information

Surety Company Not provided

Address Not provided

Bond Number Not provided

Copy of Bond Yes _____
No XX

Banking facilities used Name Not provided
Account # Not provided
Business Address: Not provided
City/State/ Zip Code: Not provided

Are the Owners/Officers affiliated with any other company?
Yes Not provided
No
If yes, list the name of the company(s):

Is the company still in business?
Yes Not provided
No          Date of Closure?

SMART Local 9
Compliance Audit Information Sheet

Audit Site (If different from employer's address):

Legacy Professionals LLP

4 Westbrook Corporate Center, Suite 700

Westchester, IL 60154

All required accounting records were available with the exception of:
The check register.

Briefly describe the nature of the delinquency, if any:
The employer did not report all hours and did not report all eligible employees.
Covered employees were issued a 1099 in 2020 and are included in our report.

Did your examination uncover anything special or unusual which should be brought to the attention of the fund or other interested persons?

Yes _____ X _____          No _____

If yes, explain:          We were not provided the check register however we were provided a sample of bank statements and found
nothing unusual.
Some covered employees were issued a 1099 in 2020. We attempted to contact the employer to discuss what the payments were for.
The employer never responded therefore we include the payments in our report. To calculate hours owed, we divided the 1099 amount
by the employees wage rate they were paid on the payroll in 2020 and rounded the hours to the nearest whole number.

There were no assessments reported to the fund after July 2022.

Auditor:     Anthony Feola

## SMART Local 9 Benefit Funds

Reconciliation of Differences per Year

| Calendar Year Ending | 2020 | 2021 | 2022 | 2023 | | Total Due |
|---|---|---|---|---|---|---|
| H&W | 11,018.08 | 13,372.43 | 10,004.08 | 5,457.64 | | $39,852.23 |
| Local Pension | 3,160.52 | 3,952.53 | 4,110.52 | 2,322.54 | | $13,546.11 |
| Loc. Pen Non-Accrual | 146.17 | 168.58 | 158.17 | 95.63 | | $568.55 |
| IFUS | 357.10 | 342.99 | 364.37 | 249.88 | | $1,314.34 |
| PSL | - | 252.56 | 291.69 | 190.43 | | $734.68 |
| Drug Test | 68.30 | 72.30 | 52.51 | 24.35 | | $217.47 |
| Local Training | 801.55 | 996.47 | 1,039.68 | 642.96 | | $3,480.66 |
| Assessment | 1,490.33 | 1,497.05 | 5,281.07 | 1,827.49 | | $10,095.94 |
| Vacation | 1,334.25 | 1,604.62 | 1,515.30 | 737.40 | | $5,191.57 |
| Vol. Vacation | - | - | - | - | | - |
| **Total Amount Due** | 18,376.29 | 22,259.53 | 22,817.39 | 11,548.32 | - | **$75,001.53** |

| | | | |
|---|---|---|---|
| **Employer Name:** | American Veteran Heating & Air | **Person Contacted:** | Brandy Conway |
| **Employer #:** | 10295 | **Date of Contact:** | August 1, 2023 |
| **Audit Start Date:** | October 4, 2023 | **Telephone:** | 719-208-5721 |
| **Audit Period :** | January 1, 2020 through March 31, 2023 | **Auditor:** | Anthony Feola |

# SMART Local 9 Benefit Funds
### Schedule of Amounts Due

Employer Name  American Veteran Heating & Air
Employer Number  10295
Audit Period  January 1, 2020 through March 31, 2023
Field Auditor  Anthony Feola

**Error Code Description**
A) Hours under reported
B) Assessment hours over/under reported
C) Eligible employee not reported
D) Employee received 1099

| Month | SSN | Name | Error Code | Classification | Hours Worked Diff. | Hours Paid Diff. | Vac Vacation Difference | H&W Rate | H&W Due | Local Pension Rate | Local Pension Due | Nat Pen Non Accrual Rate | Nat Pen Non Accrual Due | PDS Rate | PDS Due | PEL Rate | PEL Due | Drug Test Rate | Drug Test Due | Local Training Rate | Local Training Due | Assessment Rate | Assessment Due | Vacation Rate | Vacation Due | Total Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-22 | | CLARK, BRANDEN | A/B | RESIDENTIAL JOURNEY | 16.00 | 25.00 | | $5.52 | $88.32 | $2.58 | $41.28 | $0.10 | $1.60 | $0.20 | $3.20 | $0.19 | $3.04 | $0.03 | $0.48 | $0.55 | $8.80 | $0.95 | $15.20 | $1.00 | $25.00 | $186.92 |
| Jul-22 | | CLARK, BRANDEN | A/B | RESIDENTIAL JOURNEY | 49.50 | 65.00 | | $5.70 | $282.15 | $2.83 | $140.09 | $0.10 | $4.95 | $0.20 | $9.90 | $0.19 | $9.41 | $0.03 | $1.49 | $0.65 | $32.18 | $1.05 | $51.98 | $1.00 | $65.00 | $597.13 |
| Aug-22 | | CLARK, BRANDEN | B | RESIDENTIAL JOURNEY | 201.75 | | | | | | | | | | | | | | | | | $1.05 | $211.84 | | | $211.84 |
| Sep-22 | | CLARK, BRANDEN | B | RESIDENTIAL JOURNEY | 233.75 | | | | | | | | | | | | | | | | | $1.05 | $245.44 | | | $245.44 |
| Oct-22 | | CLARK, BRANDEN | B | RESIDENTIAL JOURNEY | 180.50 | | | | | | | | | | | | | | | | | $1.05 | $189.53 | | | $189.53 |
| Nov-22 | | CLARK, BRANDEN | B | RESIDENTIAL JOURNEY | 162.00 | | | | | | | | | | | | | | | | | $1.05 | $170.10 | | | $170.10 |
| Dec-22 | | CLARK, BRANDEN | B | RESIDENTIAL JOURNEY | 42.00 | | | | | | | | | | | | | | | | | $1.05 | $44.10 | | | $44.10 |
| Aug-20 | | CONWAY, AARON | A/B/C | Residential Material Handler | 76.00 | | | $4.52 | $343.52 | | - | $0.09 | $6.84 | | - | | | $0.03 | $2.28 | $0.21 | $15.96 | $0.44 | $33.44 | | | $402.04 |
| Sep-20 | | CONWAY, AARON | A/B/C | Residential Material Handler | 99.00 | | | $4.52 | $447.48 | | - | $0.09 | $8.91 | | - | | | $0.03 | $2.97 | $0.21 | $20.79 | $0.44 | $43.56 | | | $523.71 |
| Oct-20 | | CONWAY, AARON | A/B/C | Residential Material Handler | 87.50 | | | $4.52 | $395.50 | | - | $0.09 | $7.88 | | - | | | $0.03 | $2.63 | $0.21 | $18.38 | $0.44 | $38.50 | | | $462.88 |
| Nov-20 | | CONWAY, AARON | A/B/C | Residential Material Handler | 55.75 | | | $4.52 | $251.99 | | - | $0.09 | $5.02 | | - | | | $0.03 | $1.67 | $0.21 | $11.71 | $0.44 | $24.53 | | | $294.92 |
| Dec-20 | | CONWAY, AARON | A/B/C | Residential Material Handler | 86.50 | | | $4.52 | $390.98 | | - | $0.09 | $7.79 | | - | | | $0.03 | $2.60 | $0.21 | $18.17 | $0.44 | $38.06 | | | $457.59 |
| Dec-20 | | CONWAY, AARON | D | Residential Material Handler | 82.00 | | | $4.52 | $370.64 | | - | $0.09 | $7.38 | | - | | | $0.03 | $2.46 | $0.21 | $17.22 | $0.44 | $36.08 | | | $433.78 |
| Jan-21 | | CONWAY, AARON | A/B | Residential Material Handler | 66.50 | | | $4.52 | $300.58 | | - | $0.09 | $5.99 | | - | | | $0.03 | $2.00 | $0.21 | $13.97 | $0.44 | $29.26 | | | $351.79 |
| Jan-20 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 280.00 | 280.00 | | $4.52 | $1,265.60 | $2.35 | $658.00 | $0.13 | $36.40 | $0.20 | $56.00 | - | | $0.03 | $8.40 | $0.45 | $126.00 | $0.95 | $266.00 | $1.00 | $280.00 | $2,696.40 |
| Mar-20 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 160.00 | 160.00 | | $4.52 | $723.20 | $2.35 | $376.00 | $0.13 | $20.80 | $0.20 | $32.00 | - | | $0.03 | $4.80 | $0.45 | $72.00 | $0.95 | $152.00 | $1.00 | $160.00 | $1,540.80 |
| Jul-21 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 160.00 | 160.00 | | $5.52 | $883.20 | $2.58 | $412.80 | $0.10 | $16.00 | $0.20 | $32.00 | $0.19 | $30.40 | $0.03 | $4.80 | $0.55 | $88.00 | $0.95 | $152.00 | $1.00 | $160.00 | $1,779.20 |
| Jun-22 | | CONWAY, BRIAN T | A | RESIDENTIAL JOURNEY | 35.00 | 35.00 | | $5.52 | $193.20 | $2.58 | $90.30 | $0.10 | $3.50 | $0.20 | $7.00 | $0.19 | $6.65 | $0.03 | $1.05 | $0.55 | $19.25 | - | | $1.00 | $35.00 | $355.95 |
| Jul-22 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 35.00 | 35.00 | | $5.70 | $199.50 | $2.83 | $99.05 | $0.10 | $3.50 | $0.20 | $7.00 | $0.19 | $6.65 | $0.03 | $1.05 | $0.65 | $22.75 | $1.05 | $36.75 | $1.00 | $35.00 | $411.25 |
| Aug-22 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 160.00 | 160.00 | | $5.70 | $912.00 | $2.83 | $452.80 | $0.10 | $16.00 | $0.20 | $32.00 | $0.19 | $30.40 | $0.03 | $4.80 | $0.65 | $104.00 | $1.05 | $168.00 | $1.00 | $160.00 | $1,880.00 |
| Sep-22 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 160.00 | 160.00 | | $5.70 | $912.00 | $2.83 | $452.80 | $0.10 | $16.00 | $0.20 | $32.00 | $0.19 | $30.40 | $0.03 | $4.80 | $0.65 | $104.00 | $1.05 | $168.00 | $1.00 | $160.00 | $1,880.00 |
| Oct-22 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 110.00 | 110.00 | | $5.70 | $627.00 | $2.83 | $311.30 | $0.10 | $11.00 | $0.20 | $22.00 | $0.19 | $20.90 | $0.03 | $3.30 | $0.65 | $71.50 | $1.05 | $115.50 | $1.00 | $110.00 | $1,292.50 |
| Nov-22 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 120.00 | 120.00 | | $5.70 | $684.00 | $2.83 | $339.60 | $0.10 | $12.00 | $0.20 | $24.00 | $0.19 | $22.80 | $0.03 | $3.60 | $0.65 | $78.00 | $1.05 | $126.00 | $1.00 | $120.00 | $1,410.00 |
| Dec-22 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 200.00 | 200.00 | | $5.70 | $1,140.00 | $2.83 | $566.00 | $0.10 | $20.00 | $0.20 | $40.00 | $0.19 | $38.00 | $0.03 | $6.00 | $0.65 | $130.00 | $1.05 | $210.00 | $1.00 | $200.00 | $2,350.00 |
| Jan-23 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 120.00 | 120.00 | | $6.39 | $766.80 | $2.83 | $339.60 | $0.10 | $12.00 | $0.20 | $24.00 | $0.26 | $31.20 | $0.03 | $3.60 | $0.65 | $78.00 | $1.05 | $126.00 | $1.00 | $120.00 | $1,501.20 |
| Feb-23 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 80.00 | 80.00 | | $6.39 | $511.20 | $2.83 | $226.40 | $0.10 | $8.00 | $0.20 | $16.00 | $0.26 | $20.80 | $0.03 | $2.40 | $0.65 | $52.00 | $1.05 | $84.00 | $1.00 | $80.00 | $1,000.80 |
| Mar-23 | | CONWAY, BRIAN T | A/B | RESIDENTIAL JOURNEY | 120.00 | 120.00 | | $6.39 | $766.80 | $2.83 | $339.60 | $0.10 | $12.00 | $0.20 | $24.00 | $0.26 | $31.20 | $0.03 | $3.60 | $0.65 | $78.00 | $1.05 | $126.00 | $1.00 | $120.00 | $1,501.20 |
| Apr-22 | | DARNLEY, DOMINIC | A/B | 1st Yr Appr 55% | 4.25 | 6.38 | | $6.75 | $28.69 | $3.03 | $12.88 | $0.17 | $0.72 | $0.45 | $1.91 | $0.19 | $0.81 | $0.03 | $0.13 | $1.02 | $4.34 | $0.74 | $3.15 | $0.55 | $3.51 | $56.12 |
| May-22 | | DARNLEY, DOMINIC | A/B | 1st Yr Appr 55% | 31.75 | 47.63 | | $6.75 | $214.31 | $3.03 | $96.20 | $0.17 | $5.40 | $0.45 | $14.29 | $0.19 | $6.03 | $0.03 | $0.95 | $1.02 | $32.39 | $0.74 | $23.50 | $0.55 | $26.20 | $419.26 |
| Jun-22 | | DARNLEY, DOMINIC | A/B | Classified Worker 50% | 20.50 | 31.63 | | $7.41 | $138.38 | $2.76 | $56.58 | $0.15 | $3.08 | $0.45 | $9.23 | $0.18 | $3.69 | $0.03 | $0.62 | $0.93 | $19.07 | $0.67 | $13.74 | $0.50 | $15.82 | $260.18 |
| Jul-22 | | DARNLEY, DOMINIC | A/B | Classified Worker 50% | 61.50 | 76.63 | | $7.41 | $455.72 | $2.86 | $175.89 | $0.15 | $9.23 | $0.53 | $32.60 | $0.18 | $11.07 | $0.03 | $1.85 | $1.06 | $65.19 | $0.70 | $43.05 | $0.50 | $38.32 | $832.90 |
| Aug-22 | | DARNLEY, DOMINIC | B | Classified Worker 50% | 186.25 | | | | | | | | | | | | | | | | | $0.70 | $130.38 | | | $130.38 |
| Sep-22 | | DARNLEY, DOMINIC | B | Classified Worker 50% | 216.50 | | | | | | | | | | | | | | | | | $0.70 | $151.55 | | | $151.55 |
| Oct-22 | | DARNLEY, DOMINIC | B | Classified Worker 50% | 177.75 | | | | | | | | | | | | | | | | | $0.70 | $124.43 | | | $124.43 |
| Nov-22 | | DARNLEY, DOMINIC | B | Classified Worker 50% | 155.75 | | | | | | | | | | | | | | | | | $0.70 | $109.03 | | | $109.03 |
| Dec-22 | | DARNLEY, DOMINIC | B | Classified Worker 50% | 159.50 | | | | | | | | | | | | | | | | | $0.70 | $111.65 | | | $111.65 |
| Jan-23 | | DARNLEY, DOMINIC | A | Classified Worker 50% | 40.00 | 54.00 | | $7.41 | $296.40 | $2.86 | $114.40 | $0.15 | $6.00 | $0.53 | $21.20 | $0.18 | $7.20 | $0.03 | $1.20 | $1.06 | $42.40 | - | | $0.50 | $27.00 | $515.80 |
| Jan-23 | | DARNLEY, DOMINIC | B | Classified Worker 50% | 160.00 | | | | | | | | | | | | | | | | | $0.70 | $112.00 | | | $112.00 |
| Feb-23 | | DARNLEY, DOMINIC | A | Classified Worker 50% | 33.75 | 42.25 | | $7.41 | $250.09 | $2.86 | $96.53 | $0.15 | $5.06 | $0.53 | $17.89 | $0.18 | $6.08 | $0.03 | $1.01 | $1.06 | $35.78 | - | | $0.50 | $21.13 | $433.55 |
| Feb-23 | | DARNLEY, DOMINIC | B | Classified Worker 50% | 153.75 | | | | | | | | | | | | | | | | | $0.70 | $107.63 | | | $107.63 |
| Mar-23 | | DARNLEY, DOMINIC | A | Classified Worker 50% | 131.75 | 162.63 | | $7.41 | $976.27 | $2.86 | $376.81 | $0.15 | $19.76 | $0.53 | $69.83 | $0.18 | $23.72 | $0.03 | $3.95 | $1.06 | $139.66 | - | | $0.50 | $81.32 | $1,691.30 |
| Mar-23 | | DARNLEY, DOMINIC | B | Classified Worker 50% | 251.75 | | | | | | | | | | | | | | | | | $0.70 | $176.23 | | | $176.23 |
| Oct-21 | | DUGGAN, DAMIAN | A/B/C | Residential Material Handler | 16.50 | | | $4.52 | $74.58 | | - | $0.09 | $1.49 | $0.10 | $1.65 | - | | $0.03 | $0.50 | $0.21 | $3.47 | $0.44 | $7.26 | | | $88.94 |
| Nov-21 | | DUGGAN, DAMIAN | A/B/C | Residential Material Handler | 60.00 | | | $4.52 | $271.20 | | - | $0.09 | $5.40 | $0.10 | $6.00 | - | | $0.03 | $1.80 | $0.21 | $12.60 | $0.44 | $26.40 | | | $323.40 |
| Dec-21 | | DUGGAN, DAMIAN | A/B/C | Residential Material Handler | 177.25 | | | $4.52 | $801.17 | | - | $0.09 | $15.95 | $0.10 | $17.73 | - | | $0.03 | $5.32 | $0.21 | $37.22 | $0.44 | $77.99 | | | $955.38 |
| Jan-22 | | DUGGAN, DAMIAN | A/B/C | Residential Material Handler | 148.50 | | | $4.52 | $671.22 | | - | $0.09 | $13.37 | $0.10 | $14.85 | - | | $0.03 | $4.46 | $0.21 | $31.19 | $0.44 | $65.34 | | | $800.43 |
| Feb-22 | | DUGGAN, DAMIAN | A/B/C | Residential Material Handler | 8.00 | | | $4.52 | $36.16 | | - | $0.09 | $0.72 | $0.10 | $0.80 | - | | $0.03 | $0.24 | $0.21 | $1.68 | $0.44 | $3.52 | | | $43.12 |
| Aug-20 | | GILLIS, BRADLEY | A/B/C | Classified Worker 55% | 41.50 | 42.25 | | $6.25 | $259.38 | $2.95 | $122.43 | $0.17 | $7.06 | $0.45 | $18.68 | - | | $0.03 | $1.25 | $0.97 | $40.26 | $0.68 | $28.22 | $0.55 | $23.24 | $500.49 |
| Sep-20 | | GILLIS, BRADLEY | A/B/C | Classified Worker 55% | 119.00 | 119.00 | | $6.25 | $743.75 | $2.95 | $351.05 | $0.17 | $20.23 | $0.45 | $53.55 | - | | $0.03 | $3.57 | $0.97 | $115.43 | $0.68 | $80.92 | $0.55 | $65.45 | $1,433.95 |
| Jan-22 | | KELNER, AARON | A/B | RESIDENTAL 1ST YR APPR | 123.00 | 127.63 | | $5.52 | $678.96 | $1.55 | $190.65 | $0.06 | $7.38 | $0.12 | $14.76 | $0.11 | $13.53 | $0.03 | $3.69 | $0.33 | $40.59 | $0.57 | $70.11 | $0.60 | $76.58 | $1,096.25 |

## SMART Local 9 Benefit Funds
### Schedule of Amounts Due

| Month | SSN | Name | Error Code | Classification | Hours Worked Diff. | Hours Paid Diff. | Vol. Vacation Deference | H&W Rate | H&W Due | Local Pension Rate | Local Pension Due | Loc. Pen Non-Accrual Rate | Loc. Pen Non-Accrual Due | IFUS Rate | IFUS Due | PIS Rate | PIS Due | Dng Test Rate | Dng Test Due | Local Training Rate | Local Training Due | Assessment Rate | Assessment Due | Vacation Rate | Vacation Due | Total Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb-22 | | KELNER, AARON | A/B | RESIDENTIAL 1ST YR APPR | 28.00 | 42.75 | $5.52 | $154.56 | $1.55 | $43.40 | $0.06 | $1.68 | $0.12 | $3.36 | $0.11 | $3.08 | $0.03 | $0.84 | $0.33 | $9.24 | $0.57 | $15.96 | $0.60 | $25.66 | $257.77 |
| Mar-22 | | KELNER, AARON | A/B | RESIDENTIAL 1ST YR APPR | 24.50 | 37.25 | $5.52 | $135.24 | $1.55 | $37.98 | $0.06 | $1.47 | $0.12 | $2.94 | $0.11 | $2.70 | $0.03 | $0.74 | $0.33 | $8.09 | $0.57 | $13.97 | $0.60 | $22.35 | $225.46 |
| Apr-22 | | KELNER, AARON | A/B | RESIDENTIAL 1ST YR APPR | 17.00 | 27.00 | $5.52 | $93.84 | $1.55 | $26.35 | $0.06 | $1.02 | $0.12 | $2.04 | $0.11 | $1.87 | $0.03 | $0.51 | $0.33 | $5.61 | $0.57 | $9.69 | $0.60 | $16.20 | $157.13 |
| May-22 | | KELNER, AARON | A/B | RESIDENTIAL 1ST YR APPR | 36.00 | 54.50 | $5.52 | $198.72 | $1.55 | $55.80 | $0.06 | $2.16 | $0.12 | $4.32 | $0.11 | $3.96 | $0.03 | $1.08 | $0.33 | $11.88 | $0.57 | $20.52 | $0.60 | $33.72 | $331.14 |
| Jun-22 | | KELNER, AARON | A/B | RESIDENTIAL JOURNEY | 2.75 | 10.88 | $5.52 | $15.18 | $2.58 | $7.10 | $0.10 | $0.28 | $0.20 | $0.55 | $0.19 | $0.52 | $0.03 | $0.08 | $0.55 | $1.51 | | $2.61 | $1.00 | $10.88 | $38.71 |
| Jul-22 | | KELNER, AARON | A/B | RESIDENTIAL JOURNEY | 36.50 | 50.75 | $5.70 | $208.05 | $2.83 | $103.30 | $0.10 | $3.65 | $0.20 | $7.30 | $0.19 | $6.94 | $0.03 | $1.10 | $0.65 | $23.73 | | $38.33 | $1.00 | $50.75 | $443.13 |
| Aug-22 | | KELNER, AARON | B | RESIDENTIAL JOURNEY | 137.50 | | | | | | | - | | - | | - | | - | | - | | | $1.05 | $144.38 | | | $144.38 |
| Sep-22 | | KELNER, AARON | B | RESIDENTIAL JOURNEY | 215.25 | | | | | | | - | | - | | - | | - | | - | | | $1.05 | $226.01 | | | $226.01 |
| Oct-22 | | KELNER, AARON | B | RESIDENTIAL JOURNEY | 168.75 | | | | | | | - | | - | | - | | - | | - | | | $1.05 | $177.19 | | | $177.19 |
| Nov-22 | | KELNER, AARON | B | RESIDENTIAL JOURNEY | 143.25 | | | | | | | - | | - | | - | | - | | - | | | $1.05 | $150.41 | | | $150.41 |
| Dec-22 | | KELNER, AARON | A | RESIDENTIAL JOURNEY | 2.00 | 9.25 | $5.70 | $11.40 | $2.83 | $5.66 | $0.10 | $0.20 | $0.20 | $0.40 | $0.19 | $0.38 | $0.03 | $0.06 | $0.65 | $1.30 | | - | $1.00 | $9.25 | $28.65 |
| Dec-22 | | KELNER, AARON | B | RESIDENTIAL JOURNEY | 170.00 | | | | | | | - | | - | | - | | - | | - | | | $1.05 | $178.50 | | | $178.50 |
| Jan-23 | | KELNER, AARON | A | RESIDENTIAL JOURNEY | 36.50 | 44.38 | $6.39 | $233.24 | $2.83 | $103.30 | $0.10 | $3.65 | $0.20 | $7.30 | $0.26 | $9.49 | $0.03 | $1.10 | $0.65 | $23.73 | | - | $1.00 | $44.38 | $426.17 |
| Jan-23 | | KELNER, AARON | B | RESIDENTIAL JOURNEY | 156.50 | | | | | | | - | | - | | - | | - | | - | | | $1.05 | $164.33 | | | $164.33 |
| Feb-23 | | KELNER, AARON | A | RESIDENTIAL JOURNEY | 41.75 | 48.63 | $6.39 | $266.78 | $2.83 | $118.15 | $0.10 | $4.18 | $0.20 | $8.35 | $0.26 | $10.86 | $0.03 | $1.25 | $0.65 | $27.14 | | - | $1.00 | $48.63 | $485.34 |
| Feb-23 | | KELNER, AARON | B | RESIDENTIAL JOURNEY | 161.75 | | | | | | | - | | - | | - | | - | | - | | | $1.05 | $169.84 | | | $169.84 |
| Mar-23 | | KELNER, AARON | A | RESIDENTIAL JOURNEY | 59.75 | 71.25 | $6.39 | $381.80 | $2.83 | $169.09 | $0.10 | $5.98 | $0.20 | $11.95 | $0.26 | $15.54 | $0.03 | $1.79 | $0.65 | $38.84 | | - | $1.00 | $71.25 | $696.24 |
| Mar-23 | | KELNER, AARON | B | RESIDENTIAL JOURNEY | 179.75 | | | | | | | - | | - | | - | | - | | - | | | $1.05 | $188.74 | | | $188.74 |
| Jan-20 | | PETRONI, JAMES | A/B/C | Residential Material Handler | 53.75 | | $4.52 | $242.95 | | - | | - | $0.09 | $4.84 | | - | $0.03 | $1.61 | $0.21 | $11.29 | $0.44 | $23.65 | | - | | | $284.34 |
| Feb-20 | | PETRONI, JAMES | A/B/C | Residential Material Handler | 8.00 | | $4.52 | $36.16 | | - | | - | $0.09 | $0.72 | | - | $0.03 | $0.24 | $0.21 | $1.68 | $0.44 | $3.52 | | | | | $42.32 |
| Dec-20 | | PETRONI, JAMES | D | Residential Material Handler | 50.00 | | $4.52 | $226.00 | | - | | - | $0.09 | $4.50 | | - | $0.03 | $1.50 | $0.21 | $10.50 | $0.44 | $22.00 | | - | | | $264.50 |
| Jun-20 | | POOLE, SHAWN | A/B | RESIDENTIAL JOURNEY | 1.00 | 1.50 | $4.52 | $4.52 | $2.35 | $2.35 | $0.13 | $0.13 | $0.20 | $0.20 | | - | $0.03 | $0.03 | $0.45 | $0.45 | $0.95 | $0.95 | $1.00 | $1.50 | $10.13 |
| Jul-20 | | POOLE, SHAWN | A/B | RESIDENTIAL JOURNEY | 2.00 | 24.50 | $5.02 | $10.04 | $2.38 | $4.76 | $0.10 | $0.20 | $0.20 | $0.40 | | - | $0.03 | $0.06 | $0.45 | $0.90 | $0.95 | $1.90 | $1.00 | $24.50 | $42.76 |
| Aug-20 | | POOLE, SHAWN | A | RESIDENTIAL JOURNEY | 22.25 | 33.38 | $5.02 | $111.70 | $2.38 | $52.96 | $0.10 | $2.23 | $0.20 | $4.45 | | - | $0.03 | $0.67 | $0.45 | $10.01 | $0.95 | $21.14 | $1.00 | $33.38 | $236.52 |
| Sep-20 | | POOLE, SHAWN | A | RESIDENTIAL JOURNEY | | 10.63 | $5.02 | | $2.38 | | $0.10 | | $0.20 | | | - | $0.03 | | $0.45 | | | - | $1.00 | $10.63 | $10.63 |
| Sep-20 | | POOLE, SHAWN | B | RESIDENTIAL JOURNEY | 21.25 | | | | | | | | | | | | | | | | | $0.95 | $20.19 | | | $20.19 |
| Oct-20 | | POOLE, SHAWN | A/B | RESIDENTIAL JOURNEY | 35.75 | 43.38 | $5.02 | $179.47 | $2.38 | $85.09 | $0.10 | $3.58 | $0.20 | $7.15 | | - | $0.03 | $1.07 | $0.45 | $16.09 | $0.95 | $33.96 | $1.00 | $43.38 | $369.78 |
| Nov-20 | | POOLE, SHAWN | A/B | RESIDENTIAL JOURNEY | 48.25 | 48.25 | $5.02 | $242.22 | $2.38 | $114.84 | $0.10 | $4.83 | $0.20 | $9.65 | | - | $0.03 | $1.45 | $0.45 | $21.71 | $0.95 | $45.84 | $1.00 | $48.25 | $488.77 |
| Dec-20 | | POOLE, SHAWN | D | RESIDENTIAL JOURNEY | 82.00 | 82.00 | $5.02 | $411.64 | $2.38 | $195.16 | $0.10 | $8.20 | $0.20 | $16.40 | | - | $0.03 | $2.46 | $0.45 | $36.90 | $0.95 | $77.90 | $1.00 | $82.00 | $830.66 |
| May-20 | | PRESIDENT, NICHOLAS | A/B | A60 | 87.50 | 87.50 | $4.52 | $395.50 | $1.49 | $130.38 | | - | $0.12 | $10.50 | | - | $0.03 | $2.63 | $0.27 | $23.63 | $0.48 | $42.00 | $0.60 | $52.50 | $657.13 |
| Jun-20 | | PRESIDENT, NICHOLAS | A/B | A60 | 36.25 | 54.38 | $4.52 | $163.85 | $1.49 | $54.01 | | - | $0.12 | $4.35 | | - | $0.03 | $1.09 | $0.27 | $9.79 | $0.48 | $17.40 | $0.60 | $32.63 | $283.12 |
| Jul-20 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | | 13.75 | $5.02 | | $1.43 | | $0.06 | | $0.12 | | | - | $0.03 | | $0.27 | | | - | $0.60 | $8.25 | $8.25 |
| Sep-20 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | | 10.00 | $5.02 | | $1.43 | | $0.06 | | $0.12 | | | - | $0.03 | | $0.27 | | | - | $0.60 | $6.00 | $6.00 |
| Sep-20 | | PRESIDENT, NICHOLAS | B | RESIDENTAL 1ST YR APPR | 19.00 | | | | | | | | | | | | | | | | | $0.57 | $10.83 | $0.60 | - | $10.83 |
| Oct-20 | | PRESIDENT, NICHOLAS | A/B | RESIDENTAL 1ST YR APPR | 14.25 | 18.63 | $5.02 | $71.54 | $1.43 | $20.38 | $0.06 | $0.86 | $0.12 | $1.71 | | - | $0.03 | $0.43 | $0.27 | $3.85 | $0.57 | $8.12 | $0.60 | $11.18 | $118.05 |
| Nov-20 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 3.75 | 5.75 | $5.02 | $18.83 | $1.43 | $5.36 | $0.06 | $0.23 | $0.12 | $0.45 | | - | $0.03 | $0.11 | $0.27 | $1.01 | $0.57 | $2.14 | $0.60 | $3.45 | $31.58 |
| Dec-20 | | PRESIDENT, NICHOLAS | A/B | RESIDENTAL 1ST YR APPR | 20.75 | 30.63 | $5.02 | $104.17 | $1.43 | $29.67 | $0.06 | $1.25 | $0.12 | $2.49 | | - | $0.03 | $0.62 | $0.27 | $5.60 | $0.57 | $11.83 | $0.60 | $18.38 | $174.00 |
| Dec-20 | | PRESIDENT, NICHOLAS | D | RESIDENTAL 1ST YR APPR | 85.00 | 85.00 | $5.02 | $426.70 | $1.43 | $121.55 | $0.06 | $5.10 | $0.12 | $10.20 | | - | $0.03 | $2.55 | $0.27 | $22.95 | $0.57 | $48.45 | $0.60 | $51.00 | $688.50 |
| Jan-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 5.00 | 8.00 | $5.02 | $25.10 | $1.43 | $7.15 | $0.06 | $0.30 | $0.12 | $0.60 | | - | $0.03 | $0.15 | $0.27 | $1.35 | $0.57 | $2.85 | $0.60 | $4.80 | $42.30 |
| Feb-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 7.00 | 11.25 | $5.02 | $35.14 | $1.43 | $10.01 | $0.06 | $0.42 | $0.12 | $0.84 | | - | $0.03 | $0.21 | $0.27 | $1.89 | $0.57 | $3.99 | $0.60 | $6.75 | $59.25 |
| Mar-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 1.00 | 11.00 | $5.02 | $5.02 | $1.43 | $1.43 | $0.06 | $0.06 | $0.12 | $0.12 | | - | $0.03 | $0.03 | $0.27 | $0.27 | $0.57 | $0.57 | $0.60 | $6.60 | $14.10 |
| Apr-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 39.00 | 59.00 | $5.02 | $195.78 | $1.43 | $55.77 | $0.06 | $2.34 | $0.12 | $4.68 | | - | $0.03 | $1.17 | $0.27 | $10.53 | $0.57 | $22.23 | $0.60 | $35.40 | $327.90 |
| May-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 33.20 | 49.20 | $5.02 | $166.66 | $1.43 | $47.48 | $0.06 | $1.99 | $0.12 | $3.98 | | - | $0.03 | $1.00 | $0.27 | $8.96 | $0.57 | $18.92 | $0.60 | $29.52 | $278.52 |
| Jun-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 0.95 | 10.20 | $5.02 | $4.77 | $1.43 | $1.36 | $0.06 | $0.06 | $0.12 | $0.11 | | - | $0.03 | $0.03 | $0.27 | $0.26 | $0.57 | $0.54 | $0.60 | $6.12 | $13.25 |
| Jul-21 | | PRESIDENT, NICHOLAS | A/B | RESIDENTAL 1ST YR APPR | 68.60 | 83.40 | $5.52 | $378.67 | $1.55 | $106.33 | $0.06 | $4.12 | $0.12 | $8.23 | $0.11 | $7.55 | $0.03 | $2.06 | $0.33 | $22.64 | $0.57 | $39.10 | $0.60 | $50.04 | $618.73 |
| Aug-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 29.15 | 43.73 | $5.52 | $160.91 | $1.55 | $45.18 | $0.06 | $1.75 | $0.12 | $3.50 | $0.11 | $3.21 | $0.03 | $0.87 | $0.33 | $9.62 | $0.57 | $16.62 | $0.60 | $26.24 | $267.89 |
| Sep-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 33.50 | 51.25 | $5.52 | $184.92 | $1.55 | $51.93 | $0.06 | $2.01 | $0.12 | $4.02 | $0.11 | $3.69 | $0.03 | $1.01 | $0.33 | $11.06 | | - | $0.60 | $30.75 | $289.37 |
| Sep-21 | | PRESIDENT, NICHOLAS | B | RESIDENTAL 1ST YR APPR | 43.50 | | | | | | | - | | - | | - | | - | | - | | | $0.57 | $24.80 | | | $24.80 |
| Oct-21 | | PRESIDENT, NICHOLAS | A/B | RESIDENTAL 1ST YR APPR | 14.60 | 22.00 | $5.52 | $80.59 | $1.55 | $22.63 | $0.06 | $0.88 | $0.12 | $1.75 | $0.11 | $1.61 | $0.03 | $0.44 | $0.33 | $4.82 | $0.57 | $8.32 | $0.60 | $13.20 | $134.23 |
| Nov-21 | | PRESIDENT, NICHOLAS | A | RESIDENTAL 1ST YR APPR | 6.45 | 9.68 | $5.52 | $35.60 | $1.55 | $10.00 | $0.06 | $0.39 | $0.12 | $0.77 | $0.11 | $0.71 | $0.03 | $0.19 | $0.33 | $2.13 | | - | $0.60 | $5.81 | $55.60 |
| Nov-21 | | PRESIDENT, NICHOLAS | B | RESIDENTAL 1ST YR APPR | (6.05) | | | | | | | - | | - | | - | | - | | - | | | $0.57 | ($3.45) | | | ($3.45) |
| Dec-21 | | PRESIDENT, NICHOLAS | A/B | RESIDENTAL 1ST YR APPR | 1.50 | 2.50 | $5.52 | $8.28 | $1.55 | $2.33 | $0.06 | $0.09 | $0.12 | $0.18 | $0.11 | $0.17 | $0.03 | $0.05 | $0.33 | $0.50 | $0.57 | $0.86 | $0.60 | $1.50 | $13.94 |
| Aug-20 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTAL 1ST YR APPR | 187.00 | 202.13 | $5.02 | $938.74 | $1.43 | $267.41 | $0.06 | $11.22 | $0.12 | $22.44 | | - | $0.03 | $5.61 | $0.27 | $50.49 | $0.57 | $106.59 | $0.60 | $121.28 | $1,523.78 |
| Sep-20 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTAL 1ST YR APPR | 178.00 | 196.50 | $5.02 | $893.56 | $1.43 | $254.54 | $0.06 | $10.68 | $0.12 | $21.36 | | - | $0.03 | $5.34 | $0.27 | $48.06 | $0.57 | $101.46 | $0.60 | $117.90 | $1,452.90 |
| Oct-20 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTAL 1ST YR APPR | 192.50 | 195.13 | $5.02 | $966.35 | $1.43 | $275.28 | $0.06 | $11.55 | $0.12 | $23.10 | | - | $0.03 | $5.78 | $0.27 | $51.98 | $0.57 | $109.73 | $0.60 | $117.08 | $1,560.83 |
| Nov-20 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTAL 1ST YR APPR | 10.75 | 16.88 | $5.02 | $53.97 | $1.43 | $15.37 | $0.06 | $0.65 | $0.12 | $1.29 | | - | $0.03 | $0.32 | $0.27 | $2.90 | $0.57 | $6.13 | $0.60 | $10.13 | $90.75 |

# SMART Local 9 Benefit Funds
### Schedule of Amounts Due

| Month | SSN | Name | Error Code | Classification | Hours Worked Diff. | Hours Paid Diff. | Vol. Vacation Difference | H&W Rate | H&W Due | Local Pension Rate | Local Pension Due | Loc. Pen Non-Accrual Rate | Loc. Pen Non-Accrual Due | PLIS Rate | PLIS Due | PSL Rate | PSL Due | Supp't Int Rate | Supp't Int Due | Local Training Rate | Local Training Due | Assessment Rate | Assessment Due | Vacation Rate | Vacation Due | Total Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec-20 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 16.75 | 20.25 | | $5.02 | $84.09 | $1.43 | $23.95 | $0.06 | $1.01 | $0.12 | $2.01 | | - | $0.03 | $0.50 | $0.27 | $4.52 | $0.57 | $9.56 | $0.60 | $12.15 | $137.78 |
| Jan-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 3.00 | 3.00 | | $5.02 | $15.06 | $1.43 | $4.29 | $0.06 | $0.18 | $0.12 | $0.36 | | - | $0.03 | $0.09 | $0.27 | $0.81 | $0.57 | $1.71 | $0.60 | $1.80 | $24.30 |
| Feb-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 10.75 | 17.13 | | $5.02 | $53.97 | $1.43 | $15.37 | $0.06 | $0.65 | $0.12 | $1.29 | | - | $0.03 | $0.32 | $0.27 | $2.90 | $0.57 | $6.13 | $0.60 | $10.28 | $90.96 |
| Mar-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 11.50 | 18.63 | | $5.02 | $57.73 | $1.43 | $16.45 | $0.06 | $0.69 | $0.12 | $1.38 | | - | $0.03 | $0.35 | $0.27 | $3.11 | $0.57 | $6.56 | $0.60 | $11.18 | $97.43 |
| Apr-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 32.25 | 49.88 | | $5.02 | $161.90 | $1.43 | $46.12 | $0.06 | $1.94 | $0.12 | $3.87 | | - | $0.03 | $0.97 | $0.27 | $8.71 | $0.57 | $18.38 | $0.60 | $29.93 | $271.80 |
| May-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 19.00 | 34.88 | | $5.02 | $95.38 | $1.43 | $27.17 | $0.06 | $1.14 | $0.12 | $2.28 | | - | $0.03 | $0.57 | $0.27 | $5.13 | $0.57 | $10.83 | $0.60 | $20.93 | $163.43 |
| Jun-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 32.65 | 48.98 | | $5.02 | $163.90 | $1.43 | $46.69 | $0.06 | $1.96 | $0.12 | $3.92 | | - | $0.03 | $0.98 | $0.27 | $8.82 | $0.57 | $18.61 | $0.60 | $29.39 | $274.26 |
| Jul-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 83.55 | 105.83 | | $5.52 | $461.20 | $1.55 | $129.50 | $0.06 | $5.01 | $0.12 | $10.03 | $0.11 | $9.19 | $0.03 | $2.51 | $0.33 | $27.57 | $0.57 | $47.62 | $0.60 | $63.50 | $756.13 |
| Aug-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 30.50 | 46.75 | | $5.52 | $168.36 | $1.55 | $47.28 | $0.06 | $1.83 | $0.12 | $3.66 | $0.11 | $3.36 | $0.03 | $0.92 | $0.33 | $10.07 | $0.57 | $17.39 | $0.60 | $28.05 | $280.90 |
| Sep-21 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL 1ST YR APPR | 14.90 | 24.60 | | $5.52 | $82.25 | $1.55 | $23.10 | $0.06 | $0.89 | $0.12 | $1.79 | $0.11 | $1.64 | $0.03 | $0.45 | $0.33 | $4.92 | | | $0.60 | $14.76 | $129.79 |
| Sep-21 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL 1ST YR APPR | 10.90 | | | | | | | | | | | | | | | | | $0.57 | $6.21 | | | $6.21 |
| Oct-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 75.05 | 92.58 | | $5.52 | $414.28 | $1.55 | $116.33 | $0.06 | $4.50 | $0.12 | $9.01 | $0.11 | $8.26 | $0.03 | $2.25 | $0.33 | $24.77 | $0.57 | $42.78 | $0.60 | $55.55 | $677.71 |
| Nov-21 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL 1ST YR APPR | 9.25 | 13.88 | | $5.52 | $51.06 | $1.55 | $14.34 | $0.06 | $0.56 | $0.12 | $1.11 | $0.11 | $1.02 | $0.03 | $0.28 | $0.33 | $3.05 | | | $0.60 | $8.33 | $79.74 |
| Nov-21 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL 1ST YR APPR | (2.25) | | | | | | | | | | | | | | | | | $0.57 | ($1.28) | | | ($1.28) |
| Dec-21 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 3.75 | 6.25 | | $5.52 | $20.70 | $1.55 | $5.81 | $0.06 | $0.23 | $0.12 | $0.45 | $0.11 | $0.41 | $0.03 | $0.11 | $0.33 | $1.24 | $0.57 | $2.14 | $0.60 | $3.75 | $34.84 |
| Jan-22 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 14.00 | 22.00 | | $5.52 | $77.28 | $1.55 | $21.70 | $0.06 | $0.84 | $0.12 | $1.68 | $0.11 | $1.54 | $0.03 | $0.42 | $0.33 | $4.62 | $0.57 | $7.98 | $0.60 | $13.20 | $129.26 |
| Feb-22 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 6.75 | 10.13 | | $5.52 | $37.26 | $1.55 | $10.46 | $0.06 | $0.41 | $0.12 | $0.81 | $0.11 | $0.74 | $0.03 | $0.20 | $0.33 | $2.23 | $0.57 | $3.85 | $0.60 | $6.08 | $62.04 |
| Apr-22 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 44.00 | 44.00 | | $5.52 | $242.88 | $1.55 | $68.20 | $0.06 | $2.64 | $0.12 | $5.28 | $0.11 | $4.84 | $0.03 | $1.32 | $0.33 | $14.52 | $0.57 | $25.08 | $0.60 | $26.40 | $391.16 |
| May-22 | | RIVERA-VALLARDES, MYNOR | A/B | RESIDENTIAL 1ST YR APPR | 6.00 | 6.00 | | $5.52 | $33.12 | $1.55 | $9.30 | $0.06 | $0.36 | $0.12 | $0.72 | $0.11 | $0.66 | $0.03 | $0.18 | $0.33 | $1.98 | $0.57 | $3.42 | $0.60 | $3.60 | $53.34 |
| Jun-22 | | RIVERA-VALLARDES, MYNOR | | RESIDENTIAL JOURNEY | 2.00 | 2.00 | | $5.52 | $11.04 | $2.58 | $5.16 | $0.10 | $0.20 | $0.20 | $0.40 | $0.19 | $0.38 | $0.03 | $0.06 | $0.55 | $1.10 | $0.95 | $1.90 | $1.00 | $2.00 | $22.24 |
| Jul-22 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL JOURNEY | 44.00 | 44.00 | | $5.70 | $250.80 | $2.83 | $124.52 | $0.10 | $4.40 | $0.20 | $8.80 | $0.19 | $8.36 | $0.03 | $1.32 | $0.65 | $28.60 | $1.05 | $46.20 | $1.00 | $44.00 | $517.00 |
| Aug-22 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL JOURNEY | 2.00 | 2.00 | | $5.70 | $11.40 | $2.83 | $5.66 | $0.10 | $0.20 | $0.20 | $0.40 | $0.19 | $0.38 | $0.03 | $0.06 | $0.65 | $1.30 | | | $1.00 | $2.00 | $21.40 |
| Aug-22 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL JOURNEY | 162.00 | | | | | | | | | | | | | | | | | $1.05 | $170.10 | | | $170.10 |
| Sep-22 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL JOURNEY | 45.00 | 45.00 | | $5.70 | $256.50 | $2.83 | $127.35 | $0.10 | $4.50 | $0.20 | $9.00 | $0.19 | $8.55 | $0.03 | $1.35 | $0.65 | $29.25 | | | $1.00 | $45.00 | $481.50 |
| Sep-22 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL JOURNEY | 205.00 | | | | | | | | | | | | | | | | | $1.05 | $215.25 | | | $215.25 |
| Oct-22 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL JOURNEY | 2.00 | 2.00 | | $5.70 | $11.40 | $2.83 | $5.66 | $0.10 | $0.20 | $0.20 | $0.40 | $0.19 | $0.38 | $0.03 | $0.06 | $0.65 | $1.30 | | | $1.00 | $2.00 | $21.40 |
| Oct-22 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL JOURNEY | 162.00 | | | | | | | | | | | | | | | | | $1.05 | $170.10 | | | $170.10 |
| Nov-22 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL JOURNEY | 120.00 | | | | | | | | | | | | | | | | | $1.05 | $126.00 | | | $126.00 |
| Dec-22 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL JOURNEY | 56.00 | 56.00 | | $5.70 | $319.20 | $2.83 | $158.48 | $0.10 | $5.60 | $0.20 | $11.20 | $0.19 | $10.64 | $0.03 | $1.68 | $0.65 | $36.40 | | | $1.00 | $56.00 | $599.20 |
| Dec-22 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL JOURNEY | 216.00 | | | | | | | | | | | | | | | | | $1.05 | $226.80 | | | $226.80 |
| Jan-23 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL JOURNEY | 48.50 | 48.50 | | $6.39 | $309.92 | $2.83 | $137.26 | $0.10 | $4.85 | $0.20 | $9.70 | $0.26 | $12.61 | $0.03 | $1.46 | $0.65 | $31.53 | | | $1.00 | $48.50 | $555.81 |
| Jan-23 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL JOURNEY | 168.50 | | | | | | | | | | | | | | | | | $1.05 | $176.93 | | | $176.93 |
| Feb-23 | | RIVERA-VALLARDES, MYNOR | A | RESIDENTIAL JOURNEY | 40.00 | 40.00 | | $6.39 | $255.60 | $2.83 | $113.20 | $0.10 | $4.00 | $0.20 | $8.00 | $0.26 | $10.40 | $0.03 | $1.20 | $0.65 | $26.00 | | | $1.00 | $40.00 | $458.40 |
| Feb-23 | | RIVERA-VALLARDES, MYNOR | B | RESIDENTIAL JOURNEY | 160.00 | | | | | | | | | | | | | | | | | $1.05 | $168.00 | | | $168.00 |
| May-21 | | SALAZAR, RONALD D II | A/B | JOURNEYMAN | 35.75 | 38.88 | | $9.12 | $326.04 | $5.36 | $191.62 | $0.30 | $10.73 | $0.45 | $16.09 | $0.25 | $8.94 | $0.03 | $1.07 | $1.76 | $62.92 | $1.24 | $44.33 | $1.00 | $38.88 | $700.61 |
| Jun-21 | | SALAZAR, RONALD D II | A/B | JOURNEYMAN | 0.50 | 12.75 | | $9.12 | $4.56 | $5.36 | $2.68 | $0.30 | $0.15 | $0.45 | $0.23 | $0.25 | $0.13 | $0.03 | $0.02 | $1.76 | $0.88 | $1.24 | $0.62 | $1.00 | $12.75 | $22.01 |
| Jul-21 | | SALAZAR, RONALD D II | A/B | JOURNEYMAN | 56.95 | 69.43 | | $9.62 | $547.86 | $5.51 | $313.79 | $0.30 | $17.09 | $0.45 | $25.63 | $0.35 | $19.93 | $0.03 | $1.71 | $1.86 | $105.93 | $1.34 | $76.31 | $1.00 | $69.43 | $1,177.68 |
| Aug-21 | | SALAZAR, RONALD D II | A/B | JOURNEYMAN | 3.50 | 5.25 | | $9.62 | $33.67 | $5.51 | $19.29 | $0.30 | $1.05 | $0.45 | $1.58 | $0.35 | $1.23 | $0.03 | $0.11 | $1.86 | $6.51 | $1.34 | $4.69 | $1.00 | $5.25 | $73.36 |
| Oct-21 | | SALAZAR, RONALD D II | A/B | JOURNEYMAN | 54.90 | 67.95 | | $9.62 | $528.14 | $5.51 | $302.50 | $0.30 | $16.47 | $0.45 | $24.71 | $0.35 | $19.22 | $0.03 | $1.65 | $1.86 | $102.11 | $1.34 | $73.57 | $1.00 | $67.95 | $1,136.30 |
| Nov-21 | | SALAZAR, RONALD D II | A/B | JOURNEYMAN | 1.70 | 2.55 | | $9.62 | $16.35 | $5.51 | $9.37 | $0.30 | $0.51 | $0.45 | $0.77 | $0.35 | $0.60 | $0.03 | $0.05 | $1.86 | $3.16 | $1.34 | $2.28 | $1.00 | $2.55 | $35.63 |
| May-21 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 105.75 | 114.13 | | $5.02 | $530.87 | $1.43 | $151.22 | $0.06 | $6.35 | $0.12 | $12.69 | | - | $0.03 | $3.17 | $0.27 | $28.55 | $0.57 | $60.28 | $0.60 | $68.48 | $861.60 |
| Jun-21 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 143.35 | 147.68 | | $5.02 | $719.62 | $1.43 | $204.99 | $0.06 | $8.60 | $0.12 | $17.20 | | - | $0.03 | $4.30 | $0.27 | $38.70 | $0.57 | $81.71 | $0.60 | $88.61 | $1,163.73 |
| Jul-21 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 210.85 | 219.53 | | $5.52 | $1,163.89 | $1.55 | $326.82 | $0.06 | $12.65 | $0.12 | $25.30 | $0.11 | $23.19 | $0.03 | $6.33 | $0.33 | $69.58 | $0.57 | $120.18 | $0.60 | $131.72 | $1,879.66 |
| Aug-21 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 166.70 | 173.55 | | $5.52 | $920.18 | $1.55 | $258.39 | $0.06 | $10.00 | $0.12 | $20.00 | $0.11 | $18.34 | $0.03 | $5.00 | $0.33 | $55.01 | $0.57 | $95.02 | $0.60 | $104.13 | $1,486.07 |
| Sep-21 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 149.05 | 154.35 | | $5.52 | $822.76 | $1.55 | $231.03 | $0.06 | $8.94 | $0.12 | $17.89 | $0.11 | $16.40 | $0.03 | $4.47 | $0.33 | $49.19 | $0.57 | $84.96 | $0.60 | $92.61 | $1,328.23 |
| Oct-21 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 213.75 | 220.90 | | $5.52 | $1,179.90 | $1.55 | $331.31 | $0.06 | $12.83 | $0.12 | $25.65 | $0.11 | $23.51 | $0.03 | $6.41 | $0.33 | $70.54 | $0.57 | $121.84 | $0.60 | $132.54 | $1,904.53 |
| Nov-21 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 75.75 | 75.75 | | $5.52 | $418.14 | $1.55 | $117.41 | $0.06 | $4.55 | $0.12 | $9.09 | $0.11 | $8.33 | $0.03 | $2.27 | $0.33 | $25.00 | $0.57 | $43.18 | $0.60 | $45.45 | $673.42 |
| Dec-21 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 147.20 | 150.20 | | $5.52 | $812.54 | $1.55 | $228.16 | $0.06 | $8.83 | $0.12 | $17.66 | $0.11 | $16.19 | $0.03 | $4.42 | $0.33 | $48.58 | $0.57 | $83.90 | $0.60 | $90.12 | $1,310.41 |
| Jan-22 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 14.80 | 22.70 | | $5.52 | $81.70 | $1.55 | $22.94 | $0.06 | $0.89 | $0.12 | $1.78 | $0.11 | $1.63 | $0.03 | $0.44 | $0.33 | $4.88 | $0.57 | $8.44 | $0.60 | $13.62 | $136.31 |
| Feb-22 | | SUMMERS, CHRISTOPHER | A/B | RESIDENTIAL 1ST YR APPR | 10.50 | 16.38 | | $5.52 | $57.96 | $1.55 | $16.28 | $0.06 | $0.63 | $0.12 | $1.26 | $0.11 | $1.16 | $0.03 | $0.32 | $0.33 | $3.47 | $0.57 | $5.99 | $0.60 | $9.83 | $96.87 |
| Feb-20 | | TICE, STEVE J | A/B/C | Residential Material Handler | 22.00 | | | $4.52 | $99.44 | | - | $0.09 | $1.98 | | - | | - | $0.03 | $0.66 | $0.21 | $4.62 | $0.44 | $9.68 | | | $116.38 |
| Dec-20 | | TICE, STEVE J | D | Residential Material Handler | 32.00 | | | $4.52 | $144.64 | | | $0.09 | $2.88 | | | | | $0.03 | $0.96 | $0.21 | $6.72 | $0.44 | $14.08 | | | $169.28 |
| Feb-20 | | VIGIL, DANTE | A/B | Classified Worker 55% | 15.00 | 22.50 | | $6.75 | $101.25 | $3.03 | $45.45 | $0.17 | $2.55 | $0.45 | $6.75 | $0.19 | $2.85 | $0.03 | $0.45 | $1.00 | $15.00 | $0.76 | $11.40 | $0.55 | $12.38 | $198.08 |
| Jul-22 | | VIGIL, DANTE | A/B | Classified Worker 55% | 56.50 | 70.50 | | $7.41 | $418.67 | $3.15 | $177.98 | $0.17 | $9.61 | $0.53 | $29.95 | $0.19 | $10.74 | $0.03 | $1.70 | $1.17 | $66.11 | $0.76 | $42.94 | $0.55 | $38.78 | $796.44 |
| Aug-22 | | VIGIL, DANTE | A | Classified Worker 55% | 140.25 | | | | | | | | | | | | | | | | | $0.76 | $106.59 | | | $106.59 |
| Sep-22 | | VIGIL, DANTE | B | Classified Worker 55% | 201.50 | | | | | | | | | | | | | | | | | $0.76 | $153.14 | | | $153.14 |

## SMART Local 9 Benefit Funds
### Schedule of Amounts Due

| Month | SSN | Name | Error Code | Classification | Hours Worked Diff. | Hours Paid Diff. | Vol. Vacation Difference | NBW Rate | NBW Due | Local Pension Rate | Local Pension Due | Loc. Pen Non-Accrual Rate | Loc. Pen Non-Accrual Due | IFUS Rate | IFUS Due | PSL Rate | PSL Due | Drug Test Rate | Drug Test Due | Local Training Rate | Local Training Due | Assessment Rate | Assessment Due | Vacation Rate | Vacation Due | Total Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-22 | | VIGIL, DANTE | B | Classified Worker 55% | 169.00 | | | | - | | - | | - | | - | | - | | - | | - | $0.76 | $128.44 | | - | **$128.44** |
| Nov-22 | | VIGIL, DANTE | B | Classified Worker 55% | 141.00 | | | | - | | - | | - | | - | | - | | - | | - | $0.76 | $107.16 | | - | **$107.16** |
| Dec-22 | | VIGIL, DANTE | A | Classified Worker 55% | 2.03 | 4.05 | | $7.41 | $15.04 | $3.15 | $6.39 | $0.17 | $0.35 | $0.53 | $1.08 | $0.19 | $0.39 | $0.03 | $0.06 | $1.17 | $2.38 | | | $0.55 | $2.23 | **$27.91** |
| Dec-22 | | VIGIL, DANTE | B | Classified Worker 55% | 185.78 | | | | - | | - | | - | | - | | - | | - | | - | $0.76 | $141.19 | | - | **$141.19** |
| Jan-23 | | VIGIL, DANTE | A | Classified Worker 55% | 26.50 | 28.00 | | $7.41 | $196.37 | $3.15 | $83.48 | $0.17 | $4.51 | $0.53 | $14.05 | $0.19 | $5.04 | $0.03 | $0.80 | $1.17 | $31.01 | | | $0.55 | $15.40 | **$350.63** |
| Jan-23 | | VIGIL, DANTE | B | Classified Worker 55% | 146.50 | | | | - | | - | | - | | - | | - | | - | | - | $0.76 | $111.34 | | - | **$111.34** |
| Feb-23 | | VIGIL, DANTE | A | Classified Worker 55% | 33.25 | 36.00 | | $7.41 | $246.38 | $3.15 | $104.74 | $0.17 | $5.65 | $0.53 | $17.62 | $0.19 | $6.32 | $0.03 | $1.00 | $1.17 | $38.90 | | | $0.55 | $19.80 | **$440.41** |
| Feb-23 | | VIGIL, DANTE | B | Classified Worker 55% | 153.25 | | | | - | | - | | - | | - | | - | | - | | - | $0.76 | $116.47 | | - | **$116.47** |

# SMART Local 9
## American Veteran Heating & Air
### Non-Reported List

| SSN (Last 4) | Name | Job Description | Union (if applicable) |
|---|---|---|---|
| | CAVITT, TANYA | Office Worker | |
| | CONWAY, AARON | Residential Materials Handler | ***Included in our report |
| | DUGGAN, DAMIAN | Residential Materials Handler | ***Included in our report |
| | GILLIS, BRADLEY | 55% Classified Worker, Appendix A | ***Included in our report |
| | GUERRA, DONNA | Office Worker | |
| | LERNER, WENDY | Office Worker | |
| | PETRONI, JAMES | Residential Materials Handler | ***Included in our report |
| | POGUE, AMANDA | Office Worker | |
| | THOMPSON, DAWN | Office Worker | |
| | TICE, STEVE J | Residential Materials Handler | ***Included in our report |